United States District Court

Eastern District of California

GARY DALE HINES,

     Petitioner,           Civ. S-98-0784 GEB PAN

    vs.              **DEATH PENALTY CASE**

STEVE ORNOSKI, Acting Warden
of San Quentin State Prison,    Findings and Recommendation

     Respondent.

-oOo-

In 1988, a Sacramento County Superior Court jury found petitioner guilty of first degree murder and found true the special circumstances of multiple murder, felony-murder/robbery, and felony-murder/burglary.  The jury selected death as the appropriate penalty for petitioner's crimes.  Herein he seeks a writ of habeas corpus.

The case proceeds on the amended petition lodged June 9, 1999, which the court hereby orders filed nunc pro tunc to that

1    date.

2        October 22, 2001, I recommended numerous claims be dismissed

3    based on procedural bars and other grounds, viz., A, D, F(3),

4    F(5)(a), F(5)(b), F(5)(d), F(7), F(8), F(9), F(10), G(4), H(1),

5    H(3), H(4), H(7), H(8), H(9), H(10), H(11), H(12), H(13)(c),

6    H(13)(d), H(14)[1], H(16), J, K, and L(1)-(5).  The district court

7    adopted the recommendation December 18, 2001, dismissing these

8    claims.

9        April 20, 2004, I recommended summary judgment for

10   respondent on all of petitioner's claims of error at the guilt

11   phase of his trial, viz., B(1), B(2), B(3), B(4), B(5), B(6),

12   B(11), B(12), B(13), B(14), C, F(1), F(2), F(4), F(6), G(1),

13   G(2), G(3), H(5), H(6), H(13)(a) and H(13)(b).  In recommending

14   summary judgment I summarized the facts, including that

15   petitioner promised to obtain the victim's car, a pink replica

16   1923 roadster (roadster), "one way or another"; his fingerprints

17   were found in the house where the victims were killed, one

18   victim's blood was found on his clothing; he was seen driving the

19   roadster after the killing; and when he was arrested he had been

20   making a list of guns stolen from the victims and the value of

21   each.  Petitioner testified at trial that while he knew the

22   victims and asked co-defendant Houseman to accompany him to their

23   house, petitioner sat on a bus-stop bench down the street while

24

25       [1]  Claim 14(F) was omitted, inadvertently, from the order language in
     the findings and recommendations re dismissal, but internal text makes clear I
26   recommended dismissal.  The district court affirmed the recommendations in
     their entirety.

Houseman went into the house and killed the victims, but then helped Houseman open the garage door and steal the roadster and other loot.  December 23, 2004, the district court adopted the findings and recommendations.

Herein I address petitioner's penalty phase claims in IV--B(7), B(8), B(9), B(10), E, F(5)(c), H(2), H(15), I, L(6) and L(7)--and conclude the petition should be denied.[2]

This court reviews claims adjudicated by the state court only for a decision (1) contrary to or that involved an unreasonable application of clearly established federal law, as determined by the Supreme Court and (2) based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).  The state court's fact findings are presumed correct.  28 U.S.C. § 2254(e).  A state court decision is "contrary to" clearly established federal decisional law if it fails to identify and apply the correct rule or applies the correct rule to the wrong conclusion in a case involving facts materially indistinguishable from controlling authority.  A state

---

[2]  Petitioner moved May 28, 2004, for leave to expand the record on penalty phase issues, requesting court funding to (1) retain clinical psychologist Dr. Gretchen White to examine petitioner's social history to develop expert mitigation evidence regarding petitioner's background; (2) consult a poly-substance abuse expert to develop mitigation evidence based on petitioner's use of methamphetamine, marijuana and alcohol in the days before the killings; (3) retain an investigator to interview jurors regarding potential taint from Juror Yoder's belief petitioner's friend was "stalking" him as he left the courthouse, and from extraneous evidence by way of Juror Craig's reading of a newspaper, while in the jury box, which contained articles about the trial; and (4) retain a legal expert on "prevailing professional norms" with respect to petitioner's <u>Strickland</u> claims.  I denied the motion to expand the record and the district court affirmed.

1  court decision unreasonably applies federal law when it applies

2  the correct law in an objectively unreasonable way.  <u>Williams v.</u>

3  <u>Taylor</u>, 529 U.S. 362 (2000); <u>Clark v. Murphy</u>, 331 F.3d 1062 (9th

4  Cir. 2003).

5  <u>Ineffective Assistance of Counsel</u>

6       Petitioner's claim B alleges he received constitutionally

7  deficient assistance of counsel, based on the following errors:

8  failure to object to evidence of a "shank" found in petitioner's

9  mattress at the jail (RT 5903, 5908, 5920, 5914-16, 6259),

10  "incidents" between petitioner and jail officers as "threats" (RT

11  5850 et seq., 5877, 5890-97) (claim B subsection 7); failure

12  adequately to investigate potential mitigation evidence, and

13  present a sufficient mitigation case concerning petitioner's

14  mental health, social history and drug use (claim B subsections

15  8(a), (b) & (c)); failure to object to lay testimony regarding a

16  "sawed off shotgun" and a jailor's statement that capital

17  defendants are likely "to be violent," and failure to request the

18  jury be admonished it could not use an inmate witness'

19  misdemeanor convictions to impeach him (claim B subsection

20  (8)(d), (e) and (f)); failure to object to improper penalty phase

21  argument (claim B section (9)); and failure to insure the jury

22  was not tainted by extrajudicial evidence, viz., a juror's

23  conversation with her pastor regarding capital punishment, juror

24  Yoder's impressions of being followed, and juror Craig's reading

25  a newspaper while in the jury box.

26

To establish ineffective assistance at the penalty phase, petitioner must establish his counsel did not perform to the level of a "reasonably competent" attorney.  <u>Strickland</u>, 466 U.S. 668, 688 (1984).

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.
>
> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case.  As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

<u>Strickland</u>, 466 U.S. at 690-91.[3]

_____

[3]  To establish prejudice on ineffective assistance claims under <u>Strickland</u>, petitioner must "show that there is a reasonable probability that,

5

1    I first address petitioner's allegations concerning

2   counsel's development and presentation of the case in mitigation,

3   alleged in claim B subsections 8(a), (b) & (c).  In <u>Rompilla v.</u>

4   <u>Beard</u>, the United States Supreme Court recently held that the

5   adequacy of counsel's performance at the penalty phase of a

6   capital case, and whether counsel's failure to discover

7   mitigation evidence was constitutionally deficient, must be

8   assessed in the context of the specific strategies employed by

9   the prosecution and defense at trial.  Thus, while counsel may

10  behave reasonably in discontinuing inquiry into petitioner's

11  background ("Questioning a few more family members and searching

12  for old records can promise less than looking for a needle in a

13  haystack, when a lawyer truly has reason to doubt there is any

14  needle there," – <u>Rompilla</u>, 545 U.S. at ___), counsel is bound to

15  make reasonable efforts to obtain and review material he knows

16  the prosecution will offer in aggravation.  As Justice O'Connor's

17  concurrence makes clear, counsel performs deficiently when the

18  documents he failed to review were critical to both the

19  ////

20

---

21  but for counsel's unprofessional errors, the result of the proceeding would
    have been different.  A reasonable probability is a probability sufficient to
22  undermine confidence in the outcome."  <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003)
    (internal quotations omitted).  "In assessing prejudice, we re-weigh the
23  evidence in aggravation against the totality of available mitigating
    evidence."  <u>Id.</u>; <u>see also</u> <u>Earp v. Stokes</u>, ___F.3d. ___, 2005 WL 2159051 (9th
24  Cir. 2005).  The totality of the available evidence includes "both that
    adduced at trial, and the evidence adduced in the habeas proceeding[s]."
25  <u>Wiggins</u>, 539 U.S. at 536 (italics omitted), <u>quoting</u> <u>Williams</u>, 529 U.S. at 397-
    98.
26

1   prosecution's main theory in aggravation <u>and</u> the defense's

2   primary mitigation argument.

3       Under this analysis, the Court in <u>Rompilla</u> held petitioner's

4   counsel, who failed to "explore all avenues" leading to facts

5   relevant to the penalty as required under American Bar

6   Association Standards, did not provide constitutionally adequate

7   assistance at the sentencing phase.  The prejudice prong of

8   <u>Strickland</u> was met because the prior conviction file counsel

9   failed to examine would have disclosed mitigation evidence

10  (including evidence petitioner had schizophrenia, organic brain

11  damage and intelligence in the mentally retarded range; suffered

12  fetal alcohol syndrome; and had been subjected to constant,

13  sadistic, physical and verbal abuse and deprivation by his

14  alcoholic parents).

15      This case is not like <u>Rompilla</u>.  Petitioner fails to come

16  forth with any significant material counsel failed to discover,

17  much less show such material was contained in a place counsel was

18  duty-bound to look in light of prosecution and defense trial

19  strategy.[4]

20  _____

21      [4]  The prosecutor's strategy at petitioner's penalty phase included:
    (1) emphasizing the circumstances of the murders; (2) introducing evidence of
22  prior incidents of violence (i.e., an incident when petitioner threatened to
    kill someone April 27, 1984, with a sawed-off shotgun ("Frye incident")); (3)
23  introducing evidence of petitioner's threats to jail guards ("threats"), and
    possession of an inmate-manufacture weapon ("shank"), to show future
24  dangerousness in prison if sentenced to life without parole.  The prosecutor
    called as witnesses Davis Frye and Larry Wilson regarding the Frye incident;
25  Earl Warren, III, Scott French, and James Cooper regarding the threats; and
    Steve Linebarger, regarding petitioner's possession of a shank.  The defense
26  strategy was to argue there was a "lingering doubt" of petitioner's guilt;
    submit controverting evidence on the Frye incident, threats in jail and the

1    The Supreme Court also found ineffective assistance of

2  counsel at the capital penalty phase in Wiggins v. Smith, 539

3  U.S. 510 (2003).  In Wiggins, counsel's investigation drew from

4  three sources: psychological testing showing petitioner's IQ was

5  79 (borderline mentally retarded), a PSI report noting petitioner

6  suffered misery as a youth and had a "disgusting" home life, and

7  social services records showing petitioner repeatedly was placed

8  in foster care because his alcoholic mother neglected him and his

9  siblings.  Knowing of this information, counsel abandoned their

10  investigation "at an unreasonable juncture," and thus failed to

11  discover petitioner's lifelong background of severe physical and

12  sexual abuse at the hands of his mother and foster parents and

13  siblings, including being raped and gang-raped.  In light of what

14  counsel knew and what they failed to learn, their decision to

15  pursue a "direct responsibility" defense with only a partial case

16  in mitigation did not stem from reasoned strategic judgment.  The

17  mitigation evidence counsel failed to present lacked the "double

18  edge" justifying limited investigation in other cases, (see

19  Burger v. Kemp, 483 U.S. 776 (1987), Darden v. Wainwright, 477

20  U.S. 168 (1986)), and thus the prejudice prong was met,

21  warranting reversal.

22

23  "shank" possession; introduce expert testimony rebutting future dangerousness
   in prison; and call friends and family members to plead for mercy.  Petitioner
24  called as witnesses Gary Hines and Lisa Smith regarding the Frye incident;
   Joseph Tinker regarding the threats in jail; Edward Grover, Ph.D in clinical
25  psychology, to rebut future dangerousness; and Frita Hines, Richard O'Toole
   and Denise Nicols to plead for mercy and humanize petitioner by describing his
26  troubled childhood.

1    This case is not like <u>Wiggins</u> because petitioner is not

2  borderline mentally retarded.  He completed part of high school

3  and performed more work towards his high school degree while

4  incarcerated.  His intelligence is average or slightly below

5  average.  Nor was petitioner placed in foster care.  Thus,

6  material available to counsel was not sufficient to make further

7  inquiry necessary in petitioner's case.

8    The Supreme Court similarly found ineffective assistance at

9  penalty phase in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).

10 Counsel in <u>Williams</u> incorrectly believed state law blocked access

11 to records of petitioner's background, and thus failed to uncover

12 extensive records graphically describing his "nightmarish"

13 childhood (viz., petitioner was severely and repeatedly beaten by

14 his father, his parents had been imprisoned for neglecting him

15 and his siblings, he had been abused in a foster home and then

16 returned to his parents' custody in a home filled with trash and

17 excrement on the floor and where parents and children were all

18 found drunk).  Mr. Williams, like Mr. Wiggins and Mr. Rompilla,

19 was borderline mentally retarded but his counsel failed to

20 introduce evidence of that fact.  Counsel also failed to

21 introduce available evidence petitioner had been commended in

22 prison for helping to crack a drug ring, had returned a guard's

23 missing wallet, and had been described by a guard as least likely

24 among the inmates to "act in a violent, dangerous or provocative

25 way."  The Court found prejudice, weighing against aggravation

26 evidence the omitted mitigation evidence coupled with that

presented at trial (viz., that petitioner voluntarily had confessed to his crimes and his criminal history showed violent behavior as a compulsive reaction rather than as the product of "cold-blooded premeditation").

This case is not like <u>Williams</u> because petitioner, unlike Mr. Williams, could not have shown the jury positive institutional adjustment or commendable conduct while incarcerated.  Nor does petitioner submits anything to support the inference that his childhood was "nightmarish" like Mr. Williams'--no criminal neglect by his parents, no significant physical or psychological abuse, no foster care, and again, petitioner's intelligence is not sub-minimal.

The Ninth Circuit has invalidated numerous capital sentences on the ground penalty-phase counsel provided ineffective assistance in failing to investigate and present substantial, available mitigation evidence.  <u>See</u> <u>e.g.</u>, <u>Silva v. Woodford</u>, 279 F.3d 825 (9th Cir. 2002) (petitioner, convicted of abducting and robbing two college students and brutally murdering one of them, who was then dismembered (the other student being raped and killed by petitioner's accomplice), received deficient representation where counsel failed to investigate and introduce evidence petitioner was severely abused and neglected as a child by alcoholic and impoverished parents; suffered from post-traumatic stress disorder (hereinafter PTSD) and attention deficit disorder that led to repeated failure in school and eventual self-medication through the use of drugs; possibly

suffered from organic brain disorders resulting from fetal
alcohol syndrome; and likely was suffering from amphetamine
induced organic mental disorders and withdrawal symptoms when he
committed the crimes); Hendricks v. Calderon, 70 F.3d 1032 (9th
Cir. 1995) (petitioner, a homosexual prostitute, convicted of
brutally murdering two sexual partners received ineffective
assistance at the penalty phase when counsel failed to
investigate and present evidence of petitioner's psychiatric
problems and history of being sexually and physically abused as a
child); Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995)
(petitioner, who confessed to kidnaping, gang raping and brutally
murdering a college student, received ineffective assistance at
penalty when counsel failed to investigate and present evidence
petitioner suffered paranoid schizophrenia, and impulsive and
highly suggestible, and participated in the crimes under the
dominating influence of his accomplice); Bean v. Calderon, 163
F.3d 1073 (9th Cir. 1998) (petitioner received ineffective
assistance at penalty when counsel failed to investigate and
present evidence petitioner was functionally mentally retarded,
brain damaged, and suffered PTSD based on sadistic treatment
received as a child); Caro v. Woodford, 280 F.3d 1247 (9th Cir.
2002) (counsel provided ineffective assistance at penalty phase
by failing to investigate and introduce evidence of petitioner's
brain damage resulting from multiple head injuries and
extraordinary exposure to pesticides and toxic chemicals and
suffered severe physical, emotional and psychological abuse as a

child); <u>Ainsworth v. Woodford</u>, 268 F.3d 868 (9th Cir. 2001)
(counsel was constitutionally deficient at penalty trial in
failing to investigate and present evidence petitioner's volatile
alcoholic parents fought nightly, his father had tried twice to
kill him, his father committed suicide on Christmas day after
four prior attempts, petitioner began drinking alcohol at age
five, petitioner was treated in a psychiatric ward as a teen and
was expelled from school for substance abuse, petitioner suffered
from a psychoneurotic disorder and major depressive illness, had
tried to kill himself numerous times and was addicted to
narcotics and petitioner suffered prejudice where petitioner had
adjusted positively in confinement).

There is nothing to suggest petitioner had the type of
"excruciating" life history as that of the defendants in these
cases.  He does not claim to have suffered sexual or physical
abuse, torture, significant mental illness or deficiency, extreme
parental deprivation, etc.  Petitioner sought funding from this
court to hire Gretchen White to prepare a social and
psychological history, claiming that Dr. Grover, who testified
for petitioner at trial, was "incompetent" in that regard.  In
fact, Dr. Grover was not an "incompetent" expert giving evidence
on petitioner's childhood and family background; he was not
called for that purpose at all.  Rather, counsel called Grover to
testify about petitioner's likely institutional adjustment and
future dangerousness in prison if sentenced to life without
parole.

1    How, then, can petitioner have received effective assistance

2  of counsel in his mitigation case when no expert testimony

3  whatsoever was presented on his unfortunate social history?

4  There simply was not enough information, either within or without

5  counsel's possession, to put legs under a theory petitioner's

6  personal background mitigated his crimes.   Exhibits 15 and 16 to

7  the Second Petition for Writ of Habeas Corpus filed in the

8  California Supreme Court (jail mental health and medical records

9  from 1984 through 1987 and the opinion of Karen Froming, Ph.D, a

10  licensed clinical psychologist) show that this is so.

11    Jail records of March 28, 1985, show petitioner (while

12  petitioner was held on burglary charges) complained of being

13  anxious about his legal status and experienced anxiety and

14  insomnia.   He had no mental health history, and had been employed

15  full-time as a landscaper at the time of his arrest.   The next

16  day petitioner reported being less anxious and more comfortable

17  after a cell assignment change, and appeared "stable."   April 1,

18  1985, he stated he was unable to sleep and received another cell

19  change.   In ensuing weeks petitioner continued to complain of

20  being unhappy with his cell assignment; he refused mental health

21  services and was deemed no longer in need of them May 2, 1985.

22    May 21, 1985, petitioner was tearful and depressed about the

23  recent death of his mother and having been unable to attend her

24  funeral.   He was unable to sleep and appeared "so grief-stricken

25  [it was] difficult for him to problem-solve."   Brief supportive

26  ////

counseling was provided; petitioner refused to consider taking anti-depressants or receive more intensive care.  His file was closed June 10, 1985, after his continued refusal to accept supportive mental health services.

When petitioner was arrested September 17, 1986, for the murder charges supporting his conviction and capital sentence, he appeared intoxicated by an unknown substance.  He was able to give brief, concrete answers but his eyes were darting and his respiration irregular.  He reported having been on a three-week methamphetamine binge without sleep and having gone days without eating.  He reported being harassed by guards and refused mental health placement and services.

Petitioner was placed on a "5150" mental health hold September 18, 1986, after he tried to hang himself on his cell bars.  He was diagnosed with poor impulse control, acting out secondary to fears others would harm him, and possible substance abuse withdrawal.  He was placed on "5150" status for three days. He had no known previous psychiatric history, but did have a history of poly-drug usage including cocaine, heroin, amphetamines and dilaudid.  On discharge from "5150" status September 21, petitioner was returned to the mainline jail population with follow-up out-patient service.  The treating psychiatrist diagnosed poly-substance abuse, malingering (psychological) and antisocial personality disorder.

Dr. Froming prepared her report in March of 1999 after interviewing, testing and evaluating petitioner in connection

with his post-conviction challenge to his conviction.[5]  Froming's
examination took one day and included tests to determine
neuropsychological functioning and evidence of organic
impairment.  Froming also reviewed the statement of facts in
petitioner's opening brief, the California Supreme Court's
affirmance of petitioner's conviction, his school and medical
records, his juvenile records, medical and psychiatric records
from Sacramento County Jail, the psychiatric testimony of Dr.
Grover, the report of Dr. Alan Globus, petitioner's birth
certificate, and his mother's death certificate.

Dr. Froming administered neuropsychological tests assessing
petitioner's ability, behaviorally, to perceive, process and
remember information through a variety of modalities.  The
testing revealed average intellectual capability, delayed
education achievement, and overall brain impairment in the mild
to moderate range of severity.  Petitioner's ability to sustain
attention and remain focused on the task at hand was mildly
slowed but his ability to quickly process two stimuli at once,

[5]  It would appear Dr. Froming viewed her 1999 report as merely
preliminary.  April 10, 2003, this court authorized petitioner to expend up to
$10,000 to retain Dr. Froming to complete her examination and report on
petitioner's developmental trauma, multiple drug use, and possible
neurological and mental impairments.  Respondent submitted evidence March 17,
2004, that petitioner had refused to meet with Dr. Froming; petitioner offered
no rebuttal.  April 17, 2005, I specifically invited petitioner to submit a
declaration regarding the status of Dr. Froming's testing and examination; he
did not, nor did he submit any evidence there were problems in obtaining
Froming's report.  In a declaration filed November 3, 2004, counsel for
petitioner states Froming completed her examination in 2004 and would release
it to petitioner "once she actually receive[d] the approved funds."  No
supplemental report by Froming has been filed.

switch between two tasks or ignore distracting stimuli was impaired.  He frequently misunderstood directions, suggesting mild comprehension deficits, and showed a tendency to impulsively try solutions or speak.

Froming assessed petitioner's social history based on personal interview.  She noted that petitioner was the second-youngest of five children, his mother suffered severe alcoholism, he lacked a close relationship with his father, his parents had a contentious relationship and divorced when he was 12 years old, petitioner suffered injuries that appeared child-abuse-related, and he cared for his mother from age 12 after his parents divorced.  He started using drugs around the same time, beginning with marijuana and graduating to methamphetamine abuse at age 15. He may have been exposed to alcohol in utero, he had difficulties with language-related skills of reading and writing, he had impaired self-control and difficulty staying on task and was disruptive at school.  He had recurrent episodes of depression starting at age 12 and self-medicated by abusing drugs.  Doctor Froming opined that "[t]he most traumatic events of [petitioner's] life focus on his mother's severe alcoholism, neglect, and the loss of his siblings through divorce."

In sum, Froming's evidence shows petitioner had average intelligence, perhaps some learning or behavioral disabilities, and suffered depression and mild to moderate mental impairment from drug abuse.  She concluded this based on his personal interview; by inference we know petitioner's medical, school, and

juvenile court records reflect no major mental illness or impairment, including one resulting from alcohol abuse or depression.   Petitioner completed much or all of high school without placement in special education; he was not borderline mentally retarded; he had no significant psychological history; there was no history of sexual or severe physical or psychological abuse, placement in foster care, etc.[6]

Exhibits 15 and 16 belie the need for this court to appoint Dr. White to prepare a social or psychological history. Petitioner presents no documents, or declarations of friends, family members, school personnel or others, to suggest the conclusions reached in petitioner's jail records and Dr. Froming's report were misplaced.   Evidence reflected in Exhibits 15 and 16 differs little from the mitigation evidence actually presented at trial.   Petitioner's aunt, Frita Hines, testified how petitioner's mother neglected his emotional needs and drank herself to death.   She described how petitioner's father failed to discipline him and favored his younger brother, and how the

---

[6]   Even if Froming's conclusions somehow were viewed as supporting petitioner's claims, they must be taken with a grain of salt.   Her views are based on petitioner's own reporting and the record is replete with evidence that petitioner is non-credible.   For but one example, petitioner's "self-report" in the September 17, 1986, jail record that he had been on a three-week methamphetamine binge without sleep is belied by the trial record.   In fact, petitioner was in jail in Auburn from August 24 through September 11. He testified that between September 11 through the morning of September 15, he "hung out" with Cyndi Wilson, Jamie Pyle, Houseman and others and although others were using methamphetamine he mostly just used marijuana.   He woke up the morning of September 15 and did not use drugs before going to the victim's house, although he injected a significant amount of crank on the evening of September 15 after showing up in the possession of the roadster.

father moved to Washington and rejected petitioner.  She told the
jury how petitioner benefitted from the more-structured
environment he experienced when he stayed in her home as a teen;
how he enjoyed church, youth events, and trick or treating.  She
said she saw no evidence petitioner was using drugs.  She told
how he took care of her after her emergency surgery in 1985,
behaving responsibly and following house rules that he hold down
a job.  She testified that when petitioner was 18 or 19 he
started associating with "biker types" of whom she did not
approve.  Denise Nicols, petitioner's former girlfriend,
testified that she went out with him for several months in 1985,
and generally he was kind and considerate but he got mean and
paranoid when he was using drugs.  Richard O'Toole, petitioner's
former teacher at continuation school, testified that he knew
petitioner from about age 13 to about 16.  O'Toole believed
petitioner may have been on drugs during that time, and knew
petitioner came from a broken home with an alcoholic mother.
Petitioner had a poor home life, but he never was a problem at
school and he was open to talking with O'Toole about what was
going on in his life.  Petitioner was a bright student; he had
capability but didn't use it, probably due to the lack of
guidance and attention he received from his parents.  Dr. Grover
testified that petitioner had intellectual potential and was
working toward completing his high school degree, and diagnosed
anti-social personality disorder resulting from poor maternal
bonding.

1    Similarly, petitioner makes no predicate factual showing

2    sufficient to warrant appointment of a poly-substance abuse

3    expert to develop evidence of drug impairment that would have

4    provided mitigation under either factor (h) or (k) of

5    California's death penalty statute.[7]  In moving for leave to

6    expand the record, counsel for petitioner declared that two poly-

7    drug experts saw enough in petitioner's records to warrant

8    further examination.  However, counsel submitted no lay

9    declarations or other records (other than Exhibits 15 and 16)

10   supporting an inference petitioner's drug use could have provided

11   significant mitigation.  Testimony of petitioner and others made

12   clear that, regardless of what petitioner told his jailors after

13   he was arrested, he was <u>not</u> on a three-week, sleepless

14   methamphetamine binge when he killed the Robertsons.  Evidence

15   was that petitioner used inconsequential amounts of the drug,

16   plus marijuana, during the four days preceding the killings, and

17   he slept the previous night.  Petitioner celebrated his

18   accomplishments with a large hit of "crank" the night of

19   September 15.  There are no medical, educational or other

20   records, nor declarations, to show chronic and extensive drug

21   abuse causing organic brain damage.  After being jailed for his

22

23        [7]  Potential mitigating factors listed in Penal Code § 190.3 include:
24   "Whether or not at the time of the offense the capacity of the defendant to
     appreciate the criminality of his conduct or to conform his conduct to the
     requirements of law was impaired as a result of mental disease or defect, or
25   the affects of intoxication," (factor h), and "Any other circumstance which
     extenuates the gravity of the crime even though it is not a legal excuse for
26   the crime" (factor k).

crimes, petitioner retained sufficient intellectual clarity and acumen to work towards completing his high school degree.

Moreover, introducing evidence of petitioner's background would have opened the door to the prosecutor introducing petitioner's prior offenses, which included molesting an 11-year-old girl when he was 16, strong-arm robbery (purse snatch), and possession of marijuana cigarettes in jail (RT 6162-66). These prior offenses reflect the same type of avarice, contempt for authority and lack of human decency shown in petitioner's murder of his friends to steal their roadster. Petitioner also trafficked in methamphetamine and may have been involved in its manufacture. Thus, counsel made a reasonable tactical decision to avoid opening the door to damaging rebuttal evidence. See Strickland, 466 U.S. at 699 (decision not to present testimony of family members or psychological evaluations was a reasonable strategic choice because evidence would have been of little help and would have opened door to damaging evidence of defendant's criminal history); Burger v. Kemp, 483 U.S. 776, 791-94 (1987) (failure to present evidence of petitioner's exceptionally unhappy and physically abusive childhood or expert psychological testimony was reasonable professional judgment because the testimony would have shown defendant's unremorseful attitude, violent tendencies which were at odds with the defense strategy, and his prior criminal acts); Darden v. Waigwright, 477 U.S. 168 (1986) (decision to rely simply on a plea for mercy was reasonable tactical decision in view of fact that other possible

1   strategies would have opened the door for rebuttal evidence from

2   the state); <u>Campbell v. Kincheloe</u>, 829 F.2d 1453, 1462-63 (9th

3   Cir. 1987) (failure to present any mitigating evidence, including

4   that defendant's father was an alcoholic; defendant was the

5   victim of child abuse, suffered from various medical problems as

6   a child, had a history of drug and alcohol abuse, had attempted

7   suicide; and was the father of two children, was reasoned

8   strategic choice because it would have opened the door to

9   evidence that he forcibly raped his ex-wife and was involved in

10  sexually abhorent conduct with children and animals); <u>Harris v.</u>

11  <u>Vasquez</u>, 949 F.2d 1497, 1525 (9th Cir. 1990) (failure to present

12  psychiatrists to rebut damaging testimony of the government's

13  psychiatric expert was competent assistance because a psychiatric

14  defense theory would conflict with petitioner's alibi defense,

15  and testimony would open the door to equally persuasive

16  psychiatric opinions that reached a different conclusion).

17       No evidentiary hearing is required.  The rule is:

18       To establish entitlement to an evidentiary hearing,
         petitioner must demonstrate by his evidence the
19       potential of a <u>colorable claim</u> that, if proven true at
         the hearing, would show that his former counsel's
20       failure to investigate amounted to ineffective
         assistance of counsel, and that, but for such deficient
21       representation, there is a reasonable probability that
         the outcome of the proceeding would have been
22       different.

23  <u>Earp v. Stokes</u>, 423 F.3d 1024, ___, WL 2159051, (9th Cir. 2005),

24  <u>citing</u> <u>Strickland</u>, 466 U.S. at 693-94.

25       Here, petitioner comes forth with no smoking gun--viz., no

26  declarations of family members, no medical or school records,

etc.--to show there was significant mitigation evidence counsel

failed to uncover and use.  Nor did petitioner confront trial

counsel, during their depositions, with significant mitigation

evidence they failed to uncover.[8]  Petitioner fails to allege

facts that, if proven true, would establish ineffective

assistance, much less show a reasonable probability the outcome

of the proceeding would have been different if counsel had done

otherwise.  <u>Compare</u> <u>Stankewitz v. Woodford</u>, 365 F.3d 706, 717

(9th Cir. 2004) (in seeking an evidentiary hearing, borderline

mentally retarded and mentally ill habeas petitioner alleged

_____

[8]    Trial counsel were deposed and testified that they investigated
petitioner's social and mental health background and considered presenting
evidence of drug intoxication as mitigation.  The latter defense was
problematic because there was no corroboration for heavy methamphetamine use
directly before the crime, and evidence petitioner used a lot of
methamphetamine the night of September 15 after committing the crimes
accounted for petitioner's unstable and suicidal condition after his arrest.
Holmes depo. at 43-46, 52, 54.  Holmes consulted informally with a
psychologist; his decision not to proceed further was a reasonable strategic
one.  Holmes testified that it was his practice to obtain clients' medical
records; here, he did not specifically recall reviewing the records but he had
school records (depo. at 86); the record shows Holmes had petitioner's jail
mental health records.  Ex. 15.  Holmes stated that petitioner's demeanor,
when Holmes met with him, showed no indication of brain damage or serious
mental deficiencies.  Holmes depo. at 87 ("He was pretty clear-headed.  Very
clear-headed.")   Co-counsel Macias, who took primary responsibility during
the penalty phase, testified during deposition that he did not recall
reviewing petitioner's medical records and was not aware of the poly-drug
substance abuse diagnosis in jail.  Depo. at 31.  He knew from petitioner that
he had been on drugs on and before September 15, but petitioner had told him
he had no long-term habit of drug use.  <u>Id.</u> at 32.  Given what counsel knew
from trial witnesses (including petitioner) about the events of September 11
through 15, 1986, Macias' strategic decision not to inquire further into
intoxication during the crimes as mitigation was reasonable.  <u>See</u> depo. at 55-
56.  And given what counsel knew from interviewing Frita Hines, Mr. O'Toole,
and Denise Nicols and from Dr. Grover's report, they made a reasonable
strategic decision not to comb petitioner's school, medical and other records
more fully, in search of the proverbial "needle in the haystack."

detailed information about an excruciating life chronology, that
was absent from the testimony of the main witness on that subject
at penalty trial); contrast Babbitt v. Calderon, 151 F.3d 1170,
1176 (9th Cir. 1998) (denial of petition without an evidentiary
hearing affirmed; petitioner could not show prejudice because the
evidence he sought to introduce on habeas was "largely cumulative
of the evidence actually presented during the penalty phase" and
there was no reasonable probability the jury would have changed
its sentence in light of the new evidence).

     At first glance, this case appears to resemble Earp, wherein
the court of appeals reversed the district court and remanded for
an evidentiary hearing.  In Earp, as here, petitioner claimed
penalty phase counsel was deficient in failing to develop and
present mitigation evidence of certain elements in his
background, including a family history of alcoholism, abuse and
emotional problems.  But in Earp, petitioner presented in support
of his claim declarations from family members providing
additional details about his background; declarations from family
members, associates and a CYA counselor discussing his history of
substance abuse; declarations regarding time spent in CYA
custody; expert reports opining that organic brain damage caused
by traumatic brain injury might have provided a viable defense;
and declarations and reports showing petitioner was educationally
handicapped and emotionally disturbed.  423 F.3d at ___, 2005 WL
2159051, *12-13.  Based on this copious evidence of what counsel
would have discovered upon further investigation, an evidentiary

hearing was required.  Here, in contrast, petitioner presents no

such declarations or documents, but rather relies on conclusory

claims that trial counsel botched the mitigation case.

Finally, the court finds that petitioner's showing of

prejudice fails in any event because the aggravating evidence

based on the circumstances of the crime was overwhelming.

Petitioner showed no remorse, took no responsibility, and

remained defiant in jail and throughout the trial.  His crimes

were callous in the extreme and showed planning, avarice, and

utter contempt for human life.  He killed his friends out of

greed and to eliminate witnesses to the theft of the roadster.

No poverty or need to feed a drug addiction spurred the theft –

it was motivated merely by lust for a bauble that had captured

petitioner's fancy.  His "alibi" defense convinced the jury not

that he was innocent, but rather that he was irredeemable.  While

there was little "aggravation" in the form of past heinous

violence, that showed petitioner's problem was not poor impulse

control but rather a lack of a moral compass.  "In light of the

grievous nature of the crimes and [petitioner's] relentlessly

indifferent attitude towards them, [the court finds] no

reasonable probability that the jury would have reached any

verdict other than death."  Williams v. Calderon, 52 F.3d 1465,

1472 (9th Cir. 1995).

For the same reason, all of petitioner's other allegations

of ineffective assistance at penalty phase fail.  Any errors by

counsel in failing to object to argument or evidence were

1   inconsequential given the weight of the aggravation based on the

2   circumstances of the crime.

3   Ineffective Assistance of Appellate Counsel

4       In claim E, petitioner alleges appellate counsel, who sought

5   to be relieved, was not competent, lacked habeas corpus

6   experience, and provided representation falling below an

7   objective standard of professional reasonableness.  Petitioner

8   alleges he suffered prejudice but fails to explain why.  By

9   failing to identify any specific failures by appellate counsel or

10  explain how they could have plausibly prejudiced him, petitioner

11  fails to state a claim for relief.  Moreover, petitioner's claim

12  regarding appellate counsel's lack of habeas experience fails

13  because there is no constitutional right to counsel in state

14  habeas proceedings.  Vickers v. Stewart, 144 F.3d 613 (9th Cir.

15  1998).

16  Prosecutorial Misconduct

17      In claim F subsection (5)(c), petitioner alleges the

18  prosecutor committed misconduct during penalty phase closing

19  argument by reading a passage from a book saying murderers

20  destroyed their victims' moral constituency before the jury.

21      Prosecutorial misconduct requires a showing the challenged

22  conduct so infected the trial with unfairness that the resulting

23  conviction denied due process.  Greer v. Miller, 483 U.S. 756,

24  765 (1987).  The conduct must be examined to determine "whether,

25  considered in the context of the entire trial, that conduct

26  appears likely to have affected the jury's discharge of its duty

1   to judge the evidence fairly." <u>United State v. Simtob</u>, 901 F.2d

2   799, 806 (9th Cir. 1990).  Considering the entire closing

3   argument in context, the prosecutor's statements did not violate

4   due process.  The cited passage was a legitimate comment on the

5   weight of aggravating and mitigating evidence.  <u>See</u> <u>Drayden v.</u>

6   <u>White</u>, 232 F.3d 704, 714 (9th Cir. 2000) (prosecutor speaking in

7   the imagined voice of the victim as a "witness" was improper but

8   did not violate due process because prosecutor did not manipulate

9   or misstate the evidence).

10  <u>Jury's Reliance on Extrajudicial Evidence</u>.

11      In claim G(2) petitioner alleges the jury relied on

12  extrajudicial evidence, to wit, one juror was reading the

13  newspaper (which contained articles about petitioner's trial) in

14  the jury box.  He offers no evidence that any juror actually read

15  a news account of his case and he failed to develop it factually

16  in state court.  The claim is procedurally barred as explained in

17  the court's October 19, 2004, findings and recommendations.

18  <u>Due Process Claims Based on Trial Court Error</u>

19      In claim H(2) petitioner alleges the trial court violated

20  due process by telling the jury he previously had been convicted

21  of robbery and possession of a firearm.  In reality, petitioner

22  had a prior conviction for burglary but not for robbery.

23      A judge must always remain fair and impartial.  <u>Kennedy v.</u>

24  <u>Los Angeles Police Dep't</u>, 901 F.2d 702, 709 (9th Cir. 1989).  He

25  "must be ever mindful of the sensitive role [the court] plays in

26  a jury trial and avoid even the appearance of partiality."  <u>Id.</u>

(internal quotations omitted).  On direct appeal, the standard for reversing a verdict because of general judicial misconduct is stringent--there must be an "extremely high level of interference by the trial judge which creates a pervasive climate of partiality and unfairness."  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (internal quotations omitted).  On habeas, the standard is even more stringent and reversal is warranted only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution."  Id.

The prosecutor made clear to the jury during penalty phase opening argument that petitioner's prior felony convictions, which were admissible as aggravation under section 190.3(c) (prior felony convictions), were for first and second degree burglary.  (RT 5766-67.)  Prior incidents of violence, admissible as aggravation under section 190.3(b), included threats on correctional staff, the possession of a shank in the jail, and the incident with Mr. Frye.  The court's prior inadvertent reference to a robbery was of no moment and there is no reasonable likelihood it influenced the penalty verdict.

During penalty phase deliberations, the jury sent the trial judge notes asking about postsentencing procedures and what would happen if it could not reach a unanimous verdict.  In claim H(15), petitioner contends the trial court's responses to those inquiries caused the jury's verdict to become unreliable, infected the deliberations with a bias in favor of the death

1  penalty, and violated the Eighth Amendment by minimizing the

2  jury's constitutional role in sentencing.  Caldwell v.

3  Mississippi, 472 U.S. 320, 328-29 (1985) (opinion of O'Connor,

4  J., concurring) (Eighth Amendment prohibits the imposition of a

5  death sentence by a sentencer that has been led to the false

6  belief the responsibility for determining the appropriateness of

7  the defendant's capital sentence rests elsewhere).[9]

8      Here, the jury asked the court during its deliberations

9  whether the penalty could be modified through appeal, whether a

10 death sentence could be reduced to one of life without parole,

11 and whether a sentence of life without parole could be reduced to

12

---

13      [9]  In California v. Ramos, 463 U.S. 992 (1983), the Supreme Court

14 reversed the California Supreme Court and held California's so-called "Briggs
   instruction," which informed a capital sentencing jury it could consider the

15 governor's power to commute a life sentence, did not violate the federal
   constitution so long as the instruction accurately reflected state law.  463

16 U.S. at 1010.  On remand, the California Supreme Court found the Briggs
   instruction violated the state constitution, and trial courts should avoid the

17 subject of commutation in their sua sponte instructions to capital juries.
   People v. Ramos, 37 Cal.3d 136 (1984).  The court mentioned in a footnote that

18 if a jury inquired about commutation it should be informed the commutation
   power applies to both a death sentence and one of life without parole, and

19 advised not to consider the possibility of commutation in determining the
   appropriate sentence.  37 Cal.3d at 159 n.12.  The trial judge in this case

20 answered the jury's questions about postsentencing procedures in an effort to
   comply with the California Supreme Court's decision in People v. Ramos.

21 In Caldwell, the prosecutor argued during the petitioner's penalty phase trial
   that the jury did not hold ultimate responsibility for a sentence of death

22 because its decision was reviewable by higher courts and therefore was not
   final.  472 U.S. 320, 325 (1995).  A plurality of four justices construed

23 Ramos to mean that a capital sentencing jury should be informed of
   postsentencing proceedings only if instructions were both accurate and

24 relevant, and that information regarding appellate review was not relevant to
   the determination of the appropriate sentence.  472 U.S. at 335-36.

25 Concurring in the judgment, Justice O'Connor agreed with the first premise,
   but disagreed with the second, believing that information about the appeal

26 process was relevant to the capital sentencing decision.

1 a lesser term of imprisonment.  (RT 6387-6400.)  The trial judge

2 replied that the California Supreme Court could, on automatic

3 appeal, invalidate a death sentence but that he did not intend to

4 hint he believed that would happen.  (RT 6389-92.)  The judge

5 also explained that the governor could, through his "plenary

6 power of mercy," commute either a sentence of death or of life

7 without parole to something less.  (RT 6392-93.)

8      Petitioner points out no falsehoods or inaccuracies in the

9 trial judge's answers to the jury's questions, and <u>Caldwell</u>

10 provides no basis for relief.  Thus Claim H(15) should be

11 denied.[10]

12 <u>Claims Concerning California's Death Penalty Statute</u>.

13

14      [10]  Petitioner might contend the trial judge's statements about

15 commutation were inaccurate, because they failed to explain that, as a twice-
convicted felon, his sentence could be commuted by the governor only upon the
prior recommendation of four justice of the California Supreme Court.  <u>See</u>

16 <u>Hamilton v. Vasquez</u>, 17 F.3d 1149 (9th Cir. 1994); <u>McLain v. Calderon</u>, 134
F.3d 1383 (9th Cir. 1998); <u>Gallego v. McDaniel</u>, 124 F.3d 1065 (9th Cir. 1997);

17 <u>Coleman v. Calderon</u>, 210 F.3d 1047 (9th Cir. 2000).  However, the United

18 States Supreme Court has made clear that, assuming such failure is sufficient
to invalidate a capital sentence, such outcome would result only if the
federal court determined <u>both</u> that "there is a reasonable likelihood that the

19 jury has applied the challenged instruction[s] in a way that prevents the
consideration of constitutionally relevant evidence," (<u>Boyde v. California</u>,

20 494 U.S. 370 (1990)), <u>and</u> that the error "had a substantial and injurious
effect or influence in determining the jury's verdict" (<u>Brecht v. Abrahamson</u>,

21 507 U.S. 619, 637 (1993)).  <u>Calderon v. Coleman</u>, 525 U.S. 141, 145-46 (1998).
Here, I am not persuaded either the <u>Boyde</u> standard or the <u>Brecht</u> standard are

22 met, where the trial court gave the jury a version of the "factor (k)"
instruction specifically permitting the consideration of sympathy and mercy

23 and there is no indication the jury failed to give weight to petitioner's
mitigation evidence, including evidence he would not endanger others in

24 prison.  <u>See Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (jury is presumed to
follow its instructions and to understand a judge's answers to its questions).

25 As for the trial judge's refusal to answer the question about the effect of a
hung jury, petitioner cites no precedent, nor is this court aware of any, for

26 finding a constitutional violation on that ground.

1    In Claim L(6), petitioner alleges California's Penal Code §

2  3604 violates the Ex Post Facto Clause as applied to him because

3  execution by lethal injection was not allowed when he was

4  convicted.  The change in method of execution does not make the

5  sentence more burdensome and so does not violate the Ex Post

6  Facto Clause.  <u>Vickers</u>, 144 F.3d at 617, <u>citing</u> <u>Poland v.</u>

7  <u>Stewart</u>, 117 F.3d 1095, 1105 (9th Cir. 1997).

8    In claim L(7), petitioner challenges the constitutionality

9  of the California Supreme Court's timeliness standards stated in

10  Policy 3 of the Policies of the California Supreme Court

11  regarding death penalty cases.  He claims the state supreme court

12  lacks authority to promulgate such rules; Policy 3 is an invalid

13  advisory opinion outside the court's jurisdiction; Policy 3

14  violates the equal protection clause by imposing stricter

15  standards on defendants sentenced to death than on other

16  defendants; Policy 3 implicates the privilege against self-

17  incrimination because it requires a habeas petition be filed

18  during the pendency of the petitioner's appeal; and Policy 3 is

19  not consistently invoked and therefore is arbitrary and invalid.

20    Petitioner fails to show the state court's denial of this

21  claim was contrary to or an unreasonable application of clearly

22  established federal law as set forth by the United States Supreme

23  Court.  This claim should be denied.

24  <u>Cumulative Error</u>.

25    Petitioner alleges in claim I that his death sentence should

26  be invalidated due to the cumulative effect of constitutional

1  error in the penalty phase of his trial.  Based on the preceding

2  analysis there are no errors of constitutional magnitude for this

3  court to cumulate in assessing prejudice.  This claim should be

4  denied.

5       Petitioner's defense to penalty is as indefensible as his

6  defense to guilt.  Accordingly, for all of the foregoing reasons

7  the court hereby recommends that all penalty phase claims B(7),

8  B(8), B(9), B(10), E, F(5)(c), H(2), H(15), I, L(6) and L(7) be

9  resolved in favor of respondent and the petition for habeas

10 corpus be denied.

11      Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these

12 findings and recommendations are submitted to the United States

13 District Judge assigned to this case.  Written objections may be

14 filed within 20 days of service of these findings and

15 recommendations.  The document should be captioned "Objections to

16 Magistrate Judge's Findings and Recommendations."  The district

17 judge may accept, reject, or modify these findings and

18 recommendations in whole or in part.

19      Dated:  November 14, 2005.

20                          /s/ Peter A. Nowinski
                          PETER A. NOWINSKI
21                        Magistrate Judge

22

23

24

25

26