1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                     FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9   GARY DALE HINES,                          Case No.  2:98-cv-00784-TLN-JDP (DP)

10                 Petitioner,                 DEATH PENALTY CASE

11        v.                                   **FINDINGS & RECOMMENDATIONS**

12   MICHAEL MARTEL,                           ECF No. 351

13                 Respondent.                 OBJECTIONS DUE WITHIN THIRTY DAYS

14

15         Petitioner is a state prisoner under sentence of death.  Pending before the court is

16   respondent's motion for summary judgment, seeking summary judgment on petitioner's claims in

17   his Amended Petition for Writ of Habeas Corpus in which he alleged errors relating to the penalty

18   phase of his capital trial.  *See* ECF No. 66.  After consideration of the parties' briefs, ECF Nos.

19   351 & 365, and of the state court record, the undersigned concludes that petitioner has not shown

20   that the state court's denial of the claims at issue is undeserving of deference.  Accordingly, the

21   undersigned recommends that respondent's motion be granted.

22                                      **FACTS**

23         The following facts are derived from the California Supreme Court's June 26, 1997,

24   opinion affirming the judgment.  *See People v. Hines*, 15 Cal. 4th 997 (1997).  The state court's

25   factual recitation is entitled to deference absent clear and convincing evidence to the contrary.

26   *Mejia v. Garcia*, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008).  Here, neither party disputes the factual

27   accuracy of the evidentiary record, as described in the California Supreme Court's direct appeal

28   opinion.  *See* ECF No. 351 at 4 n.2; ECF No. 365 at 5 n.1.  Although the instant motion concerns

1

the penalty phase, the undersigned includes the facts from the guilt phase, since they were relevant to the jury's penalty determination.

A. Guilt Phase—Prosecution's Case

In 1985, Lawrence "Bud" Roberts, his wife Kathryn, and their daughters, Donna and Michelle, moved from Grande Ronde, in Oregon, to the North Highlands area of Sacramento County, California. In the summer of 1986, when Donna was 15 years old and Michelle was 10, the family moved from North Highlands to a house at 4840 Priscilla Lane in south Sacramento.

At that time, Rebecca Palanuk, a friend of Donna Roberts from Grand Ronde, stayed with the Roberts family for three weeks, and helped them move to their new home. Palanuk had a brief romance with defendant, Gary Dale Hines. Defendant had visited Palanuk once at the Robertses' North Highlands house and saw her three times at the south Sacramento house. When defendant noticed Bud Roberts's pink fiberglass replica of a 1923 Ford Model-T roadster in the garage, he told Palanuk that he was going to "get" the roadster "one way or another." After defendant spent a night in a motel with Palanuk and Donna Roberts, Palanuk told defendant she did not want to see him again. About the same time, defendant's probation officer told him not to see Palanuk.

In September 1986, at the request of a mutual friend, Viola DuCoing and Justin Comer gave defendant and two companions, Jamie Pyle and Mary Anne Poindexter, a ride from Auburn to Sacramento. During the drive, DuCoing, Comer, Pyle, and Poindexter all heard defendant say that the next time he went to court, he would go in a pink roadster. Defendant also told an acquaintance, Terri Wilson, that he was going to "repossess" a "real nice roadster" from "a friend."

Jamie Pyle spent the night of September 14, 1986, at the Sacramento home of Steve Tabor. Also present were defendant and several other people. During the evening, defendant played with a pearl-handled pistol. Early the next morning (September 15), Pyle and two others drove defendant and Randal Houseman to a location in south Sacramento that was unfamiliar to Pyle, and dropped them off.[2]

> FN 2: The record contains no evidence that Houseman, who was separately tried and was also convicted of murder, had ever previously visited the Roberts residence. Defendant and Houseman were apparently not close friends, and had only known each other a short time before the murders in this case took place.

About 10:30 that morning, Donna Roberts called Jiy Williams, a friend who had lived next door to the Roberts family when they lived in Grand Ronde, Oregon. According to Williams, Donna sounded "[k]ind of nervous, scared." Williams heard two and

possibly three male voices in the background; near the end of the conversation, he heard one of the voices tell Donna, "Hurry up and get off the phone." Williams asked who was present, and Donna told him.[3]

> FN 3:  In an *in limine* hearing, Williams testified that Donna Roberts told him that defendant was at the house, but the trial court excluded this statement by Donna as hearsay. . . .

That afternoon, Michelle Roberts came to the home of a neighbor, Steven Mejia, crying, and told him that she thought her mother had been killed. Mejia called the police. At the Roberts home, the police found the bodies of Kathryn and Donna Roberts. Both victims had suffered multiple gunshot wounds. Donna had been blindfolded, her mouth gagged with socks, and her hands and feet bound with shoestrings and a telephone cord. The master bedroom had been ransacked. Missing from the home were the pink roadster, the purses of Kathryn and Donna, and several rifles and pistols kept in a gun case. In addition, a videocassette recorder (VCR) had been moved from the living room to the garage.

Nine separate witnesses saw two White males driving Bud Roberts's pink roadster through the streets of Sacramento between noon and 1:30 p.m. on September 15, the day that Donna and Kathryn Roberts were killed. Most of the witnesses testified that the men were in their late teens or early 20's. (Defendant was 20 years old at the time; Houseman was 16.) Four witnesses (Jeffrey Doyle, George Perez, Lynette Douke, and James Quirk) identified Randal Houseman as the passenger in the car. Another witness (William Johnson) identified defendant as the driver.

That afternoon, defendant and Houseman drove the roadster to Steve Tabor's home, arriving about 2:00 p.m. A neighbor of Tabor's, Diane Mallett, tentatively identified defendant as the driver of the roadster, and identified Houseman as the only passenger. At Tabor's home, defendant told his friends Terri Wilson and Mary Anne Poindexter that the roadster belonged to him. Around 3:00 p.m., defendant and Houseman drove the roadster to the nearby home of Viola DuCoing, where defendant told Justin Comer that the roadster belonged to him. Defendant and Houseman left 15 minutes later and returned to Tabor's home.

That evening, defendant and Houseman drove the roadster to the home of Terri Wilson. According to Wilson, defendant and Houseman brought shotguns or rifles into the house, which they claimed were theirs. Defendant asked Wilson for sheets and blankets to cover the car.

That same evening, two of Wilson's neighbors, James Carpenter and his daughter Christie, noticed the roadster at Wilson's home. Early the next morning, September 16, 1986, James Carpenter read a newspaper story about the murders and the roadster; after determining that the car was still at the Wilson home, he called the police.

3

Police officers placed Wilson's home under surveillance. When an old pickup truck left the residence, police officers tried to detain it, but the driver took off at high speed. The police pursued the truck until it crashed into a fence, and arrested the two occupants: Frank Hiler (Terri Wilson's boyfriend), and Cyndi Wilson (Terri's sister). In the cab of the pickup, police found five rifles that had been stolen from the victims' home, and were wrapped in a quilt from the victims' bed. Also in the truck was a purse belonging to Cyndi Wilson, which contained a .22-caliber bullet and a list of the guns found at the Roberts['] house.

At 9:30 that morning, Officer Ken Walker arrested defendant at Terri Wilson's home. The officer found defendant sitting in a living room chair. Next to the chair was a tote bag belonging to murder victim Donna Roberts. The bag contained the ignition switch from the Robertses' roadster, a starter pistol and pocket knife belonging to Bud Roberts, some plastic baggies, and a loaded .22-caliber High Standard revolver. Jamie Pyle identified the revolver as the pearl-handled pistol she had seen defendant playing with the night before the murders, and she said that defendant had also been holding it on the morning of his arrest. On a small table in front of the chair where defendant had been sitting were two handwritten notes, each containing a list of the guns stolen from the Roberts home, with a price next to each gun. David Crowe, an examiner of questioned documents for the California Department of Justice, testified that defendant had written one of the notes and that Randal Houseman had written the other.

Houseman was also in Terri Wilson's living room when defendant was arrested. Beneath the couch on which Houseman was sitting was a loaded handgun that belonged to Bud Roberts. Behind Wilson's house, police found the stolen roadster partially covered with blankets and cardboard.

Robert Springer, a supervising identification technician for the Sacramento Police Department, testified that a palm print on a wall of the entry hall of the Roberts home matched defendant's, as did fingerprints on the roadster, on the lists of stolen guns, on the baggies found in Donna Roberts's tote bag, and on the VCR in the Robertses' garage. Springer also found finger and palm prints made by Houseman on the entryway to the Roberts home, the baggies in the tote bag, the roadster, and the gun lists.

Criminalist Robert Garbutt testified that bullets found at the scene of the murders had rifling characteristics similar to test shots fired from the .22-caliber High Standard revolver that was found in Donna Roberts's tote bag, the gun defendant had been playing with the night before the murders. Garbutt could not, however, conclusively identify the revolver as the murder weapon. He also testified that he found tiny spots of blood on the pants and shoes defendant was wearing at the time of his arrest, and blood on the shirt Houseman was wearing when he was arrested.

A pathologist, Dr. Thomas Amott, testified that Donna Roberts had been shot four times: in her right eye, her left thigh, the middle of

4

her back, and a close-range shot behind her right ear.  The gag on her mouth had been tied so tightly that it had caused tears of the frenulum, the tissue connecting the tongue to the floor of the mouth. Kathryn Roberts, like her daughter Donna, had been shot behind the right ear at close range; she also had been shot in her left wrist and twice in the back.  In addition, she suffered these injuries: two head lacerations that were inflicted by a blunt object such as a crowbar or pistol butt; several stab wounds to her neck, possibly inflicted by scissors; several large bruises; defensive wounds on her hands that broke bones in a thumb and two fingers; and purplish hemorrhages in the skin of her neck that could have been caused by forcefully applied fingertips.

B. Guilt Phase—Defense Case

Defendant, testifying in his own behalf, admitted that he participated in stealing the Robertses' pink roadster, but he denied playing any role in the murders of Donna and Kathryn Roberts.

Defendant said that on the day the murders took place, he had gone with Randal Houseman to the Roberts['] home to talk to Rebecca Palanuk to find out whether she was pregnant, as he had heard. (Defendant claimed he was unaware that Palanuk had returned to Oregon and was no longer staying with the Roberts family.)  At defendant's request, Houseman went to the door to see if Palanuk was home, while defendant, who had been warned by his probation officer to stay away from the home, waited at a nearby bus stop. After waiting for more than half an hour for Houseman to return, defendant walked up to the house.  He saw Houseman in the garage; "a whole bunch of stuff" was in the pink roadster.  While defendant "hot-wired" the car, Houseman entered the house.  When Houseman returned, he and defendant drove away in the roadster.

Defendant denied telling prosecution witnesses DuCoing, Comer, Pyle, and Poindexter that the next time he went to court he would go in a roadster, denied entering the Roberts home on the day of the murders, and denied any knowledge of the killings.

On rebuttal, the prosecution introduced a tape recording of a conversation between defendant and Randal Houseman that took place in a holding cell at the jail after their arrest, in which defendant made statements contrary to his trial testimony. . . .

C. Penalty Phase—Prosecution's Case

David Frye testified that on April 27, 1984, he telephoned the home of Teresa Smith, his former girlfriend and the mother of his son. When defendant answered, Frye told him to leave the house; defendant responded with profanities.  Frye then drove to Smith's house and walked up to the front door, where defendant was standing.  Defendant cocked a sawed-off shotgun, pointed it at Frye and said, "I will blow your fucking head off."  Frye entered the house, telling defendant he was going to call the police.  Defendant left.

5

1    Larry Wilson, a visitor at the Smith home, confirmed Frye's
     account of this incident.  He said that defendant had loaded the gun
2    before Frye arrived, and that Frye, who was over six feet tall and
     weighed over two hundred pounds, was very angry and was ready
3    to fight defendant when he arrived at the house.

4    Deputy Sheriff Earl Warren III, assigned to the Sacramento County
     jail, stated that defendant, on the day after his arrest, used profanity,
5    threatened to throw soap bars at Warren and to kick him in the face,
     and physically resisted Warren's efforts to force him to stand facing
6    the wall.  Later that day, defendant said to Warren: "I am going to
     kill you.  This is a threat.  You're dead."  Six months later, while
7    Deputy Warren was searching defendant's belongings in his jail
     cell, defendant told Warren, "Stop going through my stuff or I will
8    kick you in the face."

9    Deputy Sheriff James Cooper testified that he and defendant had
     several "verbal altercations" while defendant was in custody
10   awaiting trial and that on one occasion defendant told him, "I am
     going to fuck you up."  Scott French, a reserve deputy with the
11   Sacramento County Sheriff's Department who worked at the jail,
     testified that on August 28, 1987, he heard defendant say of Deputy
12   Cooper that defendant would "beat his ass down" and that "his days
     are short."  Cooper was not present at the time.
13
     Deputy Sheriff Steve Linebarger stated that on February 15, 1988,
14   while searching defendant's jail cell, he found in defendant's
     mattress a six-inch plastic knife, bound with cloth on one end and
15   sharpened on both edges.

16      D. Penalty Phase—Defense Case

17   Frita Hines, defendant's aunt, testified that she had known
     defendant since he was nine years old.  When defendant was
18   approximately 14 years old, his father moved to another state with
     defendant's sister and 2 brothers, leaving defendant in the custody
19   of his mother.  Defendant's mother, an alcoholic who was
     hospitalized frequently for alcohol-related illnesses, was unable to
20   care for defendant and allowed him to do whatever he liked.  She
     died three years after defendant's father had left.  Defendant often
21   visited Frita Hines while he was a teenager and lived at her home
     for some time.  Defendant behaved well at Hines's home, and took
22   care of her in 1985, when she had emergency surgery.  Hines
     expressed her love for defendant, and asked the jury not to sentence
23   him to death.

24   Denise Nicol testified that she had dated defendant for a few
     months and broke up with him in August 1986, shortly before his
25   arrest in this case.  At first, defendant treated her well, but later
     their relationship deteriorated, largely because of their use of drugs.
26   She, too, asked the jury to spare defendant's life.

27   Richard O'Toole, a teacher, stated that defendant was one of his
     students at a Rio Linda continuation school from the seventh or
28   eighth grade until the tenth grade.  Defendant was not a disciplinary

6

problem and often talked to O'Toole about his broken home.

Dr. Edward Grover, a staff psychologist at Camarillo State Hospital, interviewed defendant and gave this opinion: Defendant suffers from an "antisocial personality disorder," which is associated with poor bonding between mother and child in the early stages of development.  If sentenced to prison, defendant would at first rebel against the prison's "authority structure," but would "mellow out" within 10 years.  Ultimately defendant could have a productive life in prison, a conclusion Dr. Grover based in part on his experience as an intern at the California Men's Colony, a prison in San Luis Obispo.

To rebut the testimony of prosecution witnesses David Frye and Larry Wilson that defendant had assaulted Frye with a sawed-off shotgun, defendant called Lisa Smith, Wilson's sister.  Smith said she was present on the day the confrontation between defendant and Frye occurred.  Frye had threatened to "beat the hell out of" defendant.  She described Frye as a violent man; he once broke her jaw and he kicked her sister in the stomach when she was pregnant.  Defendant was simply defending himself when he pointed the gun at Frye.  She claimed the gun was a flare gun, not a sawed-off shotgun.

To counter Deputy Warren's testimony that defendant had threatened to kill him on the day after defendant's arrest, defendant called Joe Tinker, an inmate at the county jail on the day of the alleged threats.  On that day, according to Tinker, Deputy Warren and other deputies came to defendant's jail cell and asked defendant to remove his clothes so that they could take photographs of him.  Tinker then heard sounds as if the officers were beating defendant.  Inmates, Tinker said, commonly use threats and profanity against the jailers.

*People v. Hines*, 15 Cal. 4th 997, 1015-21 (1997), *as modified on denial of reh'g* (Aug. 20, 1997).

## PROCEDURAL HISTORY

On December 15, 1986, in Sacramento County, petitioner was charged with the first-degree murders of Kathryn Elizabeth Roberts and Donna Marie Roberts, with three special circumstances alleged as to the murders: (1) felony-murder (burglary); (2) felony-murder (robbery); and (3) multiple murders, as well as several other counts.  1 CT 196-200.[1]  At a jury trial, petitioner was found guilty, and all three special circumstances were found true as to both

---

[1] "CT" refers to the Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal; and "ACCT" refers to the Augmented / Corrected Clerk's Transcript on Appeal, which were lodged in this court on July 18, 2000.  ECF No. 82.  Each title is preceded by volume number and followed by a page number.

murder counts.  4 CT 952-63.  The case proceeded to a penalty phase and the jury returned a death verdict.  4 CT 1068-69.  The trial court sentenced petitioner on July 7, 1988.  4 CT 1143-61.

Petitioner's judgment was automatically appealed to the California Supreme Court, with petitioner filing his opening brief on April 27, 1993, and a supplemental opening brief on November 5, 1993.  LD II-A; LD II-C.[2]  On June 26, 1997, the California Supreme Court affirmed the convictions and sentence of death.  *People v. Hines*, 15 Cal. 4th 997 (1997); LD II-H.  Petitioner moved for rehearing, which the California Supreme Court granted, modifying its opinion without altering its affirmance of the judgment.  LD II-I; LD II-J; LD II-K.  Petitioner then sought certiorari in the United States Supreme Court, which was denied.  LD V-A; LD V-B; LD V-D.

While his direct appeal proceedings were pending, petitioner filed a petition for writ of habeas corpus in the California Supreme Court, on January 17, 1995.  LD III-A, LD III-B.  After informal briefing, on June 26, 1997, the California Supreme Court summarily denied all claims on the merits, denied some claims on the additional basis that they should have been raised on appeal, and denied some claims on the additional basis that they had been raised and rejected on appeal.  *In re Hines*, No. S044529 (Cal. Sup. Ct. June 26, 1997); LD III-F.

Proceedings in this court commenced on May 1, 1998, with petitioner filing a motion to proceed *in forma pauperis*, application for stay of execution, and application for counsel, all of which were granted.  ECF Nos. 1-3.  Petitioner then sought and was granted funds to investigate issues relevant to habeas corpus, over respondent's objection.  ECF Nos. 16-17, 20-26, 28-29, 35, 38, 41, 47-56, & 61-62; *see also* ECF Nos. 44, 59, & 60 (denying some of petitioner's funding requests).  Petitioner also requested equitable tolling of the limitations period for filing of a habeas corpus petition, which the court ultimately denied.  ECF Nos. 48, 56, 73, & 75.  On March 17, 1999, petitioner filed a Petition for Writ of Habeas Corpus and motion to stay federal proceedings pending their resolution in state court.  ECF Nos. 64, 66.  The court granted the latter

---

[2] "LD" refers to the documents lodged, in paper, with this court, on July 7, 2000, and July 18, 2000.  ECF Nos. 76 & 82.

and ordered proceedings on the habeas corpus petition abated until the state court resolved new claims that had been filed in that court. ECF Nos. 73 & 75.

On March 17, 1999, petitioner also filed a second petition for writ of habeas corpus in the California Supreme Court. LD IV-A, LD IV-B. On June 28, 2000, the California Supreme Court summarily denied all claims on the merits and denied some claims additionally on the basis of procedural bars. *In re Hines*, No. S077380 (Cal. Sup. Ct. June 28, 2000); LD IV-G.

On June 6, 1999, petitioner lodged an Amended Petition for Writ of Habeas Corpus in this court, ECF No. 74, and subsequently lodged the order of the California Supreme Court denying the second petition for writ of habeas corpus that he had filed in that court.[3] ECF No. 76. Petitioner sought further discovery, ECF Nos. 78-80, 84, & 85, which the court granted in part and denied in part. ECF No. 86; *see also* ECF Nos. 95-97.

On January 18, 2001, respondent filed an answer to petitioner's Amended Petition for Writ of Habeas Corpus. ECF No. 101. Petitioner filed a Traverse, ECF No. 105, and sought sanctions against respondent or, in the alternative, further discovery, which the court denied. ECF Nos. 102-04, 106, & 108-12. Respondent then moved to have some of the claims of the amended petition dismissed as procedurally barred; petitioner opposed. ECF Nos. 113, 117, 122, 124, 128-29, 132, & 307. Petitioner again sought sanctions or, in the alternative, further funding for investigation; the court granted this motion in part and denied it in part. ECF Nos. 114-17, 120. Petitioner subsequently sought and was granted additional funding for investigation. ECF Nos. 140 & 142.

On October 26, 2001, the then-assigned magistrate judge issued findings and recommendations on respondent's motion to apply procedural bars, recommending that claims A, D, F(3), F(5)(a), F(5)(b), F(5)(d), F(7), F(8), F(9), F(10), G(4), H(1), H(3), H(4), H(7), H(8), H(9), H(10), H(11), H(12), H(13)(c), H(13)(d), H(16), J, K, and L(1)-(5) be dismissed. ECF No. 151. Over the objections of petitioner, the district court adopted the then-assigned magistrate judge's recommendations. ECF Nos. 152, 155, 156, & 165.

---

[3] On November 15, 2005, the then-assigned magistrate judge ordered that the Amended Petition for Writ of Habeas Corpus be filed nunc pro tunc to June 6, 1999. ECF No. 298.

1   Respondent moved for summary judgment on guilt-phase issues.  ECF No. 153.

2   Petitioner opposed, ECF No. 183, and moved for substitution of counsel and to be relieved as

3   counsel.  ECF Nos. 174, & 179-81.  The then-assigned magistrate judge denied petitioner's

4   request for substitution of counsel.  ECF No. 187.  Respondent filed a reply in support of his

5   motion for summary judgment.  ECF No. 193.  Petitioner sought reconsideration, which was

6   denied; he then sought an interlocutory appeal on the issue, which was denied by the Court of

7   Appeals.  ECF Nos. 189, & 195-97.

8   The then-assigned magistrate judge denied respondent's motion for summary judgment

9   without prejudice to allow further evidentiary development of guilt-phase issues.  ECF No. 211.

10   Petitioner was granted additional investigative funds and discovery.  ECF No. 215, 218, 220-22,

11   231-32, & 238; *but see* ECF Nos. 219, 242, & 246 (denying in part some of petitioner's discovery

12   requests).  At a hearing on March 17, 2004, respondent orally renewed his motion for summary

13   judgment.  ECF No. 252.  On April 20, 2004, the then-assigned magistrate judge recommended

14   that the motion for summary judgment on guilt phase issues be granted in its entirety, ECF No.

15   258, which the district court adopted in full over petitioner's objections.  ECF Nos. 261-62 &

16   287; *see also* ECF No. 263.  This resulted in the dismissal of claims A, B(1), B(2), B(3), B(4),

17   B(5), B(6), B(11), B(12), B(13), B(14), C(1), C(2), F(1), F(2), F(3), F(4), F(6), F(7), F(8), F(9),

18   F(10), G(1), G(2), G(3), G(4), H(1), H(2), H(3), H(4), H(5), H(6), H(7), H(8), H(13)(a), H(13)(b),

19   and I of the amended petition.  ECF No. 287; *see* ECF Nos. 153 & 258.

20   The then-assigned magistrate judge permitted briefing on further development and

21   expansion of the record relating to penalty-phase issues raised in the Amended Petition for Writ

22   of Habeas Corpus.  ECF No. 260.  After briefing, the then-assigned magistrate judge denied

23   petitioner's request to expand the record.  ECF Nos. 264-74.  The district court affirmed this order

24   and denied petitioner's request for reconsideration.  ECF Nos. 276-78 & 280-86.

25   On November 15, 2005, the then-assigned magistrate judge recommended that penalty

26   phase claims B(7), B(8), B(9), B(10), E, F(5)(c), H(2), H(15), I, L(6), and L(7), be denied.  ECF

27   No. 298.  Both parties filed objections to the findings and recommendations.  ECF Nos. 302-04.

28   The district court then reversed the then-assigned magistrate judge's order denying expansion of

1   the record and, accordingly, deemed as withdrawn the findings and recommendations in which

2   the magistrate judge had recommended dismissal of the remaining penalty-phase claims.  ECF

3   No. 311.  The parties then re-briefed, before the then-assigned magistrate judge, the expansion of

4   the record.  ECF Nos. 319-20, 322, & 324.  On June 7, 2011, the then-assigned magistrate judge

5   asked the parties submit briefing on the impact of *Cullen v. Pinholster*, 563 U.S. 170 (2011), on

6   the pending proceedings, ECF No. 325, and the parties complied.  ECF Nos. 326 & 329.

7           On July 28, 2017, the then-assigned magistrate judge issued findings and

8   recommendations in which he recommended that petitioner's motion to expand the record be

9   denied.  ECF No. 331.  Neither party objected, ECF Nos. 336-37, and the district judge adopted

10  the recommendations in full, denying petitioner's motion to expand the record.  ECF No. 338.

11  The court directed respondent to file a motion for summary judgment on all remaining issues.

12  ECF Nos. 331, 338, & 339.

13          On January 29, 2019, respondent filed the instant motion for summary judgment, ECF No.

14  351, and petitioner filed his opposition on December 23, 2019.  ECF No. 365.  On October 1,

15  2020, the undersigned was assigned to this matter.  ECF No. 366.

**ANALYSIS**

17          Respondent moves for summary judgment on all of the Amended Petition claims arising

18  from the penalty phase of petitioner's trial that have not been previously dismissed as

19  procedurally barred.  *See* ECF No. 351 at 3-4.  Petitioner concedes that he is not entitled to relief

20  on claim E, alleging ineffective assistance of appellate counsel.  ECF No. 365 at 46-48.  Ergo, the

21  undersigned considers whether summary judgment should be granted in favor of respondent on

22  claims B(7), B(8), B(9), B(10), F(5)(c), H(14), H(15), L(6), or L(7).  *See* ECF No. 351 at 3-4.

23  **I.      Law Governing Summary Judgment**

24          Although a petition for writ of habeas corpus attacks a criminal judgment, it is,

25  fundamentally, "an independent civil suit."  *Riddle v. Dyche*, 262 U.S. 333, 335-36 (1923).  "The

26  procedure on applications for habeas corpus for state prisoners is . . . found in a variety of

27  different sources," 17B Wright, Miller, Cooper & Amar, Federal Practice and Procedure § 4268,

28  at 437-38 (2007), including the Federal Rules of Civil Procedure.  Rules Governing Section 2254

1    Cases in the United States District Courts, Rule 11.  Thus, courts have found summary judgment

2    motions as described in Rule 56 of the Federal Rules of Civil Procedure to be appropriate in

3    habeas corpus proceedings.  *See Blackledge v. Allison*, 431 U.S. 63, 80 (1977); *Clark v. Johnson*,

4    202 F.3d 760, 764 (5th Cir. 2000) ("As a general principle, Rule 56 of the Federal Rules of Civil

5    Procedure, relating to summary judgment, applies with equal force in the context of habeas

6    corpus cases."); *Gentry v. Sinclair*, 576 F. Supp. 2d 1130, 1138-40 (W.D. Wash. 2008).

7           Under Rule 56, summary judgment is appropriate when there is "no genuine dispute as to

8    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

9    56(a).  The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims

10   or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Procedurally, the moving

11   party bears the initial responsibility of presenting the basis for its motion and identifying those

12   portions of the record, together with affidavits, if any, that it believes demonstrate the absence of

13   a genuine issue of material fact.  *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070,

14   1076 (9th Cir. 2001) (en banc).  If the moving party meets its burden with a properly supported

15   motion, the burden then shifts to the opposing party to present specific facts that show there is a

16   genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248

17   (1986).  When the opposing party bears the burden of proof on a dispositive issue at trial, the

18   moving party need not produce evidence that negates the opponent's claim.  *See Lujan v. Nat'l*

19   *Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  Rather, the moving party need only point to matters

20   that demonstrate the absence of a genuine material factual issue.  *See Celotex*, 477 U.S. at 323-24

21   ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a

22   summary judgment motion may properly be made in reliance solely on the 'pleadings,

23   depositions, answers to interrogatories, and admissions on file.'").

24   **II.      General Law Governing the Application of 28 U.S.C. § 2254(d)**

25          Title 28 U.S.C. § 2254 gives a federal district court jurisdiction to consider a petition for

26   writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is available

27   under section 2254 only on the basis of some transgression of federal law binding on the state

28   courts.  *See Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1994); *Middleton v. Cupp*, 768 F.2d

1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000); *Middleton*, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act ("AEDPA").  To meet the standard, a petitioner must establish that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo.  *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008).

Under AEDPA, the state court's determination is given a high degree of deference and, in considering whether either subsection of 2254(d) is met, the focus of the federal court's inquiry is only the record that had been before the state court at the time of its adjudication.  *Pinholster*, 563 U.S. at 180-82.  To satisfy section 2254(d), the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Amado v. Gonzalez*, 758 F.3d 1119, 1131-32 (9th Cir. 2014).  Thus, federal habeas relief is precluded if "'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012).  The federal court must engage in the

1    deferential review even where the state court has not provided a reasoned decision. *Richter*, 562

2    U.S. at 99-100.

3        In the present case, some of petitioner's claims were raised, and rejected, in the California

4    Supreme Court's reasoned decision on appeal, and some were raised in his state habeas petitions,

5    which the California Supreme Court summarily denied. A summary denial is presumed to be a

6    denial on the merits of the petitioner's claims and, in assessing those claims summarily denied by

7    the state court, the federal court must defer to the state court's denial if review of the state court

8    record shows any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

9    The federal court "must determine what arguments or theories . . . could have supported . . . the

10   state court's decision; and then it must ask whether it is possible fairminded jurists could disagree

11   that those arguments or theories are inconsistent with the holding in a prior decision of [the

12   Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no

13   reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir.

14   2013) (quoting *Richter*, 562 U.S. at 98).

15       When reviewing the California Supreme Court's summary denial of a petition for writ of

16   habeas corpus that had been brought in state court, this court must consider that

17       the California Supreme Court's summary denial of a habeas petition
         on the merits reflects that court's determination that "the claims
18       made in th[e] petition do not state a prima facie case entitling the
         petitioner to relief." It appears that the court generally assumes the
19       allegations in the petition to be true, but does not accept wholly
         conclusory allegations, and will also "review the record of the trial .
20       . . to assess the merits of the petitioner's claims."

21   *Pinholster*, 563 U.S. at 188 n.12 (quoting *In re Clark*, 5 Cal. 4th 750, 770 (1993), and citing

22   *People v. Duvall*, 9 Cal. 4th 464, 474 (1995)). Accordingly, in these instances, the absence of a

23   prima facie case is the state-court determination that this court reviews under section 2254(d) and

24   that determination is considered a denial "on the merits" for the purposes of AEDPA. *See*

25   *Pinholster*, 563 U.S. at 190; *Ochoa v. Davis*, 50 F.4th 865, 888 (9th Cir. 2022); *Nunes v. Mueller*,

26   350 F.3d 1045, 1054-55 (9th Cir. 2003). A petitioner establishes a prima facie case of a

27   constitutional violation if he made allegations sufficient to support the claim and demonstrated

28   that "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he can prove his

                                        14

1    claim. *Nunes*, 350 F.3d at 1054-55. If this court finds petitioner had unarguably presented a

2    prima facie case for relief on a claim to the state court, the state court's summary rejection of that

3    claim was unreasonable. *Id.*

4           Under section 2254(d), the state court decision is not entitled to deference if either

5    subsection (d)(1) or (d)(2) is met. *See* 28 U.S.C. § 2254(d) (listing subsections in the disjunctive).

6    Subsection (d)(1) states that no deference is owed if the state court decision reflects "a decision

7    that was contrary to, or involved an unreasonable application of, clearly established Federal law."

8    28 U.S.C. § 2254(d)(1). "Clearly established Federal law" is that which was set forth in the

9    United States Supreme Court's "applicable holdings," *Carey v. Musladin*, 549 U.S. 70, 74 (2006),

10   rather than dicta, at the time the state court decided the issue. *Cannedy v. Adams*, 706 F.3d 1148,

11   1157 (9th Cir. 2013); *see also Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010)), *amended on*

12   *other grounds*, 733 F.3d 794 (9th Cir. 2013). While "circuit court precedent may be persuasive in

13   determining what law is clearly established and whether a state court applied that law

14   unreasonably," *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010), circuit precedent may not be

15   "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal

16   rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)

17   (citing *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam)). Additionally, where courts

18   of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly

19   established Federal law" governing that issue. *Carey*, 549 U.S. at 77.

20          A state court decision is "contrary to . . . clearly established Federal law" under subsection

21   (d)(1) if it applies a rule contradicting a holding of the Supreme Court or reaches a result different

22   from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S.

23   634, 640 (2003). A state court decision is an "unreasonable application" of clearly established

24   federal law if "the state court correctly identifies the governing legal principle . . . but

25   unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002)

26   (citing *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000)). When the federal court reviews the

27   summary denial of a habeas corpus petition by the state court—where, by virtue of it having been

28   a summary denial, the state court made no factual findings—the federal court analyzes the state-

court decision under 2254(d)(1), because the state court's determination that petitioner's allegations if true did not state a prima facie case for relief is a legal determination, rather than a factual one. *Prescott v. Santoro*, 53 F.4th 470, 479 (9th Cir. 2022).

Subsection 2254(d)(2) provides that an unreasonable factual determination by the state court is not entitled to deference. *See* 28 U.S.C. § 2254(d)(2). There are two ways a petitioner may satisfy subsection (d)(2): he may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." *Hibbler*, 693 F.3d at 1146 (citing *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014)); *see also Hurles v. Ryan*, 752 F.3d 768, 790-91 (9th Cir. 2014) (if a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process is deficient and the state court opinion is not entitled to deference), *cert. denied*, 574 U.S. 1071 (2014). The standard for determining whether the state court's fact-finding process is insufficient requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Hibbler*, 693 F.3d at 1146-47 (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)). This standard is satisfied, for example, where the state court denied the petitioner an evidentiary hearing when the petitioner's proffered evidence satisfied the state-law standard for granting one. *Brumfield v. Cain*, 576 U.S. 305, 320-22 (2015). In contrast, the state court's failure to have held an evidentiary hearing is not unreasonable if the state court may have reasonably concluded that the evidence already on the record sufficed to resolve the relevant factual question. *Hibbler*, 693 F.3d at 1147; *Earp v. Ornoski*, 431 F.3d 1158, 1167-70 (9th Cir. 2005). Thus, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." *Perez v. Rosario*, 459 F.3d 943, 951 (9th Cir. 2006) (citing *Nunes*, 350 F.3d at 1055); *cf. Landrigan v. Schriro*, 550 U.S. 465, 474 (2007) (in federal habeas corpus proceedings, a district court may decline to hold an evidentiary hearing "if the record refutes the applicant's

16

1  factual allegations or otherwise precludes habeas relief").

2    If a petitioner shows that section 2254(d)(1) or (d)(2) is satisfied, this court may review

3  the merits of the claim de novo.  28 U.S.C. § 2254(d); *see Panetti*, 551 U.S. at 953; *Frantz*, 533

4  F.3d at 737.  For the claims upon which petitioner seeks to present evidence, petitioner must meet

5  the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

6  basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

7  the presentation of evidence in a federal habeas corpus proceeding.  *See Pinholster*, 563 U.S. at

8  185-86.

9               **CLAIMS FOR RELIEF**

10  **CLAIM B(7)**

11    In claim B(7), petitioner alleges that trial counsel performed ineffectively by failing to

12  object to the admission of certain aggravating evidence under state law.  ECF No. 74 at 64-65.  In

13  state court, petitioner raised this claim on direct appeal, arguing that the evidence at issue was

14  improperly admitted, LD II-A at 181-86, 189-96; LD II-E at 68-70, and that his counsel was

15  ineffective for failing to object to its admission.  LD II-E at 18-20, 63-64.  The California

16  Supreme Court denied the claim on the merits.  *Hines*, 15 Cal. 4th at 1056-57, 1058-61.

17  Petitioner reraised this claim in his first petition for writ of habeas corpus in the California

18  Supreme Court.  LD III-A at 25-26, 89-91, 93; LD III-E at 9-10, 22-23.  The California Supreme

19  Court denied the claim on the merits in a summary order.  LD III-F.  Petitioner argues that the

20  state court's denial of this claim was unreasonable under section 2254(d)(1).  ECF No. 365 at 37.

21  The undersigned concludes that the state court's denial is entitled to deference and recommends

22  that this claim be dismissed.

23    *A.  Legal Standard*

24    Under clearly established federal law, to prevail on a claim of ineffective assistance of

25  counsel, a petitioner must show that his trial counsel's performance "fell below an objective

26  standard of reasonableness" and that "there is a reasonable probability that, but for counsel's

27  unprofessional errors, the result of the proceeding would have been different."  *Strickland v.*

28  *Washington*, 466 U.S. 668, 687-88, 694 (1984).

1    Under the first prong of the *Strickland* test, a petitioner must show that counsel's conduct

2    failed to meet an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687.  There is "a

3    'strong presumption' that counsel's representation was within the 'wide range' of reasonable

4    professional assistance."  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

5    Petitioner must rebut this presumption by demonstrating that his counsel's performance was

6    unreasonable under prevailing professional norms and was not the product of "sound trial

7    strategy."  *Strickland*, 466 U.S. at 688-89.  Counsel's duty of reasonably competent performance

8    embraces the litigation of trial issues and preparation therefor.  *Maryland v. Kulbicki*, 577 U.S. 1,

9    3-5 (2015); *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).  Defense counsel is not deficient for

10   failing to make futile arguments, motions, or objections.  *See Jones v. Barnes*, 463 U.S. 745

11   (1983); *Ochoa v. Davis*, 50 F.4th 865, 889 (9th Cir. 2022); *Rupe v. Wood*, 93 F.3d 1434, 1445

12   (9th Cir. 1996).

13   The second prong of the *Strickland* test requires a petitioner to show that counsel's

14   conduct prejudiced him.  *Strickland*, 466 U.S. at 691-92.  Prejudice is found where "there is a

15   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

16   would have been different."  *Id.* at 694.  A reasonable probability is one "sufficient to undermine

17   confidence in the outcome."  *Id.* at 693.  Where, as here, the claimed deficiency is trial counsel's

18   failure to make a particular motion, to prove prejudice petitioner must show there is a reasonable

19   probability the court would have granted the motion and, if the motion had been granted, a

20   reasonable probability of a more favorable verdict.  *Kimmelman v. Morrison*, 477 U.S. 365, 383-

21   91 (1986); *Styers v. Schriro*, 547 F.3d 1026, 1030 & n.5 (9th Cir. 2008)

22   Under clearly established federal law, in considering whether counsel's deficient

23   performance was reasonably probable to have affected the jury's verdict, the prejudice from

24   individual instances of deficient performance should be considered cumulatively.  *Strickland*, 466

25   U.S. at 695-96 ("Taking the unaffected findings as a given, and taking due account of the effect

26   of the errors on the remaining findings, a court making the prejudice inquiry must ask if the

27   defendant has met the burden of showing that the decision reached would reasonably likely have

28   been different absent the errors.").  Thus, the court "must analyze each of [petitioner's] claims

18

1    separately to determine whether his counsel was deficient, but 'prejudice may result from the

2    cumulative impact of multiple deficiencies.'" *Boyde v. Brown*, 404 F.3d 1159, 1175 (9th Cir.

3    2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)); *see also*

4    *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022); *Lang v. Cullen*, 725 F. Supp. 2d 925, 970-

5    71 (C.D. Cal. 2010).

6          When a court evaluates a claim of ineffective assistance of counsel through the AEDPA

7    lens, the court's analysis is "doubly . . . deferential," *Richter*, 562 U.S. at 105, because, in order to

8    grant relief, the court must consider not only whether *Strickland*'s substantive standard has been

9    met, but whether each prong has been met so unequivocally that no reasonable jurist could

10   conclude otherwise. *Id.* Where the state court has denied relief without a reasoned opinion, the

11   habeas court must determine whether there was any reasonable basis for the denial, consistent

12   with clearly established federal law. *Richter*, 562 U.S. at 98; *Kipp v. Davis*, 971 F.3d 939, 948

13   (9th Cir. 2020). Thus, if the state court could have reasonably found there was a lack of a prima

14   facie showing of relief on either the deficiency or prejudice prong of the *Strickland* inquiry, the

15   denial is entitled to deference. *Shinn v. Kayer*, 529 U.S. 111, 119-20 (2020); *cf. Strickland*, 466

16   U.S. at 697 (because petitioner bears the burden on both prongs, "a court need not determine

17   whether counsel's performance was deficient before examining the prejudice suffered by the

18   defendant as a result of the alleged deficiencies. . . . . If it is easier to dispose of an ineffectiveness

19   claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course

20   should be followed.").

21          *B. The California Supreme Court's Denial of This Claim Was Not Contrary to, or an*
22          *Unreasonable Application of, Clearly Established Federal Law*

23          As noted, petitioner raised this claim both on direct appeal and, subsequently, in a petition

24   for writ of habeas corpus in the California Supreme Court. On direct appeal, the California

25   Supreme Court denied the claim on the merits in a reasoned opinion, but on habeas corpus,

26   denied the claim on the merits in a summary order. LD II-H; LD III-F. The United States

27   Supreme Court has held that in these situations the federal court should presume that the state

28

1    court's summary denial reflected an adoption of the earlier, reasoned decision and conduct an

2    AEDPA analysis by "looking through" the summary order to the reasoned decision.  *Ylst v.*

3    *Nunnemaker*, 501 U.S. 797, 803, 806 (1991) (holding that, where a claim had been brought on

4    direct appeal and denied in a reasoned decision, then raised in state habeas corpus and denied

5    summarily, the federal courts should "apply[] the following presumption: Where there has been

6    one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

7    judgment or rejecting the same claim rest upon the same ground"); *see Wilson v. Sellers*, 584 U.S.

8    __, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018); *Barker v. Fleming*, 423 F.3d 1085, 1091

9    (9th Cir. 2005).  Here, the parties do not dispute that this court should consider the reasonableness

10   of the state court's decision on direct appeal when determining whether deference is owed to the

11   state court's denial of the claim.[4]  *See* ECF Nos. 351 at 17-19, 365 at 33-37.

12                    *1.  Evidence of Shank in Petitioner's Mattress*

13            Petitioner argues that reasonable defense counsel would have moved to have excluded

14   evidence that a shank was found in his mattress in his jail cell, as he awaited trial in the instant

15   case, on the basis that the prosecution could not have shown that the evidence was admissible.

16   ECF No. 74 at 64.  Under California law at the time of petitioner's trial, in a capital case, if the

17   prosecutor intended to introduce aggravation evidence of the defendant's prior violent or

18   threatening acts under section 190.3(b), the defendant had a right to request an admissibility

19   hearing at which the prosecutor would have to show that "there is substantial evidence to prove

20   each element of the . . . criminal activity."  *People v. Phillips*, 41 Cal.3d 29, 72 n.25 (1985).  At

21   ─────────────────

22          [4] The continued application of the *Ylst* doctrine in situations such as these may have been
     called into question by the California Supreme Court's recent decision in *Robinson v. Lewis*, 9
23   Cal. 5th 883, 985-86 (2020), wherein that court held that, when it denies a habeas corpus petition
     that has been filed in that court in its original jurisdiction, it is not reviewing or adopting the
24   reasons for denials of the same claims brought in other proceedings.  Nevertheless, *Ylst* remains
     binding precedent that controls here.  *See Flemming v. Matteson*, 26 F.4th 1136 (9th Cir. 2022).
25   Notably, even if the undersigned did not apply the *Ylst* presumption and instead considered the
     only relevant state court denial to be the summary denial on habeas corpus, the same result would
26   obtain: the reasons for the denial on direct appeal also could have supported the summary denial
     of the claim on habeas corpus, for the reasons set forth herein.  *See generally Richter*, 562 U.S. at
27   99-100 (state court's summary, merits denial of habeas corpus claim is owed deference by the
     federal court if it is supported by any reasonable basis).

28

1  the time of petitioner's trial, "[i]t [was] settled that a defendant's knowing possession of a

2  potentially dangerous weapon in custody is admissible under factor (b).  Such conduct is unlawful

3  and involves an implied threat of violence even where there is no evidence defendant used or

4  displayed it in a provocative or threatening manner."  *People v. Tuilaepa*, 4 Cal. 4th 569, 589

5  (1992), *aff'd sub nom. Tuilaepa v. California*, 512 U.S. 967, 114 S. Ct. 2630, 129 L. Ed. 2d 750

6  (1994).

7        Petitioner argues that defense counsel were unreasonable in not requesting a *Phillips*

8  hearing on the admissibility of evidence of a shank found in petitioner's jail mattress, on the basis

9  that "it appears that there was a genuine issue regarding whether Mr. Hines had knowledge of the

10  presence of the shank in the mattress."  ECF No. 365 at 36; *see also* ECF No. 74 at 64 (alleging

11  "[t]here was evidence . . .which tended to establish that Mr. Hines may not have been aware of

12  the presence of the 'shank' in the mattress").  Petitioner cites no evidence to support this

13  argument, *see id.*, and so he is presumably referring to that evidence adduced at trial suggesting

14  that the shank could have been placed in the mattress by another person without petitioner's

15  knowledge, *see* 22 RT 5906-20; 23 RT 6095-6105, which was the only evidence on which

16  petitioner relied in making this claim in state court.  *See* LD II-A at 183-86; LD II-E at 68-70; *cf.*

17  LD III-A at 25-26 (relying on no additional evidence in state habeas petition); LD III-E at 22

18  (same); *see also* ECF No. 74 at 64 (same).

19        The California Supreme Court's denial of this claim was not unreasonable under clearly

20  established federal law.  On direct appeal, the California Supreme Court held that defense counsel

21  was not deficient for failing to object to the evidence's admission, because the prosecution's

22  evidence that the shank had been discovered in petitioner's mattress would have permitted the

23  jury to reasonably infer that petitioner had knowing possession of it.  *Hines*, 15 Cal. 4th at 1057.

24  This is a reasonable interpretation of the evidence.  *See United States v. Haro-Portillo*, 531 F.2d

25  962, 963 (9th Cir. 1976) (where contraband is inside another item, defendant's knowledge of

26  possessing the contraband can be inferred by his possession of the item containing the

27  contraband); *Tuilaepa*, 4 Cal. 4th at 589 (defendant did not dispute that an item found in his jail

28  cell was necessarily in his knowing possession); *People v. Mason*, 52 Cal. 3d 909, 957 (1991)

21

1    (jury could infer defendant's knowing possession of a razor blade simply because it was

2    discovered in his jail cell).  As such, petitioner has not shown that every reasonable defense

3    counsel would have objected to the admission of the evidence on the basis that the prosecutor did

4    not have "substantial evidence," *see Phillips*, 41 Cal.3d at 72 n.25, of petitioner's knowing

5    possession of the shank, nor that, if such an objection had been made, there is a reasonable

6    probability the trial court would have sustained it.  Petitioner's argument that "there was a

7    genuine issue" as to whether he had knowledge of the shank's presence in the mattress, *see* ECF

8    No. 365 at 36, merely highlights that there was a factual dispute for the jury to resolve, not that

9    the record lacked substantial evidence to support the inference favorable to the prosecution.  *See*

10   *Tuilaepa*, 4 Cal. 4th at 589 ("The trier of fact is free to consider any 'innocent explanation' for

11   defendant's possession of the item, but such inferences do not render the evidence inadmissible

12   per se."); *Mason*, 52 Cal. 3d at 957 ("The availability of an innocent explanation for criminal

13   activity, however, does not make the evidence of criminal activity inadmissible.  Instead, the

14   innocent explanation merely raises an ordinary evidentiary conflict for the trier of fact.").

15          Accordingly, the California Supreme Court's rejection of this subclaim on direct appeal

16   was neither contrary to nor an unreasonable application of, clearly established federal law

17   governing claims of ineffective assistance of counsel.  *See* 28 U.S.C. § 2254(d)(1).  The

18   undersigned recommends that this portion of claim B(7) be dismissed.

19                   *2.  Evidence of Threats to Jail Personnel*

20                          *a.  Lack of Notice*

21          Petitioner alleges that trial counsel was unreasonable in failing to object to the aggravating

22   evidence of his threats to jail personnel, first, because the prosecutor had failed to comply with

23   California's notice requirements for this evidence.  ECF No. 74 at 65; ECF No. 365 at 36; *see* LD

24   II-A at 189-92; LD II-E at 61-64.  The state court's rejection of this argument was reasonable.

25          On direct appeal, the California Supreme Court held that this claim was meritless because

26   petitioner had failed to show that defense counsel had acted deficiently.  *Hines*, 15 Cal. 4th at

27   1059.  Although Penal Code section 190.3 provided that, "no evidence may be presented by the

28   prosecution in aggravation unless notice of the evidence to be introduced has been given to the

1  defendant within a reasonable period of time as determined by the court, prior to trial," there was

2  no requirement that notice be given in writing. *Id.* Ergo, although no notice of these incidents

3  was in the record, that did not establish that such notice had not been provided to defense counsel;

4  the record was simply silent on this point. *Id.* Review of the record indicates that this

5  determination does not reflect an unreasonable factual determination. Because clearly established

6  federal law placed the burden of proof on petitioner to prove that his counsel performed

7  deficiently, his claim failed because the central factual premise of his argument appeared

8  factually unsupported. The state court's ruling, therefore, was consistent with *Strickland* and its

9  progeny. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Strickland*, 466 U.S. at 687-91.

10      The state court also rejected this argument on the alternative basis that petitioner had not

11  shown prejudice, because the record did "not show that a continuance in this case would have led

12  to the discovery of additional information that would have enabled defendant to respond more

13  effectively to the prosecution's evidence." *Hines*, 15 Cal. 4th at 1059. This, too, was a

14  reasonable conclusion based on the record before it and in light of clearly established federal law.

15  To prove prejudice, petitioner had the burden of proving that there was a reasonable probability

16  that, had counsel not engaged in the specified deficient performance, the results of the proceeding

17  would have been more favorable to him. *Strickland*, 466 U.S. at 694. Here, there was nothing in

18  the record to indicate that, had defense counsel objected to the admission of the purported jail

19  threats on the basis of the lack of notice, there was a reasonable probability of a more favorable

20  verdict. The California Supreme Court held that, as a matter of state law, had defense counsel

21  raised such an objection and had the trial court sustained it, the trial court's remedy would have

22  been to allow a continuance to permit defense counsel to prepare. *Hines*, 15 Cal. 4th at 1059.

23  There was nothing in the record to indicate what the fruits of such preparation would have been,

24  and thus the state court was reasonable in concluding that petitioner had not met his burden of

25  showing that any deficient performance on this point was prejudicial, under the prejudice

26  standard set forth in clearly established federal law. *See Strickland*, 466 U.S. at 694.

27          *b.  Admissibility*

28

23

1    Petitioner also argued in state court that defense counsel performed deficiently by failing

2  to object to the admission of evidence of the purported statements on the basis that they did not

3  constitute threats under state law and therefore were inadmissible.  LD II-A at 181-82, 189, 192-

4  97; LD II-E at 19-20, 64-66; *see* ECF No. 74 at 64-65.  While defense counsel do have a

5  professional responsibility to raise meritorious objections, the Sixth Amendment does not demand

6  they raise futile, frivolous, or meritless ones.  *See Knowles v. Mirzayance*, 556 U.S. 111, 123

7  (2009); *Jones*, 463 U.S. at 751; *Ochoa*, 50 F.4th at 889; *Rupe v. Wood*, 93 F.3d at 1445.  On

8  direct appeal, the California Supreme Court held that all of the statements at issue save two made

9  concerning Deputy Cooper did constitute threats under California Penal Code section 69 and

10  therefore were properly admitted as aggravating evidence under Penal Code section 190(b).

11  *Hines*, 15 Cal. 4th at 1059-60.  This court must defer to the state court's interpretation of state

12  law, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), and, consequently, must conclude that the

13  state court was reasonable in holding that, as to those statements, petitioner had failed to prove his

14  counsel acted deficiently under clearly established federal law by failing to object to the

15  admission of this evidence.  *See Knowles*, 556 U.S. at 123; *Jones*, 463 U.S. at 751; *see generally*

16  *Strickland*, 466 U.S. at 688-91.

17    The state court was also reasonable in holding that petitioner had not proven prejudice

18  from trial counsel's failure to object to the admission of the statements petitioner had purportedly

19  made concerning Deputy Cooper.  *See Hines*, 15 Cal. 4th at 1059-60.  The state court agreed with

20  petitioner that the jury should not have heard Deputy Cooper's testimony that petitioner had

21  reportedly told other persons that Deputy Cooper's "days were short" and that he had, in another

22  instance, told Deputy Cooper, "I am going to fuck you up"—because, without more, neither

23  statement constituted a "threat" under California law.  *Id.*  The state court held, however, that the

24  jury was not prejudiced by having heard Deputy Cooper's testimony about these statements, in

25  light of the totality of the other evidence presented.  *Id.* (citing *Strickland*, 466 U.S. at 694).

26    This was a reasonable application of clearly established federal law.  In conducting its

27  prejudice analysis, the state court was required to "[t]ak[e] the unaffected findings as a given, and

28  tak[e] due account of the effect of the errors on the remaining findings, . . . [and] ask if the

1   defendant has met the burden of showing that the decision reached would reasonably likely have

2   been different absent the errors." *Strickland*, 466 U.S. at 696.  Here, the "unaffected findings"

3   consisted of aggravation evidence that was more lengthy, more detailed, and far more disquieting

4   than the statements to which Deputy Cooper testified.  Aside from Deputy Cooper's testimony,

5   the jury had also heard extensive evidence at the guilt phase that petitioner had participated in the

6   brutal killings of two people—one of whom was a child—apparently in service of a purely

7   avaricious motive.  They heard evidence that after committing the brutal murders, petitioner

8   flaunted the proceeds of his crime about town and then lied about his participation in it; to the

9   latter point, the jury seemingly rejected petitioner's testimony at the guilt phase in which he

10   denied responsibility for the murders.  The jury heard evidence at the penalty phase of additional

11   acts of aggression and violence perpetrated by petitioner, including properly admitted evidence of

12   his having engaged in multiple other instances of threatening behavior while in jail awaiting trial

13   in the instant case.  *See Hines*, 15 Cal. 4th at 1015-20.  In light of the totality of this weighty

14   aggravation evidence, the state court was reasonable in concluding that petitioner had not shown

15   there was a reasonable likelihood that, if the jury had not also heard the comments concerning

16   Deputy Cooper, they would have rejected a death verdict at the penalty phase.  *See Pinholster*,

17   563 U.S. at 202.  Petitioner has not shown that the state court's denial of this claim was

18   unreasonable under clearly established federal law, i.e., that no reasonable jurist would have

19   reached the same conclusion as did the state court, given the evidentiary record before it.  *See id.*

20   at 200-03; *Shinn*, 592 U.S. at 119-24; *Woodford v. Visciotti*, 537 U.S. 19, 22-27 (2002).

21          For these reasons, the state court's denial of relief on claim B(7) is entitled to deference,

22   28 U.S.C. § 2254(d), and the undersigned recommends that it be dismissed.

23   **CLAIM B(8)**

24          In claim B(8), petitioner alleges that defense counsel performed ineffectively in various

25   aspects of the defense presentation at the penalty phase.  *See* ECF No. 74 at 65-69.  In opposing

26   respondent's motion for summary judgment, he abandons all but three bases for this claim,

27   arguing that defense counsel performed ineffectively by failing to investigate petitioner's social

28   history (subclaim B(8)(a)), failing to consult with and present the testimony of a

neuropsychologist (subclaim B(8)(b)), and propounding the prejudicial testimony of defense witness Dr. Grover (subclaim B(8)(c)).  ECF No. 365 at 20-28; *see* ECF No. 74 at 65-68. Petitioner raised these subclaims in his first petition for writ of habeas corpus in state court, which the California Supreme Court denied summarily on the merits.  LD III-A at 27-30, 89-93; LD III-E at 23-26; LD III-F.  Petitioner re-raised, in his second petition for writ of habeas corpus in state court, his allegations that trial counsel performed ineffectively in failing to consult with a neuropsychologist.  LD IV-A at 60-61, 69-73; LD IV-E at 17-18 (acknowledging that this subclaim had been previously raised and denied and, as such, advising the state court that it need not further review it); *id*. at 50-53.  The state court denied this claim summarily, on the merits, as well.  ECF No. 76.  The undersigned concludes that the state court's denial of this claim is entitled to deference.

1. *The State Court's Summary Denial of Relief Did Not Constitute an Unreasonable Factual Determination*

Petitioner argues that the California Supreme Court's summary denial of all three subclaims at issue was based upon an unreasonable factual determination and as such is not entitled to deference.  ECF No. 365 at 31-32; *see* ECF No. 331 at 9-10 (directing petitioner to brief the issue).  The undersigned does not agree.

Under 28 U.S.C. section 2254(d)(2), a habeas petitioner is entitled to de novo review of his constitutional claim if the state court's prior denial of the same claim rested on an unreasonable factual determination.  A state court makes an unreasonable factual determination if "the fact-finding process itself . . .  was deficient in some material way."  *Hibbler*, 693 F.3d at 1146 (citing *Taylor*, 366 F.3d at 999, 1001).  The gravamen of this inquiry is whether the state's fact-finding process was objectively unreasonable:

> before we can determine that the state-court factfinding process is
> defective in some material way, or perhaps non-existent, we must
> more than merely doubt whether the process operated properly.
> Rather, we must be satisfied that any appellate court to whom the
> defect is pointed out would be unreasonable in holding that the state
> court's fact-finding process was adequate.

1    *Taylor*, 366 F.3d at 1000; *see also Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016); *see*

2    *Nunes*, 350 F.3d at 1056.  Reviewing courts have found, for example, that this standard may be

3    met if the state court made factual determinations adverse to the petitioner—after having denied

4    the petitioner the opportunity for evidentiary development on a well-pled claim for relief.  *See*

5    *Brumfield*, 576 U.S. at 312-13, 317, 320-21; *Nunes*, 350 F.3d at 1055; *see also Pizzuto v. Yordy*,

6    947 F.3d 510, 534 (9th Cir. 2019); *Murray v. Schriro*, 882 F.3d 778, 823 (9th Cir. 2018); *Loher*,

7    825 F.3d at 1117; *cf. Hurles*, 752 F.3d at 790.

8        Petitioner argues that the state court's summary denial, in 1997, of this claim, when it was

9    raised in his first petition for writ of habeas corpus, rested on an unreasonable factual

10   determination because, when summarily denying this claim, the California Supreme Court had

11   "failed to consider additional evidence which it, more than one year after denying Mr. Hines'

12   state habeas petition, deemed necessary to making that very same ruling."  ECF No. 365 at 31.

13   The state court record demonstrated that petitioner filed his first petition for writ of habeas corpus

14   in state court on January 17, 1995.  LD III-A.  Respondent then filed an informal response and, on

15   December 22, 1995, petitioner filed a reply, thus completing the informal briefing process.  LD

16   III-D; LD III-E.  Approximately eighteen months later, on May 12, 1997, as the case was pending

17   decision by the California Supreme Court, petitioner additionally filed an ex parte request for

18   funds to investigate potential mitigation evidence, including evidence of childhood trauma, drug

19   abuse, and possible neurological and mental impairments.  *See* ECF No. 271, Exs. E & F; ECF

20   No. 274 at 5-6.  This included requests for funds for petitioner to obtain available records relating

21   to him and his family; locate and interview witnesses who had observations of his life and

22   functioning; consult with a neuropsychologist; and undertake neuropsychological testing to

23   determine whether he suffered from organic brain damage.  *Id.*  The California Supreme Court

24   docketed this request in petitioner's direct appeal case, which was also pending decision

25   simultaneous with petitioner's state habeas corpus proceeding.  *See People v. Hines*, No. S006640

26   (Cal. Sup. Ct. May 13, 1997).  On the June 26, 1997, the court both denied petitioner's petition

27   for writ of habeas corpus summarily and affirmed his judgment and sentences in a reasoned

28   opinion on direct appeal.  LD III-F; LD II-H.  At that point, the court had not ruled on petitioner's

1    request for funding.

2        In his direct appeal proceedings, petitioner then sought rehearing in the California

3    Supreme Court and sought certiorari to the United States Supreme Court on grounds unrelated to

4    the funding request.  LD II-I; LD II-J; LD II-K; LD V-A; LD V-B.  On September 23, 1998, the

5    California Supreme Court issued an order granting petitioner's funding request in part, granting

6    him "$10,000 to investigate the possibility that [his] trial attorneys did not adequately investigate

7    and present mitigating evidence at the penalty phase of trial regarding [his] history of

8    developmental trauma, polydrug abuse and possible neurological and mental impairments." *See*

9    ECF No. 271, Ex. G; ECF No. 274 at 5-6.

10       Approximately six months later, petitioner filed his second petition for writ of habeas

11   corpus in state court.  LD IV-A.  As noted, in it, he re-raised his allegations that trial counsel

12   provided ineffective assistance by failing to consult with and to present the testimony of a

13   neuropsychologist, which he supported with the declaration of neuropsychologist Dr. Karen

14   Froming, but petitioner also represented to the California Supreme Court that this subclaim had

15   been previously presented to the court in the prior habeas corpus action, such that the court need

16   not review its second iteration.  LD IV-E at 17-18.

17       The undersigned is unpersuaded that the timing of the California Supreme Court's grant of

18   the funding request indicates that its earlier, summary denial of this claim in petitioner's first

19   petition for writ of habeas corpus was premised on an unreasonable factual determination.

20   Petitioner argues that "the California Supreme Court's denial of Mr. Hines' claim of ineffective

21   assistance of counsel was clearly unreasonable because that very same court concluded, by

22   granting Mr. Hines' funding request to develop the record on that very same claim, that the

23   evidence before it was insufficient to resolve the issue when it made its decision."  ECF No. 365

24   at 32.  The undersigned finds that the state record does not support this deduction but, regardless,

25   because the state court's summary denial of the habeas corpus petition did not reflect any

26   factfinding, its denial did not rely on unreasonable factfinding within the meaning of 2254(d)(2).

27       When the California Supreme Court summarily denied petitioner relief in habeas corpus

28   proceedings, it implicitly determined that petitioner's factual allegations, even if fully credited,

1    did not make a prima facie showing of his entitlement to relief.  *See Duvall*, 9 Cal. 4th at 475; *see*

2    *also In re Clark*, 5 Cal. 4th at 769 n.9.  This is a purely legal question; it reflects no fact-finding

3    whatsoever.  *Prescott*, 53 F.4th at 479.  For this reason, the California Supreme Court's summary

4    denials of habeas corpus relief are generally analyzed under 2254(d)(1)—and the reviewing

5    federal court asks whether they reflect unreasonable applications of governing law—rather than

6    under (d)(2).  *See id.*; *Gulbrandson v. Ryan*, 738 F.3d 976, 994 (9th Cir. 2013); *see also*

7    *Pinholster*, 563 U.S. at 188 & n.12.

8           In some cases, reviewing courts have found a state court's denial of evidentiary

9    development of a petitioner's well-pled allegations to reflect a denial based on an unreasonable

10   fact determination under (d)(2).  *See Brumfield*, 576 U.S. at 313 & n.3; *Nunes*, 350 F.3d at 1053-

11   56.  In these case, however, the state court had engaged in some form of fact-finding on the

12   record and then denied petitioner's claim, at least in part, on the facts that it had found.  *See*

13   *generally Hurles*, 752 F.3d at 790 (collecting cases and observing, "[w]e have held repeatedly

14   that where a state court makes factual findings without an evidentiary hearing or other

15   opportunity for the petitioner to present evidence, the fact-finding process itself is deficient and

16   not entitled to deference" under 2254(d)(2) (internal citation omitted)).  For example, in

17   *Brumfield*, the petitioner sought habeas corpus relief in state court alleging, inter alia, that his

18   intellectual disability precluded his execution under the Eighth Amendment.  *Brumfield*, 576 U.S.

19   at 309.  He supported his allegations with copious evidentiary materials and requested an

20   evidentiary hearing consistent with state pleading rules.  *Id.*  The state trial court denied the

21   request for an evidentiary hearing and denied the petition; in making the latter ruling, the state

22   court relied on some of the evidence before it concerning the petitioner's I.Q. score and his

23   impairments in adaptive functioning, concluding that neither prong had been shown to be

24   consistent with intellectual disability, meaning that petitioner could not win relief on the claim.

25   *Id.* at 310, 313-17.  In federal habeas corpus proceedings, the district court held that this reflected

26   an unreasonable determination of the facts, such that the state court's denial of this claim was not

27   entitled to deference under section 2254(d)(2), a position with which the United States Supreme

28   Court ultimately agreed.  *Id*. at 311, 314.  Under state pleading rules, the petitioner needed only to

1   present evidence sufficient to raise a reasonable doubt as to his intellectual disability.  *Id.* at 317,

2   320.  The record showed that he had amply met that standard but had not been granted an

3   opportunity for further evidentiary development by the state court.  *Id.* at 320-21.  Nonetheless,

4   the state court then made two "factual determinations," based on the record before it, that were

5   adverse to petitioner and then "premised" it denial of habeas relief on those determinations.  *Id.* at

6   313.  This reflected a decision undeserving of the federal court's deference under section

7   2254(d)(2).  *Id.* at 315-23; *see also Nunes*, 350 F.3d at 1053-56 (holding 2254(d)(2) satisfied

8   where state court made factual findings adverse to petitioner, denied petitioner evidentiary

9   development of his well-pled claim, then denied him relief based on the adverse factual findings).

10          These cases are inapposite.  In petitioner's case, the state habeas corpus petition denials

11   were not based on any factual findings adverse to petitioner, but reflected the California Supreme

12   Court's legal determination that the subclaims at issue here, as presented in petitioner's state-

13   court pleadings, did not state a prima facie case for relief even if all of petitioner's factual

14   averments were fully credited.  Therefore, section 2254(d)(2) is not implicated, since the state

15   court's adjudication of the claim was not "based on" any "determination of the facts," when it

16   summarily denied relief in either habeas corpus proceeding.  *See* 28 U.S.C. § 2254(d)(2).

17          Moreover, the California Supreme Court's grant of the funding request did not imply, as

18   petitioner would have it, that the court had determined that "the evidence before it [in the first

19   habeas corpus petition] was insufficient to resolve the issue when it made its decision" to deny

20   that petition summarily.  *See* ECF No. 365 at 32.  The legal standard employed by the California

21   Supreme Court in assessing the funding request was much less rigorous: whether petitioner had

22   shown good cause to believe that the investigation would result in "potentially meritorious bases"

23   for habeas corpus relief.  *Cal. Supreme Court Policies Regarding Cases Arising From Judgments*

24   *of Death*, Policy 3, Standard 2-2 (1992); *see also id.* at Policy 3, Standard 2-5 (1992) (habeas

25   counsel will be awarded requested investigative funds unless relating to matters "clearly not

26   cognizable in a petition for writ of habeas corpus"); *id.* at Policy 3, Standard 2-6 (where

27   investigation sought to "bolster or augment claims already presented" in a petition for writ of

28   habeas corpus, the court will grant the request upon a showing that petitioner has discovered

30

1    "new and potentially meritorious" areas of investigation supporting in claims).  Petitioner had

2    filed his first habeas corpus petition, and his reply brief in support of same, over a year before he

3    filed his funding request.  *See* LD III-A, LD III-E.  This choice by petitioner may reasonably have

4    indicated to the state court that the funds were being requested to support a possible successive

5    petition.  *See generally In re Robbins*, 18 Cal. 4th 770, 788 n.9 (1998) (at the time of the relevant

6    filings, California's successor bar was not consistently followed by the state court); *Carpenter v.*

7    *Ayers*, 548 F. Supp. 2d 736, 755-56 (N.D. Cal. 2008), *reconsideration granted on other grounds*

8    *sub nom. Carpenter v. Chappell*, No. C 98-2444 MMC, 2014 WL 4684848 (N.D. Cal. Sept. 19,

9    2014) (observing same); *cf. Cal. Supreme Court Policies Regarding Cases Arising From*

10   *Judgments of Death*, Policy 3, Standard 2-6 (1996) (setting forth standard for granting funding

11   requests for investigation of claims that have already been presented to the state court or for

12   preparation of an exhaustion petition); ECF No. 365 at 32 n.6 (citing same).  Given this timing

13   and the rules' apparent contemplation that funds could be utilized in support of successive

14   petitions, it simply is not the case that, when the California Supreme Court granted petitioner's

15   funding request, they were implicitly telegraphing that the evidence referenced therein would

16   have been necessary to the claim as presented in the first petition for writ of habeas corpus.

17        Petitioner's premise further corrodes when considering, specifically, his subclaim that trial

18   counsel unreasonable failed to investigate and present evidence concerning his neuropsychiatric

19   functioning.  The California Supreme Court's order granting petitioner investigative funding was

20   issued several months before he filed his second petition for writ of habeas corpus, wherein he re-

21   raised this particular subclaim and supported it with additional evidence.  LD IV-A at 60-61, 69-

22   73; LD IV-E at 17-18, 50-53.  The state record indicates that the California Supreme Court

23   considered these additional allegations and, nevertheless, denied relief summarily on the merits.

24   *See* LD IV-G.  Thus, relative to this particular subclaim, the state court's grant of petitioner's

25   funding request would seem in no way to convey that the state court engaged in any defective

26   fact-finding process when it denied this subclaim in the second petition for writ of habeas corpus.

27        For all of these reasons, the state court's summary denial of all three subclaims, in his first

28   and second petitions for writ of habeas corpus in state court, did not rely on an unreasonable

1  factual determination under 28 U.S.C. § 2254(d)(2).

2          2.  *The California Supreme Court's Summary Denial of Claim B(8)(a) Was Not*
3               *Contrary to, or an Unreasonable Application of, Clearly Established Federal Law*

4          a.  *Legal Standard*

5        At the time of petitioner's trial, "prevailing professional norms imposed a duty on counsel

6  to adequately investigate, develop, and present mitigating evidence in capital sentencing

7  proceedings."  *Robinson v. Schriro*, 595 F.3d 1086, 1108 (9th Cir. 2010); *see Wiggins v. Smith*,

8  539 U.S. 510, 524 (2003); *Summerlin*, 427 F.3d at 630; *Ainsworth v. Woodford*, 268 F.3d 868,

9  877 (9th Cir. 2001); ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980); *see also Strickland*,

10  466 U.S. at 690-91.  Such mitigation investigation included, as its starting point, "a thorough

11  investigation of the defendant's background" and personal history.  *Williams*, 529 U.S. at 396; *see*

12  *Sears v. Upton*, 561 U.S. 945, 952 (2010) (defense counsel's mitigation investigation "was on its

13  face . . . constitutionally inadequate" where it was limited to only interviewing a few witnesses

14  "selected by [the defendant's] mother"); *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (defense

15  counsel deficient under professional norms prevailing at time of petitioner's 1988 trial in failing

16  to "interview any members of [petitioner's] family" or acquire records relevant to his life

17  history); *Wiggins*, 539 U.S. at 524 (under professional norms in 1982, defense counsel must

18  investigate capital defendant's medical, educational, employment, incarceration, family, and

19  social history); *see also Williams*, 529 U.S. at 415 (O'Connor, J., concurring) (counsel has a duty

20  to make a "diligent investigation into his client's troubling background and unique personal

21  circumstances"); *Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence about the

22  defendant's background and character is relevant because of the belief, long held by this society,

23  that defendants who commit criminal acts that are attributable to a disadvantaged background, or

24  to emotional and mental problems, may be less culpable than defendants who have no such

25  excuse." (internal quotation and citation omitted)); *Robinson*, 595 F.3d at 1108-09 ("certain forms

26  of investigation" such as inquiry into "readily available" information about the defendant's

27  "school, employment, and medical" history "are fundamental to preparing for virtually every

28  capital sentencing proceeding").

Within this broad duty to investigate the defendant's life, counsel had a more specific obligation to investigate the defendant's "social background and evidence of family abuse," *Summerlin*, 427 F.3d at 630 (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005)), as well as other known possible sources of trauma experienced by the defendant.  *See Porter*, 558 U.S. at 35, 41; *see also Williams*, 529 U.S. at 373, 395; *Ainsworth*, 268 F.3d at 877.  Defense counsel also had a "duty to investigate and present mitigating evidence of mental impairment." *Lambright*, 490 F.3d at 1117 (quoting *Summerlin*, 427 F.3d at 630) (cleaned up).  During the course of such investigation, counsel must reasonably pursue leads or directions of inquiry suggested by the information known to them.  *See Strickland*, 466 U.S. at 690-91 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports limitations on investigation"); *see also Wiggins*, 539 U.S. at 522-23; *Rompilla v. Beard*, 545 U.S. 374, 387-89 (2005); *Earp*, 431 F.3d at 1175-76; *Douglas v. Woodford*, 316 F.3d 1079, 1088-89 (9th Cir. 2003).

Informed by a reasonable investigation, defense counsel must then present to the jury a compelling case for sparing the defendant's life.  *See Wiggins*, 539 U.S. at 532 (at the penalty phase, defense counsel has "every incentive to make their mitigation case seem as strong as possible"); *see generally Strickland*, 466 U.S. at 690 (at its core, the Sixth Amendment obligates defense counsel "to make the adversarial testing process work in the particular case").  Defense counsel is unreasonable if she fails to present at the penalty phase reasonably available evidence that was known, or should have been known, to her, that would have been mitigating and would not have exposed the defendant to harmful rebuttal.  *See Strickland*, 466 U.S. at 690-91, 698-99; *Williams*, 529 U.S. at 396, 399; *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999); *People v. Pensinger*, 52 Cal.3d 1210, 1279-80 (1991).

In assessing the prejudice for the defendant's failure to investigate and present available mitigation evidence, the reviewing court must "reweigh the evidence in aggravation against the

1     totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  Where there is a

2     "reasonable probability that at least one juror would have" voted for life after having heard the

3     available evidence defense counsel had failed to discover and present, a petitioner has

4     demonstrated prejudice.  *Id.* at 537; *see* Penal Code § 190.4(b) (noting California's unanimous

5     verdict requirement in capital sentencing).

6
           *b.  The California Supreme Court May Have Reasonably Concluded That*
7                  *Petitioner Had Not Made a Prima Facie Showing of Deficient Performance*

8         In state court, petitioner made such minimal, conclusory allegations that his trial counsel

9     performed deficiently in the investigation of his social history that the state court was reasonable

10    if it concluded that he had failed to make a prima facie showing of his entitlement to relief on this

11    subclaim.

12        In state court, petitioner's allegations concerning his trial counsel's failure to investigate

13    his social history were meager.  In his first petition for writ of habeas corpus in state court, he

14    alleged simply that "[t]rial counsel failed to conduct an adequate investigation into penalty phase

15    mitigation evidence," and thus "[i]n consequence, counsel failed to discover important mitigating

16    evidence which could have been presented on Mr. Hines' behalf and failed to present to any

17    mental health expert the detailed social and life history information necessary for a competent

18    evaluation of Mr. Hines' mental and emotional condition."  LD III-A at 26-27.  In his reply in

19    support of this petition, he alleged that he had been unable to fully investigate this claim, but that

20    available evidence showed that defense counsel had failed "to investigate [petitioner's]

21    background," including failing "to obtain medical records which documented injuries suffered by

22    petitioner during his childhood, including a head injury at age 12."  LD III-E at 23-24.  He

23    supported the latter with a documentary exhibit purporting to show that he had been treated for a

24    forehead laceration at age twelve caused by, reportedly, an errant swing by his cousin's golf club.

25    LD III-E, Ex. 27.

26        In this proceeding, petitioner appears to argue that these allegations comprised a distinct

27    subclaim that defense counsel was deficient for failing to investigate petitioner's social history, as

28    having mitigating value in and of itself, separate from any mitigating value his social history may

1    additionally have as the basis for accurate neuropsychological and mental health assessments of

2    him.  ECF No. 74 at 65-66; ECF No. 365 at 20-25, citing *Wiggins*, 539 U.S. at 523-24; *Williams*,

3    529 U.S. at 396; and *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001).  To the extent this

4    was raised in his state pleadings, the state court was reasonable if it concluded that his allegations

5    did not make a prima facie showing that his trial counsel's investigation into his social history fell

6    below contemporaneous professional norms.  *See Strickland*, 466 U.S. at 690-91; *Richter*, 562

7    U.S. at 105.  Under California's pleading rules, a habeas corpus petition "should both (i) state

8    fully and with particularity the facts on which relief is sought, as well as (ii) include copies of

9    reasonably available documentary evidence supporting the claim, including pertinent portions of

10    trial transcripts and affidavits or declarations."  *People v. Duvall*, 9 Cal. 4th 464, 474 (1995); *see*

11    *Cannedy v. Adams*, 706 F.3d 1148, 1160 (9th Cir.), *amended on denial of reh'g*, 733 F.3d 794

12    (9th Cir. 2013) (citing same); *see also Duvall*, 9 Cal. 4th at 474 ("Because a petition for a writ of

13    habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner

14    bears a heavy burden initially to *plead* sufficient grounds for relief . . . .") (italics in original);

15    *People v. Karis*, 46 Cal. 3d 612, 656 (1988) (especially where petitioner is represented by counsel

16    in his habeas corpus proceedings, "[c]onclusory allegations made without any explanation of the

17    basis for the allegations do not warrant relief, let alone an evidentiary hearing").  While this is not

18    an especially stringent standard, it does require a petitioner to make at least some specific factual

19    averments that demonstrate that, if his evidence is credited, he is entitled to the relief he seeks.

20    *See In re Harris*, 5 Cal. 4th 813, 827 (1993) ("[O]ne seeking relief on habeas corpus need only

21    file a petition for the writ alleging facts which, if true, would entitle the petitioner to relief.").

22        It was reasonable for the state court to have concluded that petitioner had not met even

23    this minimal pleading standard.  Petitioner's allegations in state court alleged, in conclusory

24    fashion, that trial counsel's investigation into his life history as mitigation had been inadequate,

25    but supported this description with virtually no factual averments.  The only specific factual

26    allegation petitioner posited was that defense counsel had failed to gather his medical records, *see*

27    LD III-E at 23-24, but without any additional factual allegations it would be impossible for a fact-

28    finder to have concluded that this failure reflected unreasonable or substandard conduct.  *See*

1   *Washington v. Shinn*, 46 F.4th 915, 928-29 (9th Cir. 2022), *cert. denied sub nom. Washington v.*

2   *Thornell*, 143 S. Ct. 1034 (2023) (although defense counsel had failed to obtain petitioner's

3   educational and incarceration records in investigating possible mitigation, such a failure was not

4   unreasonable in light of the totality of their investigation); *Babbitt v. Calderon*, 151 F.3d 1170,

5   1174 (9th Cir. 1998), *as amended* (Aug. 27, 1998) (counsel was not ineffective for failing to

6   uncover a family history of mental illness where defense investigators spoke with family

7   members and friends who might have had such information, but none of them reported any

8   history of illness and there were no allegations that the interviews were conducted in an

9   unreasonable manner).  Under California habeas corpus pleading rules, the state court could have

10   reasonably concluded that petitioner's allegations on this subclaim failed to meet his burden on

11   this prong of *Strickland*.  *See Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008) (under

12   *Strickland*, defense counsel is presumed competent, but the petitioner may "rebut this

13   presumption by showing that [counsel's] performance was objectively unreasonable under

14   prevailing professional norms and was not the product of sound strategy"); *Nunes*, 350 F.3d at

15   1054 (to make a prima facie showing of relief under *Strickland*, the habeas petitioner must

16   "demonstrate that he had sufficient evidence for a reasonable fact finder to conclude" that the

17   elements of the claim have been met); *see Karis*, 46 Cal. 3d at 656 (denying petitioner's

18   ineffective assistance of counsel claim where it was premised on conclusory allegations of

19   counsel's deficient performance); *see generally Richter*, 562 U.S. at 105.

20          For this reason, to the extent claim B(8) alleges that defense counsel were ineffective in

21   failing to investigate petitioner's social history generally, the state court was reasonable in

22   dismissing this subclaim summarily.  *See* 28 U.S.C. § 2254(d)(1); *Richter*, 562 U.S. at 105.

23                  *3.   The California Supreme Court's Summary Denial of Claim B(8)(b) Was Not*
24                       *Contrary to, or an Unreasonable Application of, Clearly Established Federal Law*

25          In state court, petitioner also alleged that his trial counsel performed ineffectively by

26   failing "to present evidence from a neuropsychologist that petitioner suffered from mental illness,

27   substance abuse, and organic brain impairment."  LD IV-A at 60; *see also* LD III-A at 27.  The

28   state court denied relief on these allegations summarily, which the undersigned concludes was not

36

1    an unreasonable application of, or contrary to, clearly established federal law.

2                    *a.  Legal Standard*

3            Depending on the facts known to defense counsel, a reasonable investigation into the

4    defendant's psychosocial history and functioning may require defense counsel to consult with,

5    and present as evidence the opinions of, appropriate experts.  *See Hinton v. Alabama*, 571 U.S.

6    263, 273 (2014); *Richter*, 562 U.S. at 105; *Jones v. Ryan*, 52 F.4th 1104, 1133-34 (9th Cir.

7    2022), *cert. granted on other grounds sub nom. Thornell v. Jones*, No. 22-982, 2023 WL

8    8605741 (U.S. Dec. 13, 2023); *Ainsworth v. Woodford*, 268 F.3d 868, 875 (9th Cir. 2001); *Caro

9    v. Calderon*, 165 F.3d 1223 (9th Cir. 1999); *see generally Mayfield v. Woodford*, 270 F.3d 915,

10   927 (9th Cir. 2001) (en banc) (holding that "[t]o perform effectively in the penalty phase of a

11   capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to

12   be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence'"

13   (quoting *Williams*, 529 U.S. at 393, 399).  Where defense counsel knows, or should have known

14   upon reasonable investigation, that the defendant suffered head injuries or had a serious history

15   of substance abuse, any reasonable defense counsel would consult with a qualified expert to

16   assess the defendant's neuropsychological functioning as potential mitigation evidence.  *Jones*,

17   52 Cal. 4th at 1133-34 (1993 capital trial); *Williams v. Filson*, 908 F.3d 546, 563-64 (9th Cir.

18   2018) (1983 capital trial); *Frierson v. Woodford*, 463 F.3d 982, 990-92 (9th Cir. 2006) (1986

19   California capital trial).

20                    *b.  The State Court's Summary Denial of this Claim Was Not Contrary to, or an
21                          Unreasonable Application of, Clearly Established Federal Law*

22           Even assuming arguendo that petitioner made a prima facie showing of deficient

23   performance on this subclaim in state court, the state court may have reasonably concluded that

24   petitioner had not made a prima facie showing of prejudice given the record that was before it.

25   His first state petition for writ of habeas corpus contained no specific factual allegations setting

26   forth any prejudice for this subclaim.  *See* LD III-A at 26-30, 89-93; LD III-E at 23-25.  In his

27   second state petition for writ of habeas corpus, the only specific factual allegations of prejudice

28   were that the jury could have heard expert testimony that petitioner

1
2
3
4

> had a history of severe depression and substance abuse resulting
> from parental neglect.  (His father had abandoned him at age 12 and
> Hines was left to care for his severely alcoholic mother during his
> adolescence.)  Moreover, such expert would have explained to the
> jury that at the time of the homicides, Mr. Hines was suffering from
> overall brain impairment in the mild to moderate range of severity.

5    LD IV-A at 60.  This evidence, per petitioner, would have been mitigating in general, and also

6    would have "explained Petitioner's passive willingness to assist Houseman in the theft of the pink

7    roadster and his vulnerability to the scapegoat role."  *Id.* at 60-61.

8        He supported these allegations with a declaration from neuropsychologist Dr. Karen

9    Froming.  LD IV-A at 60-61; LD IV-B, Ex. 16; *see also* LD IV-E at 50-53.  In it, Dr. Froming

10   briefly relayed some details of petitioner's life as he had reported them to her, including the loss

11   of his father, his mother's debilitating alcoholism, his introduction to drug use as a child, and past

12   feelings of depression.  LD IV-B, Ex. 16 ¶¶ 15-17.  She also reported the results of

13   neuropsychological testing she had conducted, which showed that petitioner exhibited "overall

14   brain impairment in the mild to moderate range of severity."  *Id*. ¶ 20.  Specifically, he

15   demonstrated that he was "impaired" in his ability to process two stimuli at once, to switch

16   between tasks, and to ignore distractions.  *Id.* ¶ 23.  He showed mild impairment in his ability to

17   sustain attention and focus on one task and mild comprehension deficits in following instructions,

18   whether verbal or visual.  *Id.* ¶¶ 23-24.

19       A jury very well may have found this evidence mitigating, had they had heard it.  It is not,

20   however, so compelling that every reasonable jurist would be bound to conclude that this

21   evidence, if presented, was reasonably probable to have swayed the jury towards a more merciful

22   penalty phase verdict.  Principally, Dr. Froming's proposed testimony offered her clinical opinion

23   of petitioner's neuropsychological functioning.  LD IV-B, Ex. 16 ¶¶ 8, 18-25, 31.  While a

24   defendant's neuropsychological disfunction may, in some cases, be mitigating, *see Earp*, 431

25   F.3d at 1178; *see generally Atkins v. Virginia*, 536 U.S. 304, 317-21 (2002), the specific

26   testimony petitioner proffered to the state court could have reasonably been seen as not

27   reasonably likely to have induced a more favorable penalty phase verdict.

28       Dr. Froming's clinical opinion was that petitioner's overall brain functioning was

impaired to a "mild to moderate" degree, with his specific deficits being that he struggled to remain focused on one task, process multiple stimuli, and effectively switch between tasks; and he had mild comprehension deficits in following verbal or visual instructions.  LD IV-B, Ex. 16 ¶¶ 20-24.  The Ninth Circuit has held that mild to moderate brain impairment is of such minimal mitigating value that a state court is reasonable in concluding that such evidence is not reasonably likely to persuade a penalty phase juror to elect a life sentence.  *See Williams v. Filson*, 908 F.3d 546, 564 (9th Cir. 2018).  In cases where prejudice has been found from defense counsel's failure to present evidence of the defendant's neuropsychological impairment, the evidence had shown either that the petitioner suffered from severe impairment; or that his impairments bore on his judgment, perceptions, and behaviors; or both.  *See Sears v. Upton*, 561 U.S. 945, 948-49 (2010); *Rompilla v. Beard*, 545 U.S. 374, 392 (2005); *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015); *Earp*, 431 F.3d at 1178; *Summerlin*, 427 F.3d at 643; *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002); *Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999); *cf. Abdul-Kabir v. Quarterman*, 550 U.S. 233, 241 (2007).  Given, therefore, the particular clinical conclusions that petitioner argues could have been presented on his behalf at the penalty phase, the state court would have been reasonable in viewing this evidence as having only slight mitigating effect on the jury.

     In addition to her clinical opinion, however, portions of Dr. Froming's proposed testimony described the basis of her clinical opinion by invoking some aspects of petitioner's life that may themselves have been considered mitigating.  Again, the state court could have reasonably found that petitioner's specific proffers were not reasonably likely to have induced a more favorable penalty verdict on this basis.  Preliminarily, it bears noting that, although Dr. Froming's proposed testimony touched on some of petitioner's life experiences and traumas, her proposed testimony did not purport to explain to the jury the import of any of these events, except insofar as they related to the etiology of petitioner's neuropsychological disfunction.  *See generally* LD IV-B, Ex. 16 ¶¶ 8-25.  This places this case in contrast to those where, in post-conviction proceedings, petitioner has tendered available expert evidence explaining how a defendant's traumatic life experiences may have affected his development more generally.  *See Roybal v. Davis*, 148 F.

1   Supp. 3d 958, 1080-81 (S.D. Cal. 2015).

2          With that caveat, Dr. Froming's declaration indicates that the jury could have heard at

3   least some evidence of petitioner's difficult upbringing, depressive episodes, and struggles with

4   substance abuse had she been called to testify.  These types of life experiences may be mitigating

5   in a capital case under clearly established federal law.  *See Wiggins*, 539 U.S. at 524; *Ainsworth v.*

6   *Woodford*, 268 F.3d 868, 875 (9th Cir. 2001).  Nevertheless, Dr. Froming's declaration was so

7   sparse in these areas that a reasonable jurist could find that, in this respect, her testimony would

8   have done little to alter the evidentiary picture before the jury.  For instance, Dr. Froming's bare

9   recitation of petitioner's description to her of the neglect and mistreatment he experienced from

10  his parents was cumulative in light of testimony the jury had heard from defense witnesses Frita

11  Hines and Peter O'Toole; petitioner makes no argument why the jury would have found Dr.

12  Froming's second-hand recounting of these themes more compelling than Ms. Hines and Mr.

13  O'Toole's specific, first-hand recollections and observations.  *See* 22 RT 6001-42; 23 RT 6085-

14  94; *see Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (testimony that only

15  "touche[s] upon general areas of mitigation" is less "useful or compelling" than more detailed

16  witness accounts); *Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (no prejudice lies

17  where the evidence adduced on habeas corpus was cumulative with that presented at trial).  On

18  the other side of the coin, Dr. Froming's proposed testimony also included that her clinical

19  impressions were informed by her having credited petitioner when he described his past feelings

20  of depression and history of substance abuse to her, *see* LD IV-B, Ex. 16 ¶¶ 15-17; petitioner's

21  jury, however, had heard petitioner's testimony at the guilt phase and had apparently rejected it.

22  Petitioner makes no argument on this point to address why the jury would have given any

23  appreciable weight to this aspect of Dr. Froming's testimony, given that the record appears to

24  indicate that the jury had found the basis for this portion of her testimony—petitioner—to be an

25  unreliable historian.  *See Knowles v. Mirzayance*, 556 U.S. at 124, 128; *Kanawha & M. Ry. Co. v.*

26  *Kerse*, 239 U.S. 576, 581 (1916).

27          Finally, neither Dr. Froming's declaration nor any other evidence proffered to the state

28  court by petitioner tended to show that he could prove his allegation that available

                                          40

1  neuropsychological expert testimony could have "explained Petitioner's passive willingness to

2  assist Houseman in the theft of the pink roadster and his vulnerability to the scapegoat role." *See*

3  LD IV-A at 60-61.  The state court may have reasonably given little weight to this speculative

4  allegation.  *See Pinholster*, 563 U.S. at 188 n.12; *Zapien v. Davis*, 849 F.3d 787, 800 (9th Cir.

5  2015); *Nunes*, 350 F.3d at 1054-55; *Duvall*, 9 Cal. 4th at 474; *Karis*, 46 Cal.3d at 656-57.  In fact,

6  petitioner's proffered evidentiary materials appear to conflict with this particular allegation, as

7  Dr. Froming declared that petitioner struggled with following directions and staying focused on a

8  task given to him, as a result of the impairments she identified.  LD IV-B, Ex. 16 ¶¶ 23-24.  Thus,

9  in light of the totality of the record before it, the state court was reasonable in concluding that this

10  particular allegation did not meaningfully contribute to petitioner meeting his pleading burden on

11  the prejudice prong for this subclaim.  *See Strickland*, 466 U.S. at 695-97; *Nunes*, 350 F.3d at

12  1054; *Duvall*, 9 Cal. 4th at 474.

13         In sum, even when all possible mitigating aspects of Dr. Froming's testimony are

14  considered together, the evidence proffered to the state court was of such slight mitigating value

15  that the state court could reasonably have concluded that petitioner could not show it was

16  reasonably probable that the jury would have reached a more favorable penalty verdict had they

17  heard it, in light of the evidence in aggravation.  *See Shinn*, 529 U.S. at 119-20; *Strickland*, 466

18  U.S. at 695-96.  This is true even where the prejudice from this subclaim is considered

19  cumulatively with petitioner's additional allegations of ineffective assistance of counsel at the

20  penalty phase.  *See Strickland*, 466 U.S. at 695-96; *Boyde*, 404 F.3d at 1175.  The undersigned

21  therefore recommends that subclaim B(8)(b) of the Amended Petition be dismissed.  28 U.S.C.

22  § 2254(d)(1).

23              *4.  The California Supreme Court's Summary Denial of Claim B(8)(c) Was Not*
              *Contrary to, or an Unreasonable Application of, Clearly Established Federal Law*
24

25         In subclaim B(8)(c), petitioner alleges that that defense counsel performed deficiently in

26  their work with defense expert Dr. Edward Grover, who testified at the penalty phase.  ECF No.

27  74 at 66-68.  Per petitioner, defense counsel unreasonably propounded testimony from Dr. Grover

28  that petitioner had anti-social personality disorder—a diagnosis that has aggravating aspects—and

1    that this decision was not strategic, within the meaning of *Strickland*, but instead was the result of

2    the defense's substandard preparation of Dr. Grover.  *Id.*

3        In state court, petitioner raised these allegations first in his direct appeal proceedings.  LD

4    II-C at 15-22; *see also* LD II-E at 72.  The California Supreme Court denied the claim on the

5    merits, on the basis that petitioner had not shown that defense counsel's performance was

6    unreasonable:

7            Defendant also appears to argue that his counsel's decision to call
             Dr. Grover to testify constituted ineffective assistance of counsel.

8            The record does not support that claim.  "When, as here, counsel's
             reasons are not apparent from the record, we will not assume

9            inadequacy of representation unless counsel had no conceivable
             tactical purpose."  (*People v. Diaz* (1992) 3 Cal. 4th 495, 558 [11

10           Cal.Rptr.2d 353, 834 P.2d 1171].)  Although reasonable minds
             could differ on the beneficial value of Dr. Grover's testimony to the

11           defense (*see Whitmore v. Lockhart* (8th Cir. 1993) 8 F.3d 614, 617
             [defense counsel not ineffective for failing to introduce evidence,

12           during penalty phase, of the defendant's antisocial personality
             disorder]), counsel could reasonably have believed that on balance

13           the benefits of Dr. Grover's testimony that defendant's disorder was
             one associated with poor maternal bonding at an early age, and that

14           defendant would be likely to "mellow" in prison, would outweigh
             any harm resulting from Dr. Grover's statement that defendant had

15           an "antisocial personality disorder."  It is not at all uncommon for
             defendants in capital cases to present such testimony.  (*See, e.g.,*

16           *People v. Davis* (1995) 10 Cal. 4th 463, 528 [41 Cal.Rptr.2d 826,
             896 P.2d 119]; *People v. Clark* (1993) 5 Cal. 4th 950, 976 [22

17           Cal.Rptr.2d 689, 857 P.2d 1099]; *People v. Clark* (1992) 3 Cal. 4th
             41, 153 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Beardslee*

18           (1991) 53 Cal.3d 68, 117 [279 Cal.Rptr. 276, 806 P.2d 1311];
             *People v. Benson* (1990) 52 Cal.3d 754, 769 [276 Cal.Rptr. 827,

19           802 P.2d 330]; *People v. McLain* (1988) 46 Cal.3d 97, 105 [249
             Cal.Rptr. 630, 757 P.2d 569].)

20
21   *Hines*, 15 Cal. 4th 1064-65.

22        Petitioner re-raised the allegations forming the basis of this subclaim in his first petition

23   for writ of habeas corpus in state court.  LD III-A at 27-30.  The California Supreme Court denied

24   relief summarily, on the merits.  LD III-F.  The undersigned finds that the state court's denial of

25   relief on this claim is entitled to deference under 28 U.S.C. § 2254(d).

26        *a.  Legal Standard*

27        As noted above, at the time of petitioner's trial, defense counsel had a duty to present a

28   "mitigation case [that was] as strong as possible" at the penalty phase.  *Wiggins*, 539 U.S. at 532;

42

1    *see also Strickland*, 466 U.S. at 690.  Such a presentation must be based on thorough

2    investigation, *see Wiggins*, 539 U.S. at 532, and, where appropriate, consultation with relevant

3    experts.  *See Hinton*, 571 U.S. at 273; *Richter*, 562 U.S. at 105.  In order for a mental health

4    expert to render a reliable opinion, defense counsel should, at a minimum, provide the expert with

5    "background information" about the defendant and any other available materials that the expert

6    requests.  *Raley v. Ylst*, 444 F.3d 1085, 1092-93 (9th Cir. 2006); *see also Bloom v. Calderon*, 132

7    F.3d 1267, 1278 (9th Cir. 1997); *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995);

8    *Lang v. Cullen*, 725 F. Supp. 2d 925, 1005 (C.D. Cal. 2010); *Bloom v. Vasquez*, 840 F. Supp.

9    1362, 1370 (C.D. Cal. 1993).

10            Reasonable defense counsel should be strategic in presenting the defense case at the

11   penalty phase.  For instance, reasonable defense counsel may choose not to propound testimony

12   that could open the door to harmful rebuttal evidence.  *See Strickland*, 466 U.S. at 690-91, 698-

13   99; *Williams*, 529 U.S. at 396, 399.  In the context of mental health expert testimony, counsel may

14   be unreasonable if he elicits from the expert testimony about the defendant's impairments or

15   diagnosis that could be viewed as aggravating.  *Clark v. Chappell*, 936 F.3d 944, 975-76 (9th Cir.

16   2019); *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006); *Davis v. Woodford*, 384 F.3d

17   628, 647 (9th Cir. 2004); *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir.), *supplemented sub*

18   *nom. Beardslee v. Brown*, 393 F.3d 1032 (9th Cir. 2004); *Caro v. Calderon*, 165 F.3d 1223, 1227

19   (9th Cir. 1999).

20                      *b.   The Ylst Presumption Applies to This Claim*

21            In assessing the reasonableness of the state court's denial of this claim, the federal court

22   applies the *Ylst* presumption.  *Wilson*, 138 S. Ct. at 1192; *Ylst*, 501 U.S. at 803, 806.  Because the

23   allegations comprising this subclaim were presented twice in state court proceedings, the federal

24   court "looks through" the California Supreme Court's summary denial of this claim on habeas

25   corpus to the reasoned decision that court had provided when denying the claim on direct appeal.[5]

26   _____

27            [5] Review of the record indicates that, relative to this subclaim, the "same claim" was
     raised both on direct appeal and in petitioner's first petition for writ of habeas corpus in state
     court.  *See Ylst*, 501 U.S. at 803; *compare* LD II-C at 15-22 *and* LD II-E at 72 *with* LD III-A at

28   27-30.

1    *Id.*  Thus, the state court's denials of this claim are entitled to deference if its direct appeal

2    decision was reasonable within the meaning of 28 U.S.C. § 2254(d).  *Wilson*, 138 S. Ct.1188; *see*

3    *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003).[6]

4            c.   *The California Supreme Court Reasonably Concluded That Petitioner Had Not*
5                 *Proven Deficient Performance*

6            When petitioner raised this claim on direct appeal, he bore the burden of proving that trial

7    counsel performed deficiently, i.e., that his counsel's performance was unreasonable in light of

8    contemporaneous professional norms.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000);

9    *Strickland*, 466 U.S. at 687-91; *Carrera v. Ayers*, 670 F.3d 938, 943 (9th Cir. 2011), *on reh'g en*

10   *banc*, 699 F.3d 1104 (9th Cir. 2012).  Petitioner argued in state court that defense counsel were

11   deficient in introducing testimony from Dr. Grover that he had diagnosed petitioner with anti-

12   social personality disorder, because this diagnosis can be viewed as aggravating by jurors;

13   because it, in fact, permitted the prosecutor to emphasize aggravating aspects of the diagnosis;

14   and because it had been premised on Dr. Grover's substandard knowledge of petitioner's

15   functioning, as defense counsel had provided him inadequate materials.  LD II-C at 15-22.  The

16   California Supreme Court was reasonable in concluding that petitioner had not met this burden, in

17   light of the record before it.  *See* 28 U.S.C. § 2254(d).

18           To the extent petitioner argued that defense counsel performed deficiently in their

19   preparation of Dr. Grover or in their provision of materials to him, the state court reasonably

20   concluded that the record did not support such a finding.  Petitioner argued that the record

21   demonstrated defense counsel's inadequate preparation of Dr. Grover by citing his testimony that

22   he had only conducted one two-and-a-half hour clinical interview of the petitioner and that he had

23   received some background information about petitioner.  LD II-C at 15-22; *see also* LD III-A at

24

25           [6] As discussed in footnote 5, *supra*, even if the *Ylst* presumption were not applied to the
26   state court's decisions in this case, the state court's denial of this claim in state habeas corpus
     proceedings would nevertheless be entitled to deference because that court may have reasonably
27   concluded that petitioner had not made a prima facie showing of counsel's deficient performance
     for the same reasons it had held that petitioner had not met his burden of persuasion on the same
28   issue on direct appeal.  *See Richter*, 562 U.S. at 98, 102.

1    27-30; *see generally* ECF No. 74 at 66-68.[7]  Petitioner did not cite any sources indicating that any

2    of these forms of preparation were substandard, at the time, among clinical psychologists in

3    rendering a diagnostic opinion or among defense counsel in preparing a mental health expert

4    witness to testify.  *See generally* LD II-C at 15-22; LD II-E at 72.

5            Based on this argument alone, the state court would have been reasonable in concluding

6    that petitioner had failed to prove his counsel's deficient performance in their preparation of Dr.

7    Grover.  Although reasonable defense counsel in a capital case are obligated to conduct a

8    thorough investigation into their client's life for the preparation of the penalty phase, including

9    investigating his mental functioning if there are signs of mental health impairments, *see Daniels*

10   *v. Woodford*, 428 F.3d 1181, 1205-06 (9th Cir. 2005), there is no clearly established federal law

11   setting forth specific requirements of what types of materials defense counsel should sua sponte

12   provide the expert or, more granularly, what length of clinical interview is reasonable.  *See Raley*,

13   444 F.3d at 1092-93; *Hendricks*, 70 F.3d at 1038-39.  On the contrary; the Ninth Circuit and other

14   courts have repeatedly held that, so long as defense counsel provides the expert "basic

15   background information" about the defendant and provides available additional information to the

16   expert when the expert requests it, defense counsel's performance is not deficient.  *See Raley*, 444

17   F.3d at 1092-93; *see also Bloom*, 132 F.3d at 1278; *Hendricks*, 70 F.3d at 1039; *Lang*, 725 F.

18   Supp. 2d at 1005; *Bloom*, 840 F. Supp. at 1370.  In light of this, the state court could reasonably

19   have concluded that the portions of the record cited by petitioner, and petitioner's argument on

20   this prong generally, failed to prove that defense counsel performed in a manner that was

21   substandard under contemporaneous professional norms and clearly established federal law.

22           The state court's determination was further reasonable because it was based on the court's

23   full review of the appellate record before it, which contained additional testimony from Dr.

24   Grover that seemed to undermine petitioner's argument.  *See generally Brown v. Brown*, 71 Cal.

25   

26           [7] In his petition for writ of habeas corpus in state court, petitioner additionally argued, without citation, that defense counsel had only retained Dr. Grover after the end of the guilt

27   phase. LD III-A at 28.  He made no additional argument or factual averments, in that pleading, tending to indicate he could prove that factual allegation or that, if proven, it reflected

28   substandard performance by any reasonable defense counsel.

1   App. 4th 358, 363 n.3 (1999) (reviewing court considers party's arguments in light of the entire

2   record before it); *see People v. Flores*, 77 Cal. App. 5th 420, 430 (2022); *People v. Jennings*, 50

3   Cal. 4th 616, 652 (2010); *People v. Sheldon*, 254 Cal. App. 2d 174, 180 (1967).  In addition to

4   testifying that he had received "background" information about petitioner from defense counsel,

5   23 RT A-6143, Dr. Grover testified that he had reviewed petitioner's educational records, 23 RT

6   6161; information about petitioner's juvenile arrest history and adult criminal history, including

7   that presented in aggravation, 23 RT 6163-64, 6167; arrest records relating to the offenses

8   charged in the instant case, 23 RT 6184; and portions of the trial testimony, including petitioner's

9   guilt-phase testimony, 23 RT 6189.  In all, he spent approximately forty hours preparing for the

10  case, including reviewing materials.  23 RT 6153.  Addressing the clinical interview, Dr. Grover

11  testified that he had attempted to interview petitioner on two additional occasions, but petitioner

12  had refused to speak to him.  23 RT 6154.  Regardless, in his experience, a two-and-a-half-hour

13  clinical interview was not unusual in comparable cases.  23 RT 6190.  There was no contrary

14  evidence on this point in the record.  *See generally* RT; CT.  In light of the entirety of this

15  evidence, the state court was reasonable to conclude that, to the extent petitioner alleged that

16  defense counsel had prepared Dr. Grover inadequately, that conclusion was simply unsupported

17  by the record before it.  *See Hines*, 15 Cal. 4th at 1064; *Clark v. Chappell*, 936 F.3d 944, 976 (9th

18  Cir. 2019).

19          The state court also reasonably rejected petitioner's argument that the record demonstrated

20  that defense counsel performed deficiently by eliciting testimony that Dr. Grover had diagnosed

21  petitioner with anti-social personality disorder.  Courts have recognized that evidence that a

22  criminal defendant has been diagnosed with this disorder may be viewed as aggravating by a jury.

23  *See Stankewitz v. Wong*, 698 F.3d 1163, 1173-74 (9th Cir. 2012); *Beardslee v. Woodford*, 358

24  F.3d 560, 583 (9th Cir. 2004); *Gerlaugh v. Stewart*, 129 F.3d 1029, 1035 (9th Cir. 1997); *Guinan*

25  *v. Amontrout*, 909 F.2d 1224, 1230 (8th Cir. 1990).  These cases, however, have not treated the

26  propounding of such evidence as per se unreasonable, but rather have examined the precise nature

27  of the testimony at issue to assess its aggravating features, in order to determine whether

28  reasonable defense counsel would have introduced it.  Thus, for instance, in *Gerlaugh*, the Ninth

46

1    Circuit held it reasonable for the defense not to call as a witness a psychiatrist who had diagnosed

2    the defendant as a sociopath and who would have testified that the defendant "associated with

3    'wild companions' and . . . 'sought out the company of lawbreakers for the thrill of hurting others

4    and then escaping the consequences of his actions.'" *Gerlaugh*, 129 F.3d at 1035.  This evidence

5    was aggravating because it "informed the sentence[er] that [the defendant] was a remorseless

6    predatory bully who victimized innocent people for thrills and who killed for status" and

7    therefore reasonable defense counsel would have not presented it at the penalty phase.  *Id*. at

8    1035-36.  In contrast, there may be little strategic downside for defense counsel to introduce

9    expert testimony that defendant is "antisocial," if, for example, the jury has already heard ample

10   evidence of the defendant's antisocial acts and if the defense expert's testimony contained

11   valuable mitigating information, as well.  *Stankewitz*, 698 F.3d at 1173-74; *see also Beardslee*,

12   358 F.3d at 583.

13          Here, Dr. Grover's testimony concerning petitioner's diagnosis of antisocial personality

14   disorder was not especially inflammatory, such that a reviewing court could reasonably conclude

15   that introducing it reflected a reasonable strategic judgment by defense counsel, particularly in

16   light of the great measure of deference given to counsel's tactical choices at trial.  *See Strickland*,

17   466 U.S. at 689.  Dr. Grover testified on direct examination that he had diagnosed petitioner with

18   anti-social personality disorder, which he described as "the most common diagnosis for people

19   that get in trouble with the law."  23 RT A-6145; *see also* 23 RT 6176-77 (reiterating same on

20   cross-examination).  He testified that the diagnosis was based on "a number of factors," including

21   whether the defendant had "been in trouble with the law," had been truant, or had stayed away

22   from home overnight without permission.  23 RT A-6145-46.  The defendant's past drug use also

23   indicated a "lack of respect for rules," further supporting the diagnosis.  23 RT A-6146.  He stated

24   that this personality disorder often developed due to poor maternal attachment, and that this

25   possibility was supported in defendant's case because his brother also had a criminal record.  23

26   RT A-6147-48.  He explained that persons diagnosed with this personality type may "rail and

27   rebel" against prison rules initially, but tend to "mellow out" over time.  23 RT A-6149.  He

28   expected petitioner would behave this way in prison, predicting that within five years he would

47

1  learn to "go[] with the system" and likely pursue educational achievement.  23 RT A-6152.  On

2  cross-examination, he testified that the diagnosis was consistent with petitioner's juvenile arrest

3  record (although he did not testify before the jury about the contents of that record), with the

4  aggravation evidence presented, and with the evidence the jury had heard of petitioner's history

5  of lying.  23 RT 6162, 6173-76.

6         On sum, reasonable defense counsel may have determined that Dr. Grover's testimony

7  would tend to help petitioner's mitigation case rather than harm it, particularly because Dr.

8  Grover had reportedly based his diagnosis on aggravating events of which the jury had already

9  heard, namely, evidence of petitioner's past misconduct, drug use, and mendacity.  Dr. Grover's

10  description of the diagnosis emphasized it as being common, in his experience, among

11  incarcerated people and being based, in part, on activities like skipping school and staying out all

12  night—descriptors unlikely to have any particularly inflammatory effect on the jury, given the

13  much more gruesome, terrible acts of which they had heard evidence at the guilt phase.  He also

14  testified compellingly, based on his personal experience treating incarcerated people in California

15  prisons, about the likelihood of petitioner's positive adjustment to prison, suggesting petitioner

16  would perform successfully if given a life sentence.  *See generally Skipper v. South Carolina*, 476

17  U.S. 1 (1986).  Under clearly established federal law, a reviewing court cannot conclude that the

18  record showed that defense counsel's calculus in considering these advantages and disadvantages

19  was objectively unreasonable.  *See Beardslee*, 358 F.3d at 583.  Certainly, it is not the case that

20  every reasonable jurist would find that, under governing Supreme Court precedent, defense

21  counsel performed substandardly, unreasonably, or in contravention of contemporaneous

22  professional norms by propounding Dr. Grover's testimony.  *See Richter*, 562 U.S. at 105.

23  Petitioner has not shown that the state court's denial of this subclaim was unreasonable.  *See*

24  *Walker*, 709 F.3d at 939.

25         For the foregoing reasons, the undersigned concludes that the state court's denial of

26  claims B(8) should be given deference and recommends that respondent's motion for summary

27  judgment be granted as to this claim.

28  **CLAIM B(9)**

1    In Claim B(9), petitioner alleges that his trial counsel performed ineffectively by failing to

2    object to portions of the prosecutor's penalty-phase closing argument that, per petitioner, were

3    improper.  ECF No. 74 at 69-70.  Specifically, petitioner asserts that the prosecutor improperly

4    maligned him during closing argument, including by suggesting that he had committed uncharged

5    crimes of drug trafficking and sexual predation; improperly commented on conditions of prison

6    life; and argued that the lack of mitigating circumstances was itself aggravating.  ECF No. 365 at

7    41-43; ECF No. 74 at 69-70.  In his direct appeal, petitioner had argued that these instances of

8    alleged misconduct entitled him to a new trial, LD II-A at 202-13; the California Supreme Court

9    denied relief because these alleged errors had not been preserved at trial, but also opined that they

10   lacked merit regardless.  *Hines*, 15 Cal. 4th at 1062-64.  In his first petition for writ of habeas

11   corpus, petitioner alleged that his trial counsel were ineffective in failing to object to these

12   instances of alleged misconduct, LD III-A at 32-33, and the California Supreme Court denied

13   relief summarily, on the merits.  LD III-F.  The undersigned finds that decision was not an

14   unreasonable application of, or contrary to, clearly established federal law and is entitled to

15   deference.

16   As set forth above, to show deficient performance for defense counsel's failure to object,

17   petitioner must show that the objection was not futile or meritless.  *See Ochoa*, 50 F.4th at 889;

18   *cf. Jones*, 463 U.S. at 751; *Rupe*, 93 F.3d at 1445.  Thus, where petitioner's allegation is that trial

19   counsel performed deficiently for failing to object to prosecutorial misconduct, the claim must

20   fail if the prosecutor's conduct had not, in fact, been improper.  *See Ochoa*, 50 F.4th at 889.

21   Here, to the extent that this claim alleges that defense counsel performed deficiently by failing to

22   object to the prosecutor's comments on petitioner's conditions of confinement, *see* ECF No. 365

23   at 43, the state court could reasonably have concluded that the prosecutor's argument was proper

24   and, consequently, that defense counsel was not deficient in failing to object to it.  During a brief

25   portion of the prosecutor's closing argument, he argued that petitioner deserved a worse

26   punishment than life in prison, because inmates had access to personal materials like "toiletries"

27   that could be used as "tools . . . to make . . . shanks."  23 RT 6229.  The prosecutor also urged the

28   jury to "forget" "any stereotypes that you've had about what prison life is like from the 1930s

49

1    where they all . . . are confined to their cells for 24 hours a day and then they mar[ch] in long step

2    to the mess hall." 23 RT 6269. The state court could have reasonably concluded this argument

3    was not misconduct. The prosecutor's argument that, if incarcerated for the rest of his life,

4    petitioner would have access to at least some personal items that he could make into shanks was a

5    fair comment on the evidence the jury heard at the penalty phase that, while in jail awaiting trial

6    in the instant case, an item appearing to be a handmade shank was discovered in petitioner's cell.

7    *See* 22 RT 5901-27, 5848-59. The prosecutor's argument that prison life did not resemble a

8    stereotype of deprivation was also a fair comment on the testimony of Dr. Grover at the penalty

9    phase, in which he had described the educational and vocational opportunities that prison inmates

10   may experience while incarcerated. *See* 23 RT A6148-54. The state court may have reasonably

11   concluded that these arguments were not misconduct and, therefore, that defense counsel had no

12   professional obligation to object to them.

13          Similarly, the state court may have reasonably found that the prosecutor did not commit

14   misconduct in his discussion of aggravating and mitigating factors and thus that defense counsel

15   was not deficient for failing to object to this portion of the argument. In state court, petitioner

16   argued that the prosecutor committed misconduct in arguing that certain statutory mitigating

17   factors were "[n]ot applicable" and that the mitigation evidence that was presented was not

18   compelling. LD II-A at 207-10; LD III-A at 32-33. The state court was reasonable in concluding

19   this argument was not misconduct. The prosecutor did not argue that the jury should give

20   aggravating weight to the absence of mitigating factors or misstate the statutory language

21   governing the jury's consideration and weighing of aggravating and mitigating factors. *See* 23

22   RT 6255-56, 6264-65; *cf. People v. Edelbacher*, 47 Cal. 3d 983, 1034-35 n.15 (1989); *People v.*

23   *Davenport*, 41 Cal. 3d 247, 289-90 (1985). It was reasonable for the state court to conclude that

24   petitioner's allegations, even if fully credited by a factfinder, did not make a prima facie showing

25   that defense counsel performed deficiently by failing to object to this portion of the prosecutor's

26   closing argument.

27          Finally, the state court could reasonably have concluded that petitioner had failed to make

28   a prima facie showing of ineffective assistance of counsel in defense counsel's failure to object to

50

1   the prosecutor's arguments that petitioner "had engaged in illegal sexual conduct with a minor"

2   and was a drug trafficker.  ECF No. 365 at 42.[8]  As to the former allegation, in state court

3   petitioner argued that the prosecutor had improperly "implied that [petitioner] was guilty of

4   statutory rape."  LD II-A at 203; *see* LD III-A at 32-33.  In fact, the portion of the argument in

5   question only obliquely suggested petitioner had committed a crime and, instead, primarily

6   emphasized that, even as a young man, petitioner seemed keen to take advantage of others more

7   vulnerable than he.  23 RT 6259.  This was a fair comment on the evidence presented by

8   petitioner about his romantic relationships, including the testimony from defense witness Denise

9   Nichol in which she reported that she had dated petitioner when she was sixteen years old and he

10  was in his early twenties.  *See* 22 RT 6042-51; 4 CT 1107 (listing petitioner's date of birth).  The

11  state court could reasonably have concluded that the prosecutor's comment did not constitute

12  misconduct and that defense counsel was reasonable in refraining to object to it.

13          Similarly, the state court could reasonably have found that defense counsel were not

14  ineffective in failing to object to that portion of the prosecutor's argument wherein he described

15  petitioner as "a drug trafficker and . . . runner," based on petitioner's "own testimony during the

16  guilt phase."  24 RT 6318.  To the extent the prosecutor's argument implied petitioner had

17  committed the crime of drug trafficking, it was improper.  *See Hines*, 15 Cal. 4th at 1062.  The

18  state court could have reasonably concluded, however, that reasonable defense counsel may have

19  opted not to object to it, to avoid calling further attention to the testimony from petitioner on

20  which the argument was based.  The state court could also have reasonably concluded that, even

21  if defense counsel should have objected, there was no prima facie showing of prejudice, given

22  how fleeting the reference was and in light of the other, compelling evidence in aggravation.

23          In sum, the state court's summary denial of this claim on habeas corpus is entitled to

24  ─────────────────

25          [8] Petitioner had previously pled that the prosecutor had used additional improper epithets
    for him during closing argument, *see* ECF No. 74 at 69-70; LD III-A at 32-33; LD II-A at 203-05,

26  but in the instant briefing has apparently abandoned all bases for this subclaim save the
    allegations that the prosecutor's use of the drug trafficker and sexual predator descriptors were

27  improper.  *See* ECF No. 365 at 42; *see generally Walker v. Martel*, 709 F.3d 925, 939 (9th Cir.
    2013) (under 28 U.S.C. § 2254(d), petitioner bears "the burden to demonstrate that 'there was no

28  reasonable basis for the state court to deny relief'" (quoting *Richter*, 562 U.S. at 98)).

1   deference, as it accords with clearly established federal law governing claims of ineffective

2   assistance of counsel.  The undersigned therefore recommends claim B(9) be dismissed.

3   **CLAIM B(10)**

4         In Claim B(10), petitioner alleges that his trial counsel performed deficiently by failing to

5   object to instances of purported juror misconduct.  ECF No. 74 at 70-73.  Specifically, petitioner

6   alleges that defense counsel unreasonably and prejudicially failed to object to one juror's

7   consultations with her pastor, the infection of the jury with information that Juror Yoder had

8   believed he had been followed by a witness, and Juror Craig's receipt of information about the

9   trial via the local newspaper.  *Id.*  He raised some of these allegations as assignments of error on

10  direct appeal to the California Supreme Court, which denied the claim on the merits.   *See* LD II-

11  C at 22-26; LD II-E at 60; LD II-H.  Petitioner raised other portions of this claim in his first and

12  second petitions for writ of habeas corpus in state court, which the California Supreme Court

13  denied summarily on the merits, in both proceedings.  LD III-A at 38, 61-62; LD IV-A at 69-70;

14  LD III-F; ECF No. 76.  The undersigned finds that the state court's denial of this claim was

15  reasonable and is entitled to deference.

16                *A.  Alleged Misconduct of Juror Craig*

17        The state court did not act contrary to, or unreasonably apply, clearly established federal

18  law in summarily denying petitioner's subclaim that trial counsel performed ineffectively by

19  failing to make an "effort to prevent Juror Craig from reading the newspaper [during trial]" and

20  by failing to "inquire whether Juror Craig had discussed the contents of the articles with other

21  jurors."  ECF No. 365 at 38-39; *see* ECF No. 74 at 72-73.  He argues that he was prejudiced

22  because, by virtue of defense counsel's inaction, "the jurors became exposed to factually

23  unfounded fears of Mr. Hines at precisely the time they were considering his fate in the face of

24  the prosecutor's argument that he was and would remain a danger to society if allowed to remain

25  incarcerated," as the extrajudicial information at issue was "directly relevant to whether Mr.

26  Hines posed a continuing threat to society from jail."  ECF No. 365 at 40; *see* ECF No. 74 at 72-

27  73.

28        In his first petition for writ of habeas corpus in state court, petitioner alleged that Juror

1    Craig "read the Metro section of the Sacramento Bee nearly every day, as he sat in the jury box . .

2    . [which] contained daily articles on Mr. Hines' case and trial," including information that was

3    not in evidence and that was prejudicial to petitioner.  LD III-A at 38.  He alleged that trial

4    counsel was ineffective for failing to call this to the trial court's attention, to determine whether

5    Mr. Craig had been exposed to prejudicial information, and to determine whether he had

6    communicated any such information to other jurors.  *Id.*  He cited no evidentiary or record-based

7    support for his factual allegations.  *See Id.*; LD III-E at 27.[9]  He reasserted these allegations in his

8    second petition for writ of habeas corpus in state court.  LD IV-A at 69-70; *see generally* LD IV-

9    B.

10           This court has previously found that petitioner had failed to make a prima facie showing

11    in state court that Juror Craig had, in fact, committed the misconduct alleged.  ECF No. 258 at 18

12    (recommending dismissal of claim G.3); *see* ECF No. 287 (adopting magistrate judge's

13    recommendation).  Petitioner's allegations were no more robust when presented to the state court

14    in the context of the instant claim of ineffective assistance of counsel.  To meet his burden in state

15    court, petitioner had to make not only allegations sufficient to support a claim of constitutional

16    error, but also make some showing that "he had sufficient evidence for a reasonable fact finder to

17    conclude" that he could prove his claim.  *Nunes*, 350 F.3d at 1054-55; *see also Pinholster*, 563

18    U.S. at 188 n.12 (in reviewing habeas corpus petitions, California Supreme Court "does not

19    accept wholly conclusory allegations"); *People v. Duvall*, 9 Cal. 4th 464, 474 (1995) (habeas

20    corpus petition may be dismissed if allegations are conclusory).  Here, petitioner did not make a

21    prima facie showing of deficient performance in state court; instead, he made conclusory

22    allegations that defense counsel was aware of Juror Craig having committed misconduct, but no

23    even minimal evidentiary showing to demonstrate that he could prove such misconduct had

24    occurred or that defense counsel had been aware of it.  Similarly, petitioner failed to make a

25    prima facie showing of prejudice: he made no showing of what information Juror Craig had been

26    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27           [9] The trial record indicates that, during the course of the trial court's investigation into
       telephone calls from petitioner to some jurors prior to commencement of the penalty phase, Juror
       Craig testified that his wife had read a newspaper article about the trial in which the calls were

28    mentioned.  21 RT 5749-50.

1   exposed to, let alone that it was prejudicial to petitioner, such that defense counsel's inaction was

2   reasonably probable to have affected the jury's penalty verdict.  Certainly, there was nothing in

3   the record before the state court to substantiate the argument that petitioner advances now, that

4   Juror Craig was exposed via the Sacramento *Bee* to information that related to the prosecutor's

5   theory of petitioner's future dangerousness.  *See* ECF No. 365 at 40.  The California Supreme

6   Court was reasonable under clearly established federal law in concluding that petitioner had made

7   no prima facie showing of his right to relief on this subclaim.

8                    *B.   Alleged Misconduct of Juror Upton*

9            In his amended petition, petitioner alleges that trial counsel performed ineffectively by

10  failing to object to one juror—Juror Upton—having talked to a religious advisor about capital

11  punishment during voir dire and during the penalty phase of the trial.  ECF No. 74 at 70.  He

12  raised the allegations concerning the juror's voir dire conduct in his direct appeal, which the

13  California Supreme Court denied in a reasoned opinion.  LD II-C at 22-26; LD II-E at 60; LD II-

14  H.  He raised some allegations concerning Juror Upton's penalty phase conduct in his first

15  petition for writ of habeas corpus in state court.  LD III-A at 60; LD III-E at 38.  The California

16  Supreme Court denied relief on that petition summarily on the merits.  LD III-F.  The

17  undersigned finds the state court's denials of the allegations comprising this claim to be

18  reasonable under clearly established federal law, in light of the record before the state court.

19           The California Supreme Court reasonably rejected petitioner's argument that defense

20  counsel was remiss in not requesting Juror Upton be dismissed after she disclosed that, during

21  voir dire, she had talked to a Bible school teacher at her church who informed her that he was

22  unsure of the church's position on capital punishment, but that the use of this penalty appeared

23  consistent with her church's teachings.  LD II-C at 22-23 (citing 1 RT 1936-37, 1941).  The state

24  court correctly observed that the record showed that the conversation between Juror Upton and

25  the religious leader "occurred weeks before the beginning of trial and brought no extrinsic

26  materials into the deliberative process" and, therefore did not reflect misconduct.  *Hines*, 15 Cal.

27  4th at 1056-57.  This accords with both California law and clearly established federal law, which

28  require, for juror misconduct claim to lie, evidence that the juror sought out external information

1    after having been instructed not to do so and having taken an oath agreeing to that instruction, i.e.,

2    after empanelment.  *See Mattox v. United States*, 146 U.S. 140, 150 (1892) ("Private

3    communications, possibly prejudicial, between *jurors* and third persons, or witnesses, or the

4    officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their

5    harmlessness is made to appear." (italics added)); *In re Hamilton*, 20 Cal. 4th 273, 305 (1999), *as*

6    *modified* (June 30, 1999) ("A sitting juror commits misconduct by violating her oath, or by failing

7    to follow the instructions and admonitions given by the trial court.  A lay juror cannot be

8    expected to conform to standards of behavior of which she has not been informed, or to make

9    unguided personal judgments about what the court needs to know.  Her failure to do so cannot

10   place at risk a presumptively valid verdict.").  In light of this, the state court was reasonable in

11   concluding that petitioner had not shown that defense counsel was deficient for failing to seek

12   Juror Upton's dismissal during voir dire due to her having communicated with a church leader

13   prior to empanelment.

14          The California Supreme Court may also reasonably have rejected, in habeas corpus

15   proceedings, petitioner's allegation that defense counsel were deficient for not seeking Juror

16   Upton's dismissal after she allegedly communicated with non-jurors during deliberations.  In state

17   court, petitioner neither cited any evidence supporting this factual allegation nor otherwise

18   indicated that he would be able to prove that, in fact, Juror Upton had engaged in such extrinsic

19   communications—and petitioner offered no evidence that defense counsel knew or reasonably

20   should have known about those communications.  *See* LD III-A at 60; LD III-E at 38.  The state

21   court may have reasonably denied relief on this conclusory, apparently unsupported allegation.

22   *See Nunes*, 350 F.3d at 1054; *Karis*, 46 Cal. 3d at 656; *see generally Richter*, 562 U.S. at 105.

23             *C.  Trial Court's Inquiry Relating to Dismissal of Juror Yoder*

24          Finally, petitioner alleges that defense counsel performed deficiently in failing to seek

25   additional remedies from the trial court relating to the dismissal of Juror Yoder.  ECF No. 74 at

26   70-72.  During the penalty phase, Juror Yoder reported to the trial court that he believed he had

27   been followed by a defense witness at some point a few weeks earlier.  22 RT 5936-40.  The trial

28   court questioned Juror Yoder outside the presence of the other jurors and dismissed him.  22 RT

1    6036-37.  The court then questioned two jurors—Jurors Kambas and Peterson—to whom Juror

2    Yoder had reportedly also told of this incident, outside of the presence of the remaining jurors.

3    22 RT 6076-79.  They each testified that they did not share Juror Yoder's concerns about the

4    incident that he had described to them.  22 RT 6076-77.  In response to defense counsel's

5    questions, they testified that they were not concerned that petitioner had anything to do with the

6    event Juror Yoder had described to them.  22 RT 6077-79.  The trial court did not dismiss Jurors

7    Kambas or Peterson, but advised them that it believed Juror Yoder had been mistaken about

8    having been followed by the witness.  22 RT 6076, 6078-79.

9            On direct appeal, petitioner argued that the trial court's inquiry was defective, as it did not

10   include questioning the remaining jurors about whether Jurors Kambas or Peterson had conveyed

11   Juror Yoder's description of the incident to any of them.  LD II-A at 178-79; LD II-E at 58-59.

12   The California Supreme Court denied the claim on the merits, holding that there was nothing in

13   the record to suggest Juror Yoder's observations or fears had been communicated to any other

14   jurors, aside from Jurors Kambas and Peterson, including Jurors Kambas and Peterson's

15   testimonies concerning their own responses to Juror Yoder's statements to them.  *Hines*, 15 Cal.

16   4th at 1055.  As such, the court concluded that the trial court's inquiry was adequate.  *Id.*  In his

17   second habeas corpus petition in state court, petitioner alleged that his trial counsel were

18   ineffective for not requesting the trial court to conduct a more thorough inquiry into the possible

19   infection of the entire jury by Juror Yoder's comments.  LD IV-A at 61-62, 72.  The California

20   Supreme Court denied this subclaim summarily, on the merits, and the undersigned concludes

21   that this denial is entitled to deference.

22           The state court may have reasonably concluded that petitioner had not made a prima facie

23   case of deficient performance.  When alerted to Juror Yoder's concerns, the trial court

24   appropriately questioned him outside of the presence of other jurors, including asking if he had

25   discussed the event and his concerns about it with any of the other jurors.  The trial court then

26   questioned the jurors whom Juror Yoder identified and both, upon questioning from the court and

27   defense counsel, indicated that they had not shared Juror Yoder's concerns.  There was nothing

28   on the record, therefore, suggesting that Jurors Yoder, Kambas, or Peterson had communicated

56

1    anything about this incident to any other member of the jury.  In light of this, the state court may

2    reasonably have concluded that petitioner had not shown that all reasonable defense counsel

3    would have pursued a more comprehensive inquiry or, if counsel had requested it, that the trial

4    court would have undertaken it.  *See United States v. Berry*, 627 F.2d 193, 197 (9th Cir. 1980)

5    ("The decision to conduct a hearing into alleged jury misconduct and to determine its extent and

6    nature is discretionary."); *People v. Avila*, 38 Cal. 4th 491, 604 (2006) ("The hearing [into

7    suspected juror misconduct] should not be used as a 'fishing expedition' to search for possible

8    misconduct, but should be held only when the defense has come forward with evidence

9    demonstrating a strong possibility that prejudicial misconduct has occurred."); *People v.

10   DeSantis*, 2 Cal. 4th 1198, 1235 (1992) (no hearing required because "nothing in the record to

11   suggest that any material matter was overheard").

12       The state court could also have reasonably denied relief on this subclaim due to lack of a

13   showing of prejudice, i.e., that absent trial counsel's deficiency, there is a reasonable probability

14   the outcome of the proceeding would have been more favorable to petitioner.  In state court,

15   petitioner tendered no evidence and made no factual allegations supporting this prong of

16   *Strickland*.  *See generally* LD IV-A; LD IV-E.  He made no showing of what the trial court would

17   have learned had it questioned the remaining jurors, let alone that it would have learned that one

18   or more of them had harbored prejudicial bias against petitioner unlikely to have been cured by

19   instructions.  *See Strickland*, 466 U.S. at 691-92; *see generally Remmer v. United States*, 347 U.S.

20   227, 230 (1954) (where juror receives extrinsic information during trial, prejudice depends on the

21   nature of the information, the circumstances of its receipt, and other facts suggestive of its impact

22   on the juror).  On the record before it, therefore, the state court may have reasonably concluded

23   that petitioner had not met his burden to show that he could prove his entitlement to relief on this

24   claim.  *See Strickland*, 466 U.S. at 695-97; *Nunes*, 350 F.3d at 1054; *Duvall*, 9 Cal. 4th at 474.

25       For these reasons, the undersigned recommends that respondent's motion be granted as to

26   claim B(10).

27   **CLAIM F(5)(C)**

28       In Claim F(5)(C), petitioner alleges that his penalty phase was rendered fundamentally

unfair by that portion of the prosecutor's closing argument wherein he quoted from a book that was not in evidence. ECF No. 74 at 113-14. Petitioner raised this argument on direct appeal, LD II-A at 202-13, which the California Supreme Court denied in a reasoned opinion. *Hines*, 15 Cal. 4th at 1063. Respondent moves for summary judgment on the grounds that the state court's denial of the claim is entitled to deference under section 2254(d), or, alternatively, that the claim fails on its merits as lacking prejudice. ECF No. 351 at 45. The undersigned agrees and recommends dismissal of the claim.

During his penalty-phase closing argument, the prosecutor urged the jury to recall the victims when weighing the aggravating nature of the capital homicides and, in making this argument, quoted from a passage of an unidentified book:

> [MR. GILMOUR:] As a prosecutor, one of the things that concerns me is that we finish this long procedure almost four months now and we finish it on a note of concern about Gary Hines. It's almost like what's best for Gary Hines. And the victims in this case have been sort of shoved to the back. And to that extent as a prosecutor, I experience some frustration because we tend to lose sight of why the defendant is here. And I would like to mention an article which I came across in a book, the title is not important. It helped crystallize my concerns about the facelessness of our victims, their loss of identity.
>
> And I want to read this one section. The author—
>
> MR. HOLMES: Your Honor, I would object to this line of argument. I think it goes beyond those things that are arguable.
>
> THE COURT: What are you going to read?
>
> MR. GILMOUR: An article from a book, your Honor, about—
>
> THE COURT: No, that's permissible. I can show you authority for that within reason. I have no reason to grant an objection so far. Go ahead.
>
> MR. GILMOUR: The article proceeds as follows: "When one person kills another, there is immediate revulsion at the nature of the crime. But in a time so short as to seem indecent, to the members of the personal family, the dead person ceases to exist as an identifiable person. To those individuals in this community of good will and empathy, warmth and compassion, only one of the key actors in the drama remains with whom to commiserate and that is always the criminal. The dead person ceases to be a part of everyday reality.
>
> MR. MACIAS: Your Honor, I renew the objection.

58

1          THE COURT: Renewal is noted and overruled.

2          MR. GILMOUR: The dead persons cease to be a part of everyday
           reality, ceases to exist.  She is only a figure in a historic event.  We
3          inevitably turn away from the past toward the ongoing reality.  And
           the ongoing reality is the criminal, trapped, anxious, desperate,
4          belligerent, heat usurps the compassion that justifiably belongs to
           his victim.  He steals the victim's moral constituency along with her
5          life." End quote.

6

7   23 RT 6263-64.  On direct appeal, petitioner argued that this argument was improper because it

8   referred to facts not in evidence.  LD II-A at 206-07; *see also* LD II-E at 72-77.

9          The California Supreme Court denied relief the merits, holding,

10         Although defendant claims that the passage injected evidence
           outside the record into the closing argument, this was not the case.
11         Rather, the passage expressed the view that at a murder trial the
           victim is often forgotten because the focus of the trial is on the
12         defendant.  The prosecutor used the passage as part of his argument
           that the jury should not forget the victims in this case or what
13         defendant did to them.  The trial court did not abuse its discretion
           when it permitted the prosecutor to read the passage in question.
14         (See *People v. Rowland* (1992) 4 Cal. 4th 238, 277, 14 Cal.Rptr.2d
           377, 841 P.2d 897 & fn. 17 [rejecting claim that by reading the
15         same quotation at issue here, the prosecutor "suggested that the
           'judicial system unfairly protects the defendant at the expense of
16         ignoring the victim'"].)

17  *Hines*, 15 Cal. 4th at 1063 (footnote omitted).

18         The California Supreme Court's rejection of this claim was not contrary to or an

19  objectively unreasonable application of clearly established federal law.  Prosecutorial misconduct

20  violates the federal constitution only when the misconduct "so infected the trial with unfairness as

21  to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168,

22  181 (1986).  This standard is stringent.  *See Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006)

23  ('[T]he narrow standard of due process,' in contrast to the 'broad exercise of supervisory power' .

24  . . is not appropriate in situations where, for example, the prosecutor's conduct 'did not

25  manipulate or misstate the evidence' or 'implicate other specific rights of the accused such as the

26  right to counsel or the right to remain silent.'); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir.

27  2000) ("This standard allows a federal court to grant relief when the state-court trial was

28  fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of

1   constitutional magnitude.").  In *Darden*, for example, in closing argument the prosecutor

2   described the defendant as an "animal," opined that the defendant should only be allowed out of a

3   jail cell if he were on a leash, and shared his wish that the defendant was "sitting here with no

4   face, blown away by a shotgun."   477 U.S. at 181-83 nn.11 & 12.  The Supreme Court held that

5   these statements—although improper—did not deprive the defendant of a fair trial, in light of the

6   instruction by the court that the arguments made by counsel were not evidence and in light of the

7   substantial evidence of the defendant's culpability.  *Id.* at 181-83; *see also Donnelly v.*

8   *DeChristoforo*, 416 U.S. 637, 647 (1974) (holding no due process violation by prosecutor's

9   improper closing argument, because court instructed the jury that the remark was not evidence

10   and in light of the substantial evidence of guilt).

11        Here, the state court did not act contrary to, or unreasonably apply, contemporaneous

12   Supreme Court precedent when it determined that the portion at issue of the prosecutor's closing

13   argument was not misconduct.  The prosecutor's comments arguably exhorted the jury not to

14   forget the homicide victims when considering the circumstances of the crime as an aggravating

15   factor, a sentiment that the Supreme Court has specifically held does not offend due process in a

16   capital trial.  *See Payne v. Tennessee*, 501 U.S. 808, 823-26 (1991) (victim impact evidence

17   admissible in the penalty phase of a capital trial because the jury's consideration of "each victim's

18   'uniqueness as an individual human being'" "allow[s] the jury to bear in mind th[e] harm [caused

19   by the homicide] at the same time as it considers the mitigating evidence introduced by the

20   defendant").  The prosecutor's comments were not analogous, as petitioner claims, to cases where

21   the prosecutor has committed misconduct by invoking religious authorities in closing argument.

22   *See* ECF No. 365 at 43 (citing *People v. Sandoval*, 4 Cal. 4th 155, 193-94, 841 P.2d 862 (1992),

23   *as modified on denial of reh'g* (Feb. 10, 1993)).  In those cases, the gravamen of the misconduct

24   is the prosecutor's suggestion that there is a moral authority superseding the law that supports a

25   particular verdict.  *See Sandoval*, 4 Cal. 4th at 193; *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th

26   Cir. 2000).  Here, however, the prosecutor's argument did not identify the source of the quote,

27   thereby failing to suggest that, as source, it had any particular authority, let alone an authority

28   somehow greater than the court's.  And although the prosecutor's argument purported to quote

60

1   from an article, it was reasonable for the state court to view this not as referencing facts not in

2   evidence, *see* LD II-A, but rather as a rhetorical vehicle for articulating a lawful conceptualization

3   of the relevance of the victims' loss as part of the aggravating evidence.  *See People v. Wharton*,

4   53 Cal. 3d 522, 567 (1991), *as modified on denial of reh'g* (July 9, 1991) ("It is . . . clear that

5   counsel during summation may state matters not in evidence, but which are common knowledge

6   or are illustrations drawn from common experience, history or literature." (internal citation

7   omitted)).  In sum, it was not unreasonable for the state court to conclude that the comments in

8   question were not misconduct and did not infect the trial with unfairness.  The state court's denial

9   of this claim is therefore entitled to deference.  *See* 28 U.S.C. § 2254(d).

10          Respondent also moves for summary judgement on the alternative grounds that the

11   comments, even if improper, did not prejudice petitioner, and thus this claim may be denied on its

12   merits.  ECF No. 351 at 45, 48.  Petitioner raises virtually no opposition to these grounds for

13   summary judgement, *see* ECF No. 365 at 41-46, and the undersigned finds summary judgement

14   proper on this alternative basis, as well.

15          Where the court has found that the prosecutor committed misconduct so grave as to

16   constitute a due process violation, habeas relief may only be granted where the record

17   demonstrates that the misconduct "had substantial and injurious effect or influence in determining

18   the jury's verdict," under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  *See Shaw v. Terhune*,

19   380 F.3d 473, 478 (9th Cir. 2004); *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002);

20   *Bains v. Cambra*, 204 F.3d 964, 976-78 (9th Cir. 2000).  In assessing prejudice under *Brecht*,

21   courts often consider the strength of the evidence supporting the verdict, the egregiousness of the

22   misconduct, and whether any of the court's instructions may have cured the misconduct.  *See*

23   *Deck v. Jenkins*, 814 F.3d 954, 985-86 (9th Cir. 2016); *Shaw*, 380 F.3d at 480; *Fields*, 309 F.3d at

24   1109.  Here, even accounting for the jury's struggle in reaching their penalty verdict, the record

25   does not support a finding that the prosecutor's comments had substantial and injurious effect or

26   influence on jury's verdict.  The comments at issue were brief, comprising only less than one

27   transcript page, within a much longer argument.  *Compare* 23 RT 6263-64 *with* 23 RT 6249-73

28   *and* 24 RT 6313-24.  They were made in the midst of the prosecutor's initial closing argument,

prior to defense counsel's closing argument, the prosecutor's rebuttal argument, and the defense's

rebuttal argument, placing this case in contrast to those where the improper comments were

among the last things the jury heard before beginning deliberations. *See Baldwin v. Adams*, 899

F. Supp. 2d 889, 920 (N.D. Cal. 2012); *cf. Darden*, 477 U.S. at 181-83. The comments were at

most mildly inflammatory; although petitioner argues now that the comments "denigrate[d] any

request by [petitioner] for grace or compassion," ECF No. 365 at 41, the comments themselves

suggested no such denigration and were less inflammatory than other comments that the Supreme

Court has found unproblematic in a capital trial. *See Payne*, 501 U.S. at 814-16. Finally, at the

close of the penalty phase, the trial court instructed the jury that they should not harbor any

prejudice against petitioner and could consider mercy or sympathy towards him in reaching their

verdict; that the factors to consider included the circumstances of the crime and any circumstance

that supports a sentence less than death; that they should reach their verdict based on the evidence

presented; and that the arguments of counsel were not evidence. 4 CT 1032-34, 1036. Petitioner

offers no reason why any misconduct was not cured by these instructions, which the jury is

presumed to have followed. *See Comer v. Schriro*, 463 F.3d 934, 960-61 (9th Cir. 2006) (holding

that prosecutor's "dehumanizing" remarks did not deny defendant fundamentally fair trial where

prosecutor did not misstate or manipulate evidence and where court's specific admonishments

that lawyers' statements were not evidence "significantly limited any prejudice caused by the

prosecutor's remarks"); *see generally Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (juries are

presumed to follow the court's instructions). In light of the totality of this record, the

prosecutor's argument cannot be shown to have had substantial and injurious effect or influence

in determining the jury's penalty phase verdict, such that dismissal of this claim is proper. *See*

*Brown v. Davenport*, __ U.S. __, 212 L. Ed. 2d 463, 142 S. Ct. 1510, 1524 (2022); *Berghuis v.*

*Thompkins*, 560 U.S. 370, 389-90 (2010).

**CLAIM H(14)**

In Claim H(14), petitioner alleges that his rights to due process and to be free from cruel

and unusual punishment were violated by the trial court's failure "to ensure that the jury was

unanimous in finding which special circumstance justified its verdict that Mr. Hines be put to

1    death[,] [a]lthough the jury did unanimously find that three special circumstances were present at

2    the close of the guilt phase of the case as required by California law."  ECF No. 365 at 48; *see*

3    ECF No. 74 at 151-52.  Petitioner raised this claim on direct appeal, LD II-A at 221-22, which the

4    California Supreme Court denied on the merits.  *Hines*, 15 Cal. 4th at 1070-71.  The undersigned

5    concludes that that denial is entitled to deference under section 2254(d).

6         At trial, the prosecution alleged five special circumstances and, at the close of the guilt

7    phase, the jury returned verdicts finding each of the special circumstances true.[10]  4 CT 954.

8    After the penalty phase, the trial court gave the jury two possible verdict forms relative to the

9    homicide counts: one indicating a death sentence and one indicating a life sentence.  4 CT 1063;

10   *see* 4 CT 1069; 24 RT 6360.  The jury returned the verdict form electing a death sentence.  4 CT

11   1068-69.  This verdict form, however, did not indicate which special circumstance or

12   circumstances the jurors had found "justified" the death sentence.  ECF No. 365 at 48; *see* 4 CT

13   1069.  This omission, per petitioner, resulted in a death verdict that is unreliable, in contravention

14   of the protections of the Eighth Amendment and due process clause of the Fourteenth

15   Amendment.  ECF No. 365 at 48-50; *see* ECF No. 74 at 151-52.

16        The California Supreme Court did not act unreasonably or contrary to clearly established

17   federal law in rejecting this claim for failing to demonstrate a federal constitutional violation, and

18   its denial was not premised on an unreasonable fact determination.  *See Hines*, 15 Cal. 4th at

19   1070-71.  The United States Supreme Court has long held that neither the Eighth Amendment nor

20   due process principles require a capital sentencing jury to elucidate the basis of their verdict via

21   their verdict form, so long as the state's sentencing scheme narrows who is death eligible,

22   provides guidance to the jurors in selecting the penalty verdict, and enables the jury to consider

23   all mitigating evidence.  *See Gregg v. Georgia*, 428 U.S. 153, 189-98 (1976).  The Supreme Court

24   has specifically approved California's statutory scheme under this standard.  *Pulley v. Harris*, 465

25   _____

26        [10] Specifically, the jury found that the murder of Donna Roberts occurred during the
     commission of a burglary, that the murder of Kathryn Roberts occurred during the commission of

27   a burglary, that the murder of Donna Roberts occurred during the commission of a robbery, that
     the murder of Kathryn Roberts occurred during the commission of a robbery, and that petitioner

28   committed multiple murders.  4 CT 954.

1   U.S. 37, 51-53 (1984); *see also Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002);

2   *Mayfield v. Woodford*, 270 F.3d 915, 924 (9th Cir. 2001).  There is no Supreme Court authority

3   supporting petitioner's argument that either the Eighth Amendment or due process clause require

4   the jury to make specific findings, in their penalty phase verdict, as to which special circumstance

5   or circumstances informed their decision that death was the proper punishment.  *See Williams v.*

6   *Calderon*, 52 F.3d 1465, 1484-85 (9th Cir. 1995); *Harris v. Pulley*, 692 F.2d 1189, 1195 (9th Cir.

7   1982), *rev'd on other grounds*, 465 U.S. 37 (1984).  Accordingly, petitioner has not shown that

8   the California Supreme Court's rejection of this claim reflected a decision that was contrary to, or

9   an unreasonable application of, clearly established federal law, or was premised on an

10  unreasonable factual determination.  *See* 28 U.S.C. § 2254(d).  The undersigned therefore

11  recommends claim H(14) be dismissed.

12  **CLAIM H(15)**

13          In Claim H(15), petitioner alleges that the trial court committed constitutional error by

14  minimizing to the jury their sense of responsibility for the penalty decision.  ECF No. 74 at 152-

15  54.  He raised this claim on direct appeal, LD II-A at 222-28, which the California Supreme Court

16  denied in a reasoned opinion.  *Hines*, 15 Cal. 4th at 1071-75.  The undersigned concludes that that

17  denial is entitled to deference under section 2254(d).

18          The state record reflects that, during penalty phase deliberations, the jury sent a note to the

19  trial court with three questions:

20          1. If the jury finds that the penalty should be death, what sentence
            would apply if the death penalty law is ruled unconstitutional or if
21          changed by voters as an initiative?

22          2. Can our penalty decision be modified through any part of the
            appeal process?
23
24                  a) Can a death penalty be reduced to a penalty of life
                    imprisonment without possibility of parole?

25                  b) Can a penalty of life imprisonment without possibility of
                    parole be reduced to a lesser term of imprisonment?
26
27          3. What happens if the jury becomes hopelessly deadlocked?

28                  a) Does the judge make a penalty decision?

64

b) Is a mistrial declared?  (And what will happen if a mistrial is declared)

c) Other possibility?

4 CT 1066; *see Hines*, 15 Cal. 4th at 1071.  After conferring with the prosecutor and defense counsel, the court responded to the first and second questions, electing not to answer the third per California case law.  24 RT 6364-99.  The court's response to the jury was lengthy and elaborate. 24 RT 6388-99.  In response to the first question, the court described that, historically, there had been an instance where the Supreme Court rendered a decision that had resulted in "wiping out" the death penalty for those persons who had been sentenced under statutes that the Supreme Court had held were infirm.  24 RT 6395.  The court also described that, in contrast, when the California statute governing the death penalty has been changed by voter initiative, that had not affected the sentences of persons sentenced under the earlier law.  24 RT 6396.  The court concluded this exposition by emphasizing that the jury should not speculate or base their verdict on these types of concerns, but instead should render the verdict that they considered apt under the instructions that they had been given.  24 RT 6397.

In response to the second question, the court stated that "[t]he framers of our present law have attempted in as strongly as they could within constitutional limits, to indicate that . . . when one of those penalties is imposed, is ordered, it shall be carried out," with two possible exceptions.  24 RT 6389.  These exceptions reflected that it was "theoretically possible" that the California Supreme Court could overturn the jury's sentence by announcing a new principle of law in petitioner's case, or that the Governor could pardon the petitioner or commute his sentence.  24 RT 6390-93.  After explaining these possibilities, the court, again and at length, urged the jury not to speculate on the likelihood of either one coming to pass in petitioner's case and to only render a sentencing decision per the evidence and instructions they had received.  24 RT 6393-94.  The court repeated this admonition at the conclusion of his remarks, after explaining that the court could not provide an answer to the third question from the jury.  24 RT 6397-99.

On direct appeal, petitioner argued that the trial court's comments were improper because

1   they minimized the jury's sense of responsibility for the sentencing decision.  LD II-A at 222-28

2   (citing *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985)).  The California Supreme Court

3   rejected this argument on the merits, finding that the trial court's response to the jury's questions

4   was accurate and that the court had repeatedly instructed the jury not to speculate or to base their

5   decision on the possibility of future actions by others.  *Hines*, 15 Cal. 4th at 1073-74.  The

6   California Supreme Court found distinguishable cases where the trial courts had provided

7   inaccurate responses to the jury about the possibility of the defendant's future parole eligibility

8   and cases where the trial court had sua sponte informed the jury about the Governor's

9   commutation power.  *Id.*  The California Supreme Court held that, on the whole, the trial court's

10  comments, while unduly lengthy, did not inappropriately minimize the jury's sense of

11  responsibility for their sentencing decision and did not inaccurately describe the post-trial

12  processes implicated by the jury's questions.  *Id.* at 1073-75.

13          The California Supreme Court's decision accorded with contemporaneous clearly

14  established federal law.  In *Caldwell*, 472 U.S. 320, the Supreme Court held that a capital

15  defendant's Eighth Amendment rights had been violated when, in penalty phase closing

16  argument, the prosecutor emphasized the role of appellate review in death penalty cases and

17  urged the jurors to view their verdict as not the "final decision" in the case.  472 U.S. at 325-26;

18  *see* ECF No. 365 at 50-52 (identifying *Caldwell* as the clearly established federal law governing

19  this claim); ECF No. 74 at 152-53 (citing only *Caldwell*).  The Supreme Court held that "it is

20  constitutionally impermissible to rest a death sentence on a determination made by a sentencer

21  who has been led to believe that the responsibility for determining the appropriateness of the

22  defendant's death rests elsewhere."  *Id.* at 328-29.  Under this standard, the prosecutor's comment

23  in *Caldwell* was unlawful because it was "inaccurate, both because it was misleading as to the

24  nature of the appellate court's review and because it depicted the jury's role in a way

25  fundamentally at odds with the role that a capital sentencer must perform" and because it

26  suggested a death sentence was proper for reasons that were "not linked to any arguably valid

27  sentencing consideration[,] [as the fact] [t]hat appellate review is available to a capital defendant

28  sentenced to death is no valid basis for a jury to return such a sentence if otherwise it might not."

1 | *Id*. at 336.

2 |       After *Caldwell*, the Supreme Court emphasized that *Caldwell*'s holding was limited to

3 | situations in which the jury had been given inaccurate or misleading information.  In *Darden*, 477

4 | U.S. at 184, n.15, the Supreme Court explained that, "*Caldwell* is relevant only to certain types of

5 | comment—those that mislead the jury as to its role in the sentencing process in a way that allows

6 | the jury to feel less responsible than it should for the sentencing decision."  *See Romano v.*

7 | *Oklahoma,* 512 U.S. 1, 9 (1994) (quoting same).  A few years later, the Supreme Court reiterated

8 | that "if the challenged instructions accurately described the role of the jury under state law, there

9 | is no basis for a *Caldwell* claim.  To establish a *Caldwell* violation, a defendant necessarily must

10 | show that the remarks to the jury improperly described the role assigned to the jury by local law."

11 | *Dugger v. Adams*, 489 U.S. 401, 407-08 (1989); *see Hendricks v. Vasquez*, 974 F.2d 1099, 1108

12 | (9th Cir. 1992), *as amended on denial of reh'g* (Oct. 29, 1992).

13 |       Here, petitioner does not argue that the trial court's statements to the jury were inaccurate,

14 | *see* ECF No. 365 at 50-52, and the California Supreme Court found them to be an accurate

15 | description of California law, a determination to which this court must defer.  *Hines*, 15 Cal. 4th

16 | at 1071-74; *see Bradshaw*, 546 U.S. at 76.  Under clearly established federal law at the time of

17 | the state court adjudication, this was fact was fatal to petitioner's claim, as no *Caldwell* claim

18 | could lie where the comments at issue had accurately described relevant state law.  *See Romano*,

19 | 512 U.S. at 9; *Dugger*, 489 U.S. at 407-08; *Darden*, 477 U.S. at 184, n.15.  Moreover, review of

20 | the entirety of the trial court's statements to the jury indicates that the comments did not

21 | implicitly contravene state law by suggesting, as in *Caldwell*, that the jury's death verdict would

22 | be merely advisory or would reflect only a "preliminary step toward the actual determination of

23 | the appropriateness of death—a determination which would eventually be made by others and for

24 | which the jury was not responsible."  *See Caldwell*, 472 U.S. at 336.  Here, the trial court's

25 | statements described the possibility of a post-trial change in petitioner's sentence as a remote or

26 | theoretical possibility and repeatedly exhorted the jury not to consider these possibilities when

27 | rendering their verdict, and instead to base their verdict on the instructions they had received.  24

28 | RT 6388-99.  It was reasonable for the California Supreme Court to have concluded that these

1   comments did not minimize the jury's sense of responsibility for their verdict under *Caldwell* or,

2   more broadly, under the Eighth Amendment.

3        The state court's determination, therefore, was not contrary to nor an unreasonable

4   application of clearly established federal law and its denial of this claim is entitled to deference.

5   *See* 28 U.S.C. § 2254(d)(1).[11]  The undersigned recommends that claim H(15) of the Amended

6   Petition be dismissed.

7   **CLAIM L(6)**

8        In Claim L(6), petitioner alleges that after the date of the imposition of his sentence, the

9   California Penal Code was amended to allow for lethal injection as a means of execution, where it

10  previously had only allowed for lethal gas.  This amendment, per petitioner, constitutes an ex post

11  facto law that cannot be applied to him.  ECF No. 74 at 165.  Petitioner raised this claim in his

12  first petition for writ of habeas corpus before the California Supreme Court.  LD III-A at 68; *see*

13  *also* LD III-E at 39-40.  The California Supreme Court summary denied relief on the merits,

14  which the undersigned finds was neither contrary to, nor an unreasonable application of, clearly

15  established federal law.  *See* 28 U.S.C. § 2254(d)(1).

16       Under clearly established federal law at the time of the state court adjudication, the ex

17  post facto clause forbids application against a criminal defendant of "any statute . . . which makes

18  more burdensome the punishment for a crime, after its commission."  *Beazell v. Ohio*, 269 U.S.

19  167, 169-70 (1925); *see also Collins v. Youngblood*, 497 U.S. 37, 43 (1990) ("Legislatures may

20  not retroactively . . . increase the punishment for criminal acts.").  A change in the manner of

21  execution may reflect an ex post facto violation if the new method is less humane than that

22  utilized at the time the defendant committed the capital crime.  *Weaver v. Graham*, 450 U.S. 24,

23  32 n.17 (1981); *Malloy v. South Carolina*, 237 U.S. 180, 185 (1915); *see Poland v. Stewart*, 117

24  F.3d 1094, 1105 (9th Cir. 1997); *Miller v. Parker*, 910 F.3d 259, 261 (6th Cir. 2018).

25  _____

26       [11] Petitioner does not argue that the state court's determination was premised on an
    unreasonable factual determination, per section 2254(d)(2).  *See* ECF No. 365 at 50-52; *see*

27  *generally Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (petitioner bears burden "to
    demonstrate that 'there was no reasonable basis for the state court to deny relief'" under 28

28  U.S.C. § 2254(d) (quoting *Richter*, 562 U.S. at 98)).

1        In state court, petitioner made no showing that lethal injection was a less humane method

2   of execution than lethal gas, such that it was reasonable for the state court to find that petitioner

3   had not made a prima facie case.  In state court, petitioner argued only that "it remains unclear

4   whether lethal injection is a method which will prolong the pain of the condemned person prior to

5   losing consciousness," as contrasted with the use of lethal gas.  LD III-E at 40.  As evidentiary

6   support, petitioner asserted that "in California, as far as Petitioner is aware, there are no standards

7   for the type of lethal injection or for the manner in which it is to be applied," whereas such

8   standards did exist for the use of lethal gas in executions.  *Id.*  The state court could reasonably

9   have concluded that this failed to make even a prima facie showing that execution by lethal

10  injection was in fact a less humane, i.e., more burdensome, form of punishment than execution by

11  lethal gas.  *See Poland*, 117 F.3d at 1105 (where petitioner did not show the change in execution

12  method resulted in a more burdensome sentence, there was no ex post facto clause violation);

13  *Miller*, 910 F.3d 261 (holding petitioner had not shown an ex post facto violation where he only

14  showed that the change in execution method "potentially result[ed] in greater harm"); *Williams v.*

15  *Hobbs*, 658 F.3d 842, 848-49 (8th Cir. 2011) (petitioner had not shown an ex post facto violation

16  because he had only shown that it was possible the new execution protocol would be applied in a

17  manner that would cause him greater pain than the previous protocol); *see generally Fauber v.*

18  *Davis*, 43 F.4th 987, 1009 (9th Cir. 2022) (opinions of circuit courts "demonstrat[e] that

19  fairminded jurists" on the California Supreme Court "could reach the same conclusion that these

20  many courts have" on how to apply clearly established federal law).  The state court therefore was

21  reasonable if it denied relief on this basis.  *See* 28 U.S.C. § 2254(d)(1).  The undersigned

22  recommends that Claim L(6) be dismissed.

23  **CLAIM L(7)**

24        In Claim L(7), petitioner alleges that California's timeliness standards for capital habeas

25  corpus petitions are unconstitutional.  ECF No. 74 at 165-67.  Petitioner raised this claim in his

26  first petition for writ of habeas corpus in state court, LD III-A at 69-86, which the California

27  Supreme Court denied on the merits.  LD III-F.  The undersigned recommends dismissal of this

28  claim.

1     The Ninth Circuit has held that an allegation of "errors in the state post-conviction review

2  process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman*, 877 F.2d

3  26, 26 (9th Cir. 1989) (per curiam); *see Redd v. Guerrero*, 84 F.4th 874 (9th Cir. 2023) (due

4  process challenge to California's capital post-conviction review process raised under 42 U.S.C.

5  § 1983). Hence, this subclaim is recommended to be denied as not cognizable. *See Shinn v.*

6  *Ramirez*, 596 U.S. __, 142 S. Ct. 1718, 1739, 212 L. Ed. 2d 713 (2022) ("a federal habeas court

7  may *never* 'needlessly prolong' a habeas case"); *Shriro v. Landrigan*, 550 U.S. 465, 474 (2007)

8  (summary adjudication proper where further evidentiary development would never "entitle

9  [petitioner] to federal habeas relief").

10     The undersigned therefore recommends claim L(7) be dismissed.

70

1   Accordingly, IT IS HEREBY RECOMMENDED that:

2   1.   Respondent's Motion for Summary Judgment, ECF No. 351, be granted as to

3   Claims B(7), B(8), B(9), B(10); E; F(5)(C), H(14), H(15), L(6), and L(7); and

4   2.   Claims B(7), B(8), B(9), B(10), E; F(5)(C), H(14), H(15), L(6), and L(7) of the

5   Amended Petition for Writ of Habeas Corpus, ECF No. 74, be dismissed.

6   These findings and recommendations are submitted to the United States District Judge

7   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after

8   being served with these findings and recommendations, any party may file written objections with

9   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

10  Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also

11  address whether a certificate of appealability should issue and, if so, why and as to which issues.

12  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a

13  substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any

14  response to the objections shall be filed and served within thirty days after service of the

15  objections.  The parties are advised that failure to file objections within the specified time may

16  waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

17  1991).

18

19

20  IT IS SO ORDERED.

21

22  Dated:    February 22, 2024

23                                                JEREMY D. PETERSON
                                                 UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28

71